MRS. ALMA KOY v. WILLIAM SCHNEIDER, TAX COLLECTOR OF AUSTIN
COUNTY.

No. 3359.   Decided January 28, April 21, 1920.

(218 S. W., 479, 221 S. W., 880.)

### 1.—Constitutional Law—Women Voters at Primary Elections.

The Act of March 26, 1918, Laws, 35th Leg., 4th Called Session, ch. 34,
p. 61, giving to women the right to vote at primary elections, is not uncon-
stitutional as violative of art. 6, sec. 2, of the Constitution of Texas.   (Pp.
375-383).

### 2.—Same—Suffrage in Organizations.

Many organized groups, of the highest value for the promotion of the
general good, such as charitable and religious societies, mutual insurance
companies, etc., depend for the accomplishment of their purposes on the
exercise of a form of suffrage by their members which the law will recognize
and often enforce but do not fall within the purview of article 6 of the
Constitution, in which the words" qualified elector" and election are therefore
obviously not used in their broadest sense.   (P. 376).

### 3.—Political Parties—Primaries.

A political party is an organization of individuals for the purpose of
maintaining certain political principles or beliefs in the public policies of
the Government by control of the agences of government.   Waples v. Marrast,
108 Texas, 11.   (Pp. 376, 377).

### 4.—Same.

Political and governmental organizations distinguished,—and held, that
the suffrage article of the Constitution does not relate to suffrage within a
mere political organization as distinguished from a governmental one.   (P.
377).

### 5.—Same.

The right of suffrage as fixed by the Constitution can be changed or
restricted only by its amendment.   It is granted to all possessing the qualifi-
cations named, and if applicable to a primary election law, would render any
such law impossible, since necessarily excluding from its franchise all save
members of the political organization in question, though they possess all
the constitutional qualifications of electors.   (Pp. 377, 378).

### 6.—Same—Rulings in Other States.

The decisions in other states holding primary election laws valid under
similar constitutional provisions, on the ground that these do not apply to
such primary elections, are reviewed; also the rulings in various States that
such constitutional restrictions apply only to elections provided for by their
constitutions, and not to those which are merely statutory.   Such rulings, if
not conclusive on the question, as the court incline to regard them, are at
least sufficient to raise serious doubts as to the applicability of the suffrage
provisions of our Constitution to primary elections, and to call for their
judicial construction.   (Pp. 379-381).

7.—Constitutional Law—Legislative and Executive Construction.

Courts will give weight to the construction previously given to the Constitution by the legislative and executive branches of the Government and decline to overturn same, unless clearly wrong. Brown v. Galveston, 97 Texas, 9, followed. Anderson v. Ashe, 62 Texas Civ. App., 262; Lane v. McElmore, 169 S. W., 1073, distinguished. Hamilton v. Davis, 217 S. W., 431, approved. (Pp. 381-383).

8.—Invading Rights of Electors.

The primary election law does not invade the rights secured to electors by article 6, section 2, of the Constitution. No elector is compelled to take part in the primary, nor is his legal right to vote as he may choose at the election following impaired, whatever may be the moral obligation imposed by the pledge required of him at the primary. (P. 383).

9.—Legislative Power.

The legislative power includes all the power which may be exercised by the people in the formation of laws against which there is no prohibition expressed or implied in the fundamental law. (P. 383).

ON MOTION FOR REHEARING.

10.—Primary Elections Distinguished from Governmental.

Primary elections perform no govermental function and are distinguishable therein from ordinary elections. Cases thereon reviewed. (Pp. 395, 396).

11.—Validity of Statute—Legislative Construction.

Due consideration and weight, although not necessarily conclusive force, should be given by the courts to construction placed by the Legislature upon the State Constitution; a statute is to be sustained unless its unconstitutionality is clear and unquestionable. (P. 396).

12.—Legislative Power.

Except as restrained by the organic law, the Legislature has full power to deal as it may see fit with the subject of suffrage. (P. 396).

13.—Executive Construction.

When a statute is ambiguous—open to construction—a construction given it by even the head of an executive department of the State Government will be followed and upheld by the courts unless clearly erroneous. (Pp. 401-405).

14.—Previous Judical Construction.

In enacting the present law the Legislature adopted and followed that classification of elections which the judical department in Waples v. Marrast and Bene v. Waples had previously made and applied to the primary election laws of 1913. (Pp. 404, 405, 427-432).

15.—Same.

The executive, legislative, and judicial construction heretofore given to article 5 of the Constitution and numerous decisions on similar constitutional provisions in other states are cited and reviewed to disprove the contention

that the statute can be held clearly repugant to such section and is not open to construction. (Pp. 401-425).

### 16—Constitutional Decisions of Other Statutes.

A statutory or constitutional provision borrowed from another State has commonly applied to it the same construction which it had received in that state before adoption here, and similar but subsequent decisions of the courts of those states are persuasive though not authoritative. (P. 410 et seq.).

### 17.—Construction—Strict or Liberal.

Remedial provisions in a statute or a constitution are to be liberally construed; but those merely limiting legislative power are subject to a stricter construction. (Pp. 454-457).

### 18.—Construction—Same Word in Different Connections.

A word will ordinarily receive the same construction in one article of a constitution which is to be given to it when used in another; but this rule is not a conclusive one (Aransas County v. Pasture Co., 108 Texas, 218); and the same word in different articles may be construed liberally in one case and more strictly in another, if the purpose and subject-matter to which it is applied so require. Ashford v. Goodwin, 103 Texas, 491, distinguished. (Pp. 457-460).

### DISSENTING OPINION.

### 19.—Dissenting Opinion.

Mr. Chief Justice PHILLIPS dissents from the rulings of the majority of the court upon the following grounds:

(1) The language of sec. 2, art. 6, of the Constitution is so simple and plain as not to admit of construction, and means that the qualifications which it prescribes shall be possessed by all voters at all public elections in the State which the Legislature has the power to establish. (Pp. 384, 387).

(2) The Legislature has no power to say what persons or classes of persons shall exercise the rights and privileges of members of the political parties of this State. (P. 386).

(3) One of the chief rights of the citizen is to associate himself with other citizens in a political party for the advancement of his political beliefs. As to how a political party shall select its nominees may be regulated by Government (Waples v. Marrast, 108 Texas, 5). But the Government has no power to declare who shall be members of a political party. If so it would have an equal right to declare what should be the principals of that party. (P. 386).

(4) The term "elections" in amended section 8 of article 5 of the Constitution giving District Courts jurisdiction over contested elections was held in Ashford v. Goodwin, 103 Texas, 491, to include primary elections and the same word should receive the same construction in article 6, section 2. The same word in a statute will be presumed to be used in the same sense. Texas Bank & Tr. Co. v. Smith, 105 Texas 265. (Pp. 388, 389).

(5) The primary election in this State is the one decisive of the actual result of the election, and the right to select the candidate is as valuable as the right to vote for him after nomination. To hold the constitutional restrictions inapplicable to primaries is to render such restriction of no practical effect and to defeat its purpose. (P. 391).

(6) If entitled to add to those qualified by the Constitution to vote, the Legislature would be equally entitled to deprive of the franchise those to whom it is thereby given. (P. 392).

Questions certified from the Court of Civil Appeals for the First District, in an appeal from Fayette County.

*Walter Acker, Sr.* for appellant.—The brief of Frank B. Terry, County Attorney, C. M. Cureton, Attorney-General, W. J. Townsend, Assistant, W. E. Spell, S. Maude Ryan, and Gallagher & McCullough, in the case of Hamilton v. Davis· in the Court of Civil Appeals for the third District, involving the same question, was filed in this case.

The constitutional requirements prescribing the qualifications of an elector (voter) do not apply to the qualifications of those participating in primary elections. Waples v. Marrast, 184 S. W., 181; Loan Association v. Topeka, 20 Wall., 655, 22 L. Ed., 455; People v. Town of Salem, 20 Mich., 452, 4 Am. St. Rep., 400; State v. Nichols, 50 Wash., ·522, 97 Pac., 731; Riter v. Douglass, 109 Pac., 444; Ledgerwood v. Pitts, 125 S. W., 1036; Hanna v. Young, 84 Md., 179, 34 L. R. A., 55; Montgomery v. Chelf, 118 Ky., 766, 82 S. W., 388; Morrow v. Wipf, 22 S. D., 146, 115 N. W., 1,121; Baer v. Gore, 90 S. E., 530, 1917B, Law Rep. Ann.; State ex rel. Howells v. Metcalf, 18 S. D., 393, 67 L. R. A., 331, 100 N. W., 923; State ex rel. Webber v. Felton, 77 Ohio St., 554, 84 N. E., 85, 12 Ann. Cas., 65; Hager v. Robinson, 154 Ky., 489, 157 S. W., 1138; State ex rel. Gulden v. Johnson, 87 Minn., 223, 91 N. W., 604, 849; Line v. Election Canvassers (Line v. Waite), 154 Mich., 329, 18 L. R. A. (N. S.), 412, 117 N. W., 730; Dooley v. Jackson, 104 Mo. App., 21, 78 S. W., 330; Gray v. Seitz, 162 Ind., 1, 69 N. E., 456; State ex rel. Miller v Flaherty, 23 N. D., 313, 41 L. R. A. (N. S.), 132, 136 N. W., 76; State v. Woodruff, 68 N. J. L., 89, 52 Atl., 294; Kelso v. Cook (Ind.), 110 N. E., 987; Brown v. City of Galveston, 75 S. W., 488; State v. Johnson, 91 N. W., 840; Hodge v. Bryan, 148 S. W., 21; Gardner v. Ray, 157 S. W., 1147; Kelso v. Monte, 110 N. E., 987; 26 Am. Ann. Cases, 703; Insurance Co. v. Chowning, 86 Texas, 657; State ex rel. Gulden v. Johnson, 91 N. W., 604; State ex rel. Zent v. Nichols, 97 Pac., 728; 125 Tenn., 592; L. R. A., 1916F, 189; 129 Tenn., 153; 136 Tenn., 97, 153; 139 Tenn., 78; 144 Wis., 30, 31; 35 L. R. A. (N. S.), 365; 174 Mich., 481; 130 Minn., 500; L. R. A. 1916B, 935; 37 Nev., 502; L. R. A. 1915B, 204, 81 Ore., 216; 184 Ind., 191, 205; 243 U. S., 487, 61 L. Ed., 865; 79 W. Va., 67; L. R. A. 1917B, 722; 79 W. Va., 58; L. R. A. 1917B, 27, 28; 20 N. D., 610; 41 L. R. A. (N. S.), 134, 135, 138, 140; L. R. A., 1915B, 201; 60 Wash., 380, 381, 376; 66 Wash., 613; 67 Wash., 613; 68 Wash., 576; 40 L. R. A. (N. S.), 797; 69 Wash., 353; 73 Wash., 252; 76 Wash., 318; 79 Wash., 232; 92 Wash., 389; 91 Wash., 422; 93 Wash., 249, 253; 155 Cal., 781, 790; 142 Wis., 341, 342; 20 Ann. Cas., 641; 18 Idaho, 511, 489; 122 Tenn., 595; 32 Nev., 419, 428, 429,

433, 438, 426; 18 Cal. App., 717; 23 N. D., 325; 41 L. R. A.
(N. S.), 145; 23 N. D., 522, 524; 154 Ky., 518; 130 Minn., 500,
505; L. R. A. 1916B, 935, 937; 37 Nev., 493, 497; L. R. A.
1915B, 198, 202, 203; 184 Ind., 191; Ann. Cas. 1918E, 75, 81
Ore., 216; 243 U. S., 487; 61 L. Ed., 865; 79 W. Va., 58, 59; L.
R. A. 1917B, 728; 18 L. R. A. (N. S.), 412; 22 L. R. A. (N. S.),
1138, 1139; L. R. A. 1915B, 199; L. R. A. 1915B, 402; L. R.
A. 1916B, 939; 149 Ky., 112; 151 Ky., 291; 154 Ky., 497, 498, 500,
517; 165 Ky., 790; 177 Ky., 109; 155 Cal., 790; 122 Tenn., 590; 32
Nev., 429, 433; 23 N. D., 325, 41 L. R. A. (N. S.), 145; 236 Fed., 996;
243 U. S., 487; 61 L. Ed., 865; 79 W. Va., 58; L. R. A., 1917B,
728; 18 L. R. A. (N. S.), 412, 413; 41 L. R. A. (N. S.), 135; 1
A. L. R., 1543; 55 Nev., 426, 143; 34 Nev., 293, 490; 35 Nev., 40; 37
Nev., 493, 498, 502, 505; L. R. A. 1915B, 203, 204, 205, 199, 200, 201,
202; 37 Nev., 455; 60 Wash., 374; 23 N. D., 325; 41 L. R. A. (N. S.),
145; 174 Mich., 481; 184 Ind., 191; 81 Ore., 216; 79 W. Va., 58, 59,
67; L. R. A. 1917B, 721, 727, 728; 41 L. R. A. (N. S.), 133, 136, 138,
141; L. R. A. 1915B, 197.

The qualifications of electors authorized to participate in general
and special elections held under the Constitution are fixed by the
Constitution, and the Legislature cannot change them. Other
elections, however, provided for only by statute and not by the
Constitution, are wholly within the control of the Legislature.
Scown v. Czarnecki, 264 Ill., 305, 1915 (B), L. R. A. (N. S.), 247;
Ahrens v. English, 139 Ill., 622, 15 L. R. A., 131; Plummer v.
Yost, 144 Ill., 68, 19 L. R. A., 110; Ackermann v. Hanck, 147 Ill.,
514; Dorsey v. Brigham, 177 Ill., 250; Collier v. Anlicker, 189 Ill.,
34; Bloom v. Hagraeff, 193 Ill., 195; Dunham v. Morgan, 90 Ill.,
558; Akin v. Kipley, 171 Ill., 44; Akin v. Loeffler, 175 Ill., 585;
Saddler v. Olsen, 245 Ill., 288; Wies v. Bowman, 247 Ill., 276;
Belles v. Burr, 76 Mich., 1, 43 N. W., 24; Wheeler v. Brady, 15
Kan., 26; Harris v. Burr., 32 Oregon, 348, 52 Pac., 17; State
ex rel. Gibson v. Monahan, 72 Kan., 492, 84 Pac., 139; Oliver v.
School District, 86 Neb., 135, 125 N. W., 141; Hall v. Madison, 12
Wis., 132, 107 N. W., 31; · Ann. Cases, 1915A, 772; Hanna v.
Young, 84 Md., 179, 57 Am. St. Rep., 396; State v. Hanson, 80
Neb., 724; State v. Dillon, 32 Fla., 545, 22 L. R. A., 124; Spitzer v.
Fulton, 172 N. Y., 285, 92 Am. St. Rep., 736; Ann. Cases, 1915A,
802; Richardson v. Young, 122 Tenn., 471; Wheeler v. Brady, 15
Kan., 26; State v. French, 96 Ohio St., 172; Ann. Cases, 1918C,
896.

The qualifications of voters in general or special elections are
fixed by the Constitution—the Constitution is silent as to the quali-
fications of voters in political primaries and nominating conventions.
Arts. 1, 2 and 3, Sec. 6, State Constitution. Cooley, Constitutional
Limitations, Sec. 752; 15 Cyc., page 280; State v. Dillon (Fla.),

22 L. R. A., 124; Kennen v. Wells, 114 Mass., 499; Minor v. Happersett, 21 Wall., 171; United States v. Reese, 92 U. S., 214; Solon v. State, 114 S. W., 353; 9 Ruling Case Law, sec. 41; Beene v. Waples, 187 S. W., 191; State ex rel. Laubauve v. Mitchell, 46 So., 435; Hopper v. Stack, 56 Atl., 1; Ransom v. Black, 24 Atl., 439; Socialist Party v. Uhl, 103 Pac., 188; Rouse v. Thompson, 81 N. E., 1111; Sherman v. People, 210 Ill., 532; Ritter v. Douglas, 109 Pac., 444; Morrow v. Wipf, 115 N. W., 1124; State v. Nichols, 97 Pac., 728; State v. Nichel, 46 So., 430; State v. Drexel, 74 Neb., 776; Nooker v. Stack, 56 Atl., 1; People v. Democratic Committee, 58 N. E., 124; Schostag v. Cator, 91 Pac., 502; Brittain v. Board of Commissioners, 129 Cal., 337, 61 Pac., 1115; State v. Metcalf, 100 N. W., 923, 67 L. R. A., 331; Ladd v. Holmes, 66 Pac., 714, 91 Am.. St. Rep., 457; Rouse v. Thompson, 81 N. H., 1109.

*C. G. Krueger* and *McMeans, Garrison & Pollard,* for appellee.— The general primary election, held under the express mandate of the laws of the State, is within the terms, intent, purpose and meaning of the Constitution, and the electors defined in the Constitution being restricted to males, the act of the Legislature attempting to confer a limited franchise upon women in the general primary election is unconstitutional, and void, because the Legislature had no power to enlarge the electorate of the State beyond that defined in the Constitution, especially as to any election which comes within the terms, intent, purpose and meaning of the constitutional provision relating to suffrage. Chapter 34, Acts of the Fourth Called Session of the Thirty-fifth Legislature, page 61 (Woman's Suffrage Act); Constitution, art. 6, secs. 1, 2, 3, 4, 5; Constitution, art. 16, secs. 2 and 5; Chapter 101, Acts Regular Session Twenty-eighth Legislature, page 133 (Original Primary Law); Chapter 11, page 520, Acts of the Twenty-ninth Legislature, First Called Session (Present Primary Law); Chapter 177, Acts of the Regular Session of Thirtieth Legislature, page 328 (Amendments to Secs. 114 and 141, Primary Election Laws); Acts of the Thirty-first Legislature, Second Called Session, Chapter 26, page 451 (Amendments to Secs. 126-141, Primary Election Laws); Ashford v. Goodwin, 131 S. W., 535; Anderson v. Ashe, 130 S. W., 1044; Spier v. Baker, 41 L. R. A., 196; Johnson v. Grand Forks County, 125 Am. St. Rep., 662; Johnson v. Grand Forks County, 135, N. W., 179; State v. Flaherty, 41 L. R. A. (N. S.), 132; State v. Hirsch, 125 Ind., 207; Scown v. Czarnecki (1914), 106 N. E.. 277; Rouse v. Thompson, 81 N. E., 1109; People v. Board of Commissioners, 77 N. E., 321; Kelso v. Cook, 110 N. E., 987, 184 Ind., 173; Gougar v. Timberlake, 46 N. E., 339; Board of Commissioners v. Knight, 117 N. E., 566; Cooley's Constitutional

Limitations, 7th Ed., 99; Bloomer v. Todd, 1 L. R. A., 111; State v. Knight, L. R. A. (1915F), 898.

MR. JUSTICE GREENWOOD delivered the opinion of the court.

Question certified from the Court of Civil Appeals of the First Supreme Judicial District of Texas, in an appeal from the District Court of Fayette County.

The certificate of the Honorable Court of Civil Appeals is as follows:

"In the above styled and numbered cause, now pending in this Court on appeal from the District Court of Fayette County, the question hereinafter stated, which is material to a decision of this appeal, arises upon the statement of the nature and result of the suit, and the facts disclosed by the record, which are as follows:

"The suit was brought by appellant for mandamus to compel the appellee, the Tax Collector of Austin County, to issue a poll tax receipt entitling her to vote, under the provisions of Chapter 34, Acts of the Fourth Called Session of the 35th Legislature. The petition alleges and the facts disclose that appellant possessed all of the qualifications of a voter prescribed in said Act of the Legislature. The application for payment of poll tax and the issuance of receipt therefor contains all of the requisites prescribed by the statute. The appellee, upon presentation of the application, refused to accept the poll tax money which was tendered by appellant, and refused to issue her a receipt.

"The appellee answered in this suit by filing a general demurrer, and admitting the allegations of plaintiff's petition as to her sex, residence, tender of poll tax money, demand for poll tax receipt, and all other facts necessary to entitle her to a poll tax receipt under said Act of the Legislature. The court below sustained appellee's general demurrer to plaintiff's petition, on the ground that the Act of the Fourth Called Session of the 35th Legislature, before cited, was unconstitutional and void.

"Because of the public importance of the question, and the obvious desirability of obtaining its final decision within the earliest practical time, we deem it advisable to certify for your decision the following question:

"Is the Act of the Legislature above cited, granting to women the privilege of voting in primary elections, violative of Section 2 of Article 6 of our State Constitution?"

Article VI of the Constitution of the State of Texas, in section 2, prescribes that every male person, subject to no disqualification specified by section 1, and who shall have attained the age of twenty-one years, and who shall be a citizen of the United States, and who shall have resided in this State one year next preceding an election and the last six months within the district or county in which he offers to vote shall be deemed a qualified elector; and

that every male person of foreign birth, subject to no disqualification specified by section 1, who not less than six months before an election, at which he offers to vote, shall have declared his intention to become a citizen of the United States in accordance with the Federal Naturalization Laws, and shall have resided in this State one year next preceding such election and the last six months in the county in which he offers to vote, shall also be deemed a qualified elector.

The Act of the Legislature confers the right to vote on women possessing the qualifications, save of sex, of electors under the Constitution and laws of the State, at any and all primary elections or nominating conventions to be held under the laws of the State, and requires each woman offering to vote in any primary election or convention, after January 1, 1919, to comply with all provisions of our laws requiring and permitting voting on payment of poll taxes.

Our answer to the certified question depends on whether the constitutional provision, when rightly construed, fixes the qualifications of participants in party primaries or conventions.

There are many organized voluntary groups in the various States of the Union, whose purposes and objects depend for their accomplishment on the exercise of a form of suffrage by the individual member. Such groups are of the highest value in the promotion of the general good. Among these groups are many maintained for charity, many maintained for helpful cooperation, such as mutual insurance associations, and many maintained for the support of religious worship, such as the various churches having a congregational form of government. The law recognizes, and will often enforce, the right of the individual as an elector in the conduct of the affairs of each of such groups to which he belongs, but no one would maintain that such · right, even when exercised in a group regulated by statute, as not infrequently occurs, came within the purview of article VI of our Constitution. It follows that the words "qualified elector" and the word "election" were not used in this constitutional provision in the broadest possible sense, and that in order to determine their application to the exercise of the right of suffrage within an organization we cannot ignore the essential nature and objects of such organization.

The Act of the Legislature deals only with suffrage within the party primary or convention, which is but an instrumentality of a group of individuals for the accomplishment of party ends.

As so well stated by this Court in Waples v. Marrast, 108 Texas, 11 to 13, L. R. A., 1917A, 253, 184 S. W., 183: "A political party is nothing more or less than a body of men associated for the purpose of furnishing and maintaining the prevalence of certain political principles or beliefs in the public policies of the

government. As rivals for popular favor they strive at the general election for the control of the agencies of the government as the means of providing a course for the government in accord with their political principles and administration of those agencies by their own adherents. According to the soundness of their principles and the wisdom of their policies they serve a great purpose in the life of a government. But the fact remains that the objects of political organizations are intimate to those who compose them. They do not concern the general public. They directly interest, both in their conduct and in their success, only so much of the public as are comprised in their membership, and they only as members of the particular organization. They perform no governmental function. They constitute no governmental agency. The purpose of their primary elections is merely to enable them to furnish their nominees as candidates for the popular suffrage. . . . To provide nominees of political parties for the people to vote upon in the general elections is not the business of the State. It is not the business of the State because in the conduct of the government the State knows no parties and can know none. . . . Political parties are political instrumentalities. They are in no sense governmental instrumentalities.'' In a previous portion of the opinion, the Court recognized that: ''General elections are essential to the public welfare and are distinctly related to the discharge of an important governmental duty, because it is only by their means that the organic law may be amended and in the elective offices public officials be supplied for the various administrative agencies of the State.'' 108 Texas, 11.

From the above it appears that the real question before us is whether we should construe the suffrage article of our Constitution as sufficiently broad in scope to relate to suffrage within a mere political organization, as contradistinguished from a governmental organization, and within an organization, whose objects do not concern the general public and are intimate only to those who are comprised within the organization's membership? To our minds, this question admits of no answer save in the negative.

It is difficult to conceive how the primary election law of this State, even without the provision admitting women to participation in primaries and conventions, could be held free of violation of the constitution, if section 2, of article VI, were construed to govern voting at party primaries and conventions. For, it would seem unquestionable that the constitutional provision was designed to prevent the denial of the right of suffrage, which it safeguards, to any person possessing the requisite qualifications; and all the authorities seem in accord with the statement that ''where the right of suffrage is fixed in the constitution of a State, as is the case in most States, it can be restricted or changed by an amendment to the constitution or by an amendment to the Federal Constitution, which, of course, is

binding upon the States. But it cannot be restricted or changed in any other way. The Legislature can pass no law directly or indirectly either restricting or extending the right of suffrage as fixed by the constitution." 10 A. & E. Encyclopedia of Law, 573, 576; 15 Cyc., 282, 8 R. C. L., sec. 41.

In Cooley's Constitutional Limitations, in section 599, it is said: "Whenever the Constitution has prescribed the qualifications of electors, they cannot be changed or added to by the Legislature or otherwise than by an amendment to the Constitution."

The rule stated was approved in the opinion of Justice Ramsey in Solon v. State, 4 Texas Cr., 261, 114 S. W., 349, where it is said: "Where a Constitution has conferred the right and prescribed the qualifications of electors, it, of course, is paramount until amended, and the Legislature cannot change or add to them in any way; but, where the Constitution does not fix the right of suffrage or prescribe the qualifications of voters, it is competent for the Legislature, as the representative of the lawmaking power of the State, to do so."

By its very nature, and certainly by its express terms, the Texas primary law provides for the exclusion from participation in party primaries of persons granted the constitutional right of suffrage, if the constitutional grant extends to primary suffrage. The definition in our statutes of a "primary election" excludes therefrom all save "the members of an organized political party." The test prescribed and authorized, as to which the Constitution is silent, operates still more restrictively. Arts. 3085, 3096, 3093, Vernon's Sayles' Texas Civil Statutes.

We think it fallacious to argue that our primary election laws regulate but do not restrict the right of suffrage. It is true they regulate, but the first and essential step in the regulation is to restrict.

Most of the States, as above noted, have primary election systems, established under constitutional provisions similar to ours. Hence, if our primary system is affected by constitutional infirmity, so would be most of the primary systems of our sister States.

No matter how far reaching and disastrous would be the consequences of declaring primary suffrage within the scope of our constitutional provision, we would not decline to make the declaration if such was believed to be the true intent of the language of the Constitution. It is a proper inquiry, however, in ascertaining whether a certain interpretation should be given to the language of the Constitution, to consider whether its framers and the voters by whom it was adopted intended the consequences which must follow such interpretation. Scott v. Sandford, 19 How., 426, 15 L. Ed., 691; Maxwell v. Dow, 176 U. S., 602; Assn. v. New York, 152 N. Y., 257, 37 L. R. A., 792, 46 N. E., 499.

In Kelso v. Cook, 184 Ind., 173, 110 N. E., 990-993, it was contended that a primary election came within the purview of section 2, of article 2, of the Constitution of Indiana, which reads: "In all elections not otherwise provided by this Constitution, every male citizen of the United States, of the age of 21 years, . . . who shall have resided . . . in the township sixty days, and in . . . the precinct thirty days, immediately preceding such election, . . . shall be entitled to vote in the . . . precinct where he may reside, if he shall have been duly reg'ste~ed. . . ." In rejecting the contention, the Supreme Court of Indiana said: "The character of an act is often best determined by viewing it from the standpoint of its results. The practical results of holding that section 2, of article 2, *supra,* cover primary elections, is their destruction, whether voluntarily held by groups of electors called political parties, or involuntarily held under statutory mandate. We do not believe that the people in adopting the constitutional provision, had any such result in mind."

Likewise, we have no doubt that nothing was further from the minds of anyone having a part in framing the suffrage provisions of our constitutions or further from the minds of the voters by whom same were adopted than to prevent nominations by means of party primaries.

Indeed, in the light of the history of party nominations by conventions and by primaries in this State, the conclusion seems inevitable that the people in voting on section 2, of article VI. of the Constitution of 1876, and on the amendment adopted in 1902, could not have contemplated or intended for the original section or amendment to have any relation whatever to party primaries. The idea of subjecting parties to restraint in the matter of selecting nominees and of declaring and accomplishing party aims is one which arose after the words were put into the Constitution, which are now claimed to govern the qualifications of participants in primaries.

It seems to us that due consideration for the opinions of the appellate courts of other states, construing similar constitutional provisions, relating to elections and to electors, must at least make doubtful whether the language of section 2, of our article VI, could be properly held to refer to primary elections and to those participating therein. Our obligation to carefully consider such opinions, in determining constitutional questions, is plainly announced by this Court in 'the opinion of Chief Justice Hemphill in the early case of DeCordova v. Galveston, 4 Texas, 476.

It was said by the Supreme Court of West Virginia in the case of Baer v. Gore, 79 W. Va., 58, L. R. A., 1917B, 728, 90 S. E., 533: "By many text-books and decisions an important distinction is noted between a general and a primary election. They treat a

primary election merely as a substitute for a nominating caucus convention and not as an "election" within the meaning of that term as used in Constitutions. So treated, it is a mere matter of statutory regulation within a reasonable exercise of the police power of the State, predicated on rights reserved by the people, when not forbidden by the organic law of the municipality. *This principle is especially emphasized with reference to the qualifications of electors and tests of party membership prescribed by primary laws."*

In State v. Flaherty, 23 N. D., 323, 41 L. R. A. (N. S.), 132, 136 N. W., 81, it is stated: "Many courts lay down the broad rule that such constitutional provisions are applicable only to general elections and therefore do not apply to primary elections. As illustrat've, we quote from Riter v. Douglass, 32 Nev., 400, 109 Pac., 444; 'That a primary election of candidates is not an election of officers within the meaning of the constitutional test has been sustained bv an overwhelming weight of authority in States with similar constitutional provisions to those contained in the Constitution of Nevada,' citing Line v. Election Canvassers (Line v. Waite), 154 Mich., 329, 18 L. R. A. (N. S.), 412, 117 N. W., 730, 16 Ann. Cas., 248; Montgomery v. Chelf, 118 Ky., 766, 82 S. W., 388; State ex rel. Gulden v. Johnson, 87 Minn., 222, 91 N. W., 608, 840; State ex rel. Webber v. Felton, 77 Ohio St., 554-578, 84 N. E., 85, 12 Ann. Cas., 65; Dooley v. Jackson, 104 Mo. App., 21, 78 S. W., 333."

There is another line of authorities which excludes from the purview of such constitutional provisions as ours all elections provided for by statute only, and not by the Constitution. Scown v. Czarnecki, 264 Ill., 305, 106 N. E., 276, L. R. A., 1915B, 253; Riter v. Douglass, 32 Nev., 400, 109 Pac., 444; State v. Nichols, 50 Wash., 508, 97 Pac., 728; Schostag v. Cator, 151 Cal., 600, 91 Pac., 502; State v. Flaherty, 23 N. D., 313, 136 N. W., 76, 41 L. R. A. (N. S.), 132; Hanna v. Young, 84 Md., 179, 35 Atl., 674, 34 L. R. A., 55, 57 Am. St. Rep., 396; Coggeshall v. Des Moines, 138 Iowa, 730, 128 Am. St. Rep., 229, 117 N. W., 309; Buckner v. Gordon, 81 Ky., 665; Florida (State ex rel.) v. Dillon, 32 Fla., 545, 14 So., 383, 22 L. R. A., 124; State v. Johnson, 87 Minn., 223, 91 N. W., 604, 841.

See, also: Baer v. Gore, 79 W. Va., 50, 90 S. E., 533, L. R. A., 1917B, 728; Montgomery v. Chelf, 118 Ky., 766, 82 S. W., 388; Wheeler v. Brady, 15 Kan., 26; State v. Monahan, 72 Kan., 492, 115 Am. St. Rep., 224, 84 Pac., 130, 7 Ann. Cases, 661; Harris v. Burr, 32 Or., 348, 39 L. R. A., 768, 52 Pac., 17; State v. Board of Elections, 9 Ohio, C. C., 34; State v. Felton, 77 Ohio St., 554, 84 N. E., 85, 12 Ann. Cas., 65; Re Carragher, 149 Iowa, 225, 128 N. W., 352, 31 L. R. A. (N. S.), 322, Ann. Cases, 1912C, 972; Seaman v. Baughmann, 82 Ia., 216, 47 N. W., 109, 11 L. R. A., 354; Mayor v. Shattuck, 19 Colo., 104, 34 Pac., 947, 41 Am. St. Rep., 208; People v. English, 139 Ill., 622, 29 N. E., 478, 15 L. R. A., 131; Plummer

v. Yost, 144 Ill., 68, 33 N. E., 191, 19 L. R. A., 110; Ackerman v. Haenck, 147 Ill., 514, 35 N. E., 381; Landis v. (Ashworth) School Dist., 57 N. J. L., 509, 31 Atl., 1017; State v. Board, 57 N. J. L., 605, 31 Atl., 1033; Opinion of Justices, 115 Mass., 605; Olive v. School Dist., 86 Neb., 135, 125 N. W., 141, 27 L. R. A. (N. S.), 522; State v. Cones, 15 Neb., 444, 19 N. W., 682; Belles v. Burr, 76 Mich., 1, 43 N. W., 24; Menton v. Cook, 147 Mich., 540, 111 N. W., 94; In re Gage, 141 N. Y., 112, 25 L. R. A., 781, 35 N. E., 1084; In re Inspectors of Elections, 25 N. Y. Supp., 1063; Spitzer v. Fulton, 172 N. Y., 285, 92 Am. St. Rep., 736, 64 N. E., 957; State v. Board of Elections, 2 Ohio Dec., 94; Leflore County v. State, 70 Miss., 769, 12 So., 904.

A number of the above cases announce conclusions similar to Scown v. Czarnecki, 264 Ill., 305, 106 N. E., 276, L. R. A., 1915B, 247, Ann. Cas., 1915A, 776, which involved the validity of an Illinois statute of 1913, known as the Woman's Suffrage Act, and which, though it did not mention party primaries, granted to women the right of suffrage as to certain officers and as to certain other subjects therein mentioned, some of which were, and some of which were not, covered by provisions of the Constitution of Illinois. The line of cleavage was very clearly drawn and strictly followed, as of determinative force, by the Supreme Court of that State, in an opinion holding said statute in part invalid and in part valid. In that opinion, after reviewing previous decisions of the Illinois Supreme Court, it is said: "By these decisions the rule is settled that section 1 of article 7 of the Constitution refers only to elections provided for by that instrument. The qualifications of voters at such elections are fixed by the Constitution and the Legislature cannot change them. Other elections, however, provided for only by statute and not by the Constitution, are wholly within the control of the Legislature."

The Court of Civil Appeals at Austin determined in a carefully considered opinion, in the case of Hamilton v. Davis, 217 S. W., 431, in which all the judges concurred, that the legislative act mentioned in the certified question was not violative of the Constitution.

If the decisions referred to, and others in line with them, should not be accepted as conclusive in so far as they bear on the precise question under consideration, as we are inclined to regard them, it seems to us that they must at least raise grave doubt as to whether our constitutional provision and similar clauses in other constitutions were meant to prescribe the qualifications of participants in party primaries.

Nothing is plainer than our duty when such doubt exists. Judge Brown was very particular in laying down the principle which has ever guided and must ever guide this Court, under such conditions, when he said, in Brown v. Galveston, 97 Texas, 9, 75 S. W., 492: "If there be doubt as to the validity of the law it is due

to the co-ordinate branch of the government that its action should be upheld and its decision accepted by the judicial department. In his work on Constitutional Limitations, page 218, Mr. Cooley says: 'The question whether a law be void for its repugnancy to the Constitution is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station could it be unmindful of the solemn obligation which that station imposes; but it is not on slight implication and vague conjecture that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.' ''

Judge Brown and the Court felt that the importance of this enunciation justified its repetition, and later in the same opinion it is declared: ''If there was doubt in our minds our conclusion must be as expressed in the following quotation: ''But if I could rest my opinion in favor of the constitutionality of the law on which the question arises on no other ground than this doubt so felt and acknowledged, that alone would, in my estimation, be a satisfactory vindication of it. It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity, until its violation of the Constitution is proved beyond all reasonable doubt.' '' Brown v. Galveston, 97 Texas, 12.

Principal reliance is placed, in attacking the statute, on the decisions in Ashford v. Goodwin, 103 Texas, 491, 131 S. W., 535, Ann, Cases, 1913A, 699; Anderson v. Ashe, 62 Texas Civ. App., 262, 130 S. W., 1044, and Lane v. McLemore, 169 S. W., 1073. The last named two cases follow the decision in Ashford v. Goodwin, where it was held that the amendment to the Constitution conferring original jurisdiction on the district courts in cases of contested elections authorized the district courts to hear and determine contests of primary elections.

That decision can be rightly understood by bearing in mind its underlying principle, announced by the court, per Judge Brown, immediately after the statement of the case in these words: ''When the Legislature passed that Act they must, in the discharge of their duty, have determined that the power to so enact was conferred upon that body by the language we have quoted above from section 8 of article 5 of the Constitution as amended. The Legislature having determined that the power was granted to that body to pass the law, this court must sustain it unless its invalidity be apparent beyond a reasonable doubt.'' Here, the Legislature necessarily determined that section 2, of article VI, left them free to fix the qualifications of participants in primaries,

and, since we cannot say that the legislative determination was wrong beyond a reasonable doubt, we must sustain it. If we did otherwise, we would fail to apply the principle on which the decision in Ashford v. Goodwin is based.

We do not regard the proceedings of the constitutional convention relative to woman suffrage as bearing on the right of women to participate in primaries, under an act of the Legislature. Such proceedings related only to the participation of woman in governmental elections, and not to their participation in the acts of any non-governmental, voluntary groups of citizens, clothed with no ultimate power to fill constitutional or other offices, to amend constitutions, or to impose tax burdens.

We cannot agree that the Act of the Legislature infringes on any right of qualified electors under section 2, of article VI. While it is true that no one actuated by conscientious and honorable motives will fail to support the nominees of a primary in which he or she participates, the fact remains that the primary law compels no one not satisfied with the statutory and party regulations to enter a primary. Even after participating in the primary, the qualified elector is legally free to vote as he chooses in the general election, no matter how contrary that vote may be to good conscience or to moral obligation. It would be most unreasonable to say that something amounts to an actual infringement of a person's rights, when the asserted infringement may be entirely avoided at the option of such person.

There being no constitutional prohibition, it follows that the Legislature was free to extend the privilege of participation in party primaries and conventions to women possessing the qualifications, save sex, of electors under our Constitution and laws, as is recognized in the above quoted portion of the opinion in Solon v. State. "By section 1, of article 3, the Constitution declares 'the legislative power of this State shall be vested in a Senate and House of Representatives, which together shall be styled 'the Legislature of the State of Texas,' The legislative power of this State means all the power of the people which may properly be exercised in the formation of laws against which there is no inhibition expressed or implied in the fundamental law.'' Brown v. Galveston, 97 Texas, 15.

We answer "No" to the certified question, having determined that there is no conflict between the legislative act and section 2, of article VI, of the Constitution.

Opinion delivered January 28, 1920.

Chief Justice Phillips dissents.

### DISSENTING OPINION.

MR. CHIEF JUSTICE PHILLIPS delivered the following dissenting opinion.

This decision in my opinion subverts the Constitution of this State and makes of it a vain and useless document.

If the plain, simple and unmistakable language of section 2 of article 6 may be evaded with the ease and facility that marks this decision, there is no provision in the instrument that is stable in its meaning and secure in its foundation. By the sanction of this holding the settled terms of other provisions are made subject to the same ingenuity of construction. Instead of standing there as certain terms, they are made equivocal terms. The Constitution of the people, meant by them to be the charter—the constant charter —of their rights and liberties; the inviolable limitations upon the powers of government confided by them in trust to the agencies of their creation; the unchanging, immutable organic law of the Commonwealth until amended by their hands; becomes but a fickle and variable pronouncement, having no longer the force of their sovereign command and affording no longer the protection of their sovereign will.

I protest against any holding that impoverishes this State by reducing its Constitution to that poor degree. I object to the construing away of any part of that instrument. Therefore I enter and record my emphatic dissent from this decision.

The decision affirms:

1.   That although the Constitution in section 2 of article 6 by express terms makes "any election" in Texas the subject of its provision and prescribes what shall be the qualifications of voters in Texas at "any election;" that although party primaries are by the laws of the State made public "elections," and are "elections" in the common, every day meaning of the word, and so known and recognized to be by every body; and although those elections are so vital to the people of the State as ever since their establishment by law to have been the means of naming all the elective officers of the State, from the highest to the lowest; yet, this section of the State's supreme law does not comprehend them and has no application whatever to them.

I maintain that the language of this section is so simple and plain as not to admit of construction or refinement by courts, and that it means, steadily and unfailingly, the qualifications it prescribes shall be possessed by all voters at all public elections in the State which the Legislature has the power to establish and which it may provide by law.

2.   That it is within the authority of the Legislature to say what persons or classes of persons shall exercise the rights and privileges of members of the political parties of this State, and thus, at its will, constitute them members of those parties.

I say the Legislature has no such power. If it has, there are no individual rights, no personal liberties, in this State that are not

held at legislative sufferance and are not subordinate to' legislative control.

This decision will have a consequence far beyond this immediate case. I doubt if its authors realize the effect of it. I doubt if they have estimated its meaning, or foreseen its result. It unsettles the basis upon which until now the inherent, natural rights of the citizens of Texas have rested. It denies the character of those rights as something free and exempt from governmental interference. It places them at the open and unrestrained disposal of governmental power.

The two propositions stated above, which the decision inevitably declares shall hereafter be the law as announced by this court, I wish to briefly discuss. Before doing so it may be well to re-state some common things which ought not to require re-statement, but only in the clear and sustaining light of whose self-evident truth may such questions as these be truly understood and rightly solved.

The people of the State are the source of all the governmental authority of the State. They and they only created the government of the State and gave its legislative, executive and judicial departments their several powers. They did this by means of the Constitution. It is their handiwork, their law. That is why it is the paramount law, the final law. It is equally binding upon the government of the State in all of its branches, as upon every individual in the State. No power of the government in either of its branches may be exercised except in faithful obedience to it. The authority of the people is original. The authority of the government is only derivative. When the government exercises its power in observance of the Constitution, its action has all the force of the original sovereignty of the people because lawful use is made of that part of their sovereignty which they have confided to it. When in the exercise of its powers it disregards the limitations, express or implied placed by the people through the Constitution upon its authority, it makes unlawful use of that delegated sovereignty, and its action is void.

The rights of the people do not owe their origin to the Constitution, nor to the government created by means of the Constitution. They existed before either was made. The great office of the Constitution of the State is to preserve them. That is why in its essential character it is a limitation, a restraint, upon the powers entrusted to the government.

What in the creation of the State government the people deemed inherent rights, natural rights, rights to be freely and independently exercised in the absolute right of themselves as individuals, beyond any meddling, and hindrance, and any control by the government, they excepted out of the powers of the government. They remain their individual rights. The people have retained their control solely unto themselves, because unwilling to surrender them into

any other hands. They express the individual freedom of the citizen. They comprise his personal liberties. They are his birth-right. They alone make him a freeman and invest him with the proud dignity of that incomparable character. The government is without any power to abate them, to impair them, to control them or regulate them. They are free. And whenever the government in any degree infringes them, in the language of the Bill of Rights it "transgresses its powers."

These rights are many. It is not necessary to enumerate them here. Among them, and one of the chief among them, is the right of the citizen to associate himself with other citizens in a political party for the advancement of his political beliefs and the influential exercise of his political rights.

As to how a political party shall elect its nominees may be regulated by the government. This authority exists because of the essential and known importance of those elections and its being a proper concern of the government that they be fairly held. The government therefore has the power to say that such an election shall be by means of a party primary, and to provide proper laws for the conduct of the primary. It was so declared in my opinion in Waples v. Marrast, 108 Texas, 5, L. R. A., 1917A, 253, 184 S. W., 180.

But the power to declare who shall be members of a political party, is another matter. If the government has that power, it has the equal power to say what shall be the beliefs, the principles, of the party. The principles of a party will always be determined by who are its members. If the government may do the one, it may do the other. If it may do both, or either, what power has the party? Its freedom of action is gone, and with it the character of its organization.

The words of a constitution are to be expounded, rather than construed. As found in our Constitution they are plain Anglo-Saxon words, hardy words, and therefore simple words—the word of the common speech of the people. They were written for the people to easily understand in their voting upon the adoption of the instrument. There is nothing abstruse about them, nothing occult, hidden or mystical. They were not supposed to present enigmas to the people in adopting them nor to courts in enforcing them. They are not to be dissected with the niceties of the acute mind that is able to "sever and divide a hair' twixt north and north-west side." They are not to be wrested from their plain meaning. They are neither to be enlarged nor reduced by courts. They are only to be expounded in their ordinary and common sense—not the sense that the learned man, the metaphysician, or the casuist might attach to them—but as the average man would understand them. Judge Story said this on the subject:

"Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of commonsense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss."

If what this eminent author warned against be avoided, and the plain, ordinary meaning of the term "elections" as used in section 2 of article 6 be given it, it includes any public election established by law, and therefore the primary elections provided by the statutes of the State.

That section in prescribing the qualifications of voters in "elections" and in "any election" to be held in this State, does not attempted to particularize any kind of "election." It does not name "general elections." The term "general elections" is not found in any of the provisions of the Constitution dealing with elections. Only in section 27 of article 3 does even the word "general" appear. That section reads: "Elections for Senators and Representatives shall be general throughout the State, and shall be regulated by law." Neither does section 2 of article 6 designate "bond elections," or "stock law" elections. Yet no one will deny that voters in those elections must have the qualifications declared in section 2 of article 6. Why apply the Constitution to them, and not to primary elections? What in their nature—their nature alone, and not reasons of convenience, should furnish the test—is peculiar to primary elections that differentiates them from other public elections and exempts them from the operation of the Constitution?

If an election to determine whether pigs may run at large in a justice precinct at which only 100 men may vote, is an election within the meaning of the Constitution, by what process of reasoning is it to be held that an election at which 400,000 citizens customarily vote and whose effect is to name the incumbents of all the elective offices of the people, is wholly ungoverned by the Constitution? It is a process that does not commend itself to me, and I reject it.

It begs the question to say that the "elections" referred to in this section mean only the elections provided in other parts of the Constitution. The Constitution itself nowhere says that. What warrant has a court in saying it? How does it know that that is true? What liberty has it to read any such provision into the Constitution? Judge Campbell, one of the great judges of the land, who with Judge Cooley was a notable figure upon the Supreme Court of Michigan, exposed the fallacy of this contention in his

dissenting opinion in Belles v. Burr, 76 Mich., 1, 43 N. W., 32. The holding in support of it in the Scown case, 264 Ill., 305, 106 N. E., 276, L. R. A., 1915B, 247, Ann. Cases, 1915A, 772, cited in the prevailing opinion, was only by a divided court. No sound reason can be given for making a distinction between the qualifications of voters in an election provided by a constitution and one lawfully provided by statute. The latter may be of as great importance as the former. No ground for the distinction is to be found in our Constitution. When in section 2 of article 6 it fixes the qualifications of voters in "any election," it means all public elections provided by law. If it doesn't mean this, it either means nothing or whatever a court simply according to its own notion may declare.

By express decision of this court, the attempt to exclude primary elections from the meaning of the term "elections" as used in amended section 8 of article 5 wherein the District Courts are given jurisdiction of "contested elections," was repudiated. Ashford v. Goodwin, 103 Texas, 491, Ann. Cases, 1913A, 699, 131 S. W., 535.

Such jurisdiction was first conferred upon the District Courts by that Amendment to the Constitution, adopted in 1891. There was then no primary election law. The first law of that character in this State was enacted in 1903. Public primary elections, therefore, were not known to any existing law when the Amendment of section 8, article 5, was adopted.

It was insisted in that case, in the same way that it has been insisted here and held here, that the word "elections" used in amended section 8 of article 5 did not mean "primary elections."

This court held that it did.

In sustaining the validity of a statute which gave to the District Courts the jurisdiction to review the action of County Executive Committees on party primary elections—which would have been invalid unless the term "elections" as used in amended section 8 of article 5 included primary elections, the court held that the term "elections" as used in the Constitution was broad enough to include primary elections, made the subject of the legislative act, *"there being nothing in the Constitution which limits the meaning of the words used."* Neither is there anything in the Constitution which limits the meaning of the term "election" as used in section 2 of article 6.

If there, as declared by this court, the term "elections" as used in section 8 of article 5 was broad enough to warrant the Legislature's giving it the meaning of "primary elections," how can it be held here—in determining the sense of a constitution, an instrument whose terms in their very nature are broad and general, always, and therefore always to be liberally interpreted—that the same term when used in another provision of the same Constitution

is so narrow as to exclude that meaning? It is a strange doctrine for any court, and especially this court, to announce.

Is the same simple word in a constitution to be thus construed? Is it to be held as meaning one thing at one place in the Constitution and a wholly different thing at another? Is it to be broadly interpreted as found in one provision and narrowly interpreted as found in another provision? If so, why? If so, has it any certainty of meaning anywhere in the instrument? This court has held that in a statute the same term, without amplifying phrase, will be presumed to have been used in the same sense. Texas Bank & Trust Company v. Smith, 108 Texas, 265, 2 A. L. R., 771, 192 S. W., 533. This is more true of the words of a constitution, particularly words of the most familiar character, as the word ''election'' is.

If a decision of this court, rendered by judges among the ablest that have ever composed it, has any authoritative force with the court itself, Ashford v. Goodwin settles this question and settles it beyond any doubt.

Anderson v. Ashe, 62 Texas Civ. App., 262, 130 S. W., 1044, by the Court of Civil Appeals for the First District, is equally conclusive.

If authorities beyond those of this court are to be consulted, as clear and definite a determination of the question by a strong and learned court as can be found, is Leonard v. Commonwealth, by the Supreme Court of Pennsylvania. 112 Pa., 607, 4 Atl., 220. By the Constitution of Pennsylvania it was provided that any one while a candidate for office guilty of bribery, fraud or willful violation of ''any election law,'' should be forever disqualified from holding any office of trust or profit in the Commonwealth. Leonard, who had been elected to such an office and had entered upon its duties, was ousted from the office by a *quo warranto* proceeding under the authority of this provision of the Constitution. The election law he had violated was one relating to primary elections. On the appeal, it was contended that the phrase ''any election law'' used in the Constitution had no reference to primary elections. Holding that a constitution provides for the future as well as the present, and that the phrase in question meant any election law in existence when the Constitution was adopted, *''or thereafter to be passed by the Legislature, which that body had a right to pass,''* the court further said:

''What is an election law? Here, again, we must bring to our aid the common and popular use of words. Our laws are intended for the people, who are presumed to read and understand them. They are not like the edicts of the Roman Emperor Caligula, which Dio Cassino says were written in very small characters, and hung up so high that the people could not read them. When laws are made by a popular government, that is to say, 'a government

of the people, by the people, and for the people,' we may safely assume that words in a statute or a constitution are used in a sense in which the people who made the statute or constitution understood them; so that, when the people inserted in their constitution the words 'any election law,' it is fair to assume that they meant any law relating to elections.''

Is it any less fair to assume that the people of Texas in adopting section 2 of article 6 meant that the qualifications of voters in "any election" there prescribed should be the qualifications of all voters in all public elections then known to the laws of the State or that the Legislature might thereafter lawfully establish?

In The People v. Strassheim, 240 Illinois, 279, 22 L. R. A. (N. S.), 1135, 88 N. E., 821, it was held that a primary election law was within the meaning of the Constitution of that State prescribing the qualifications of voters, and that to be valid a primary election law must sustain those qualifications and not curtail, subvert or add to them.

Other cases to like effect—many might be cited, are The People ex rel. Breckon v. Board of Election Commissioners 221 Ill., 9; 77 N. E., 321, 5 Ann. Cases, 562; Rouse v. Thompson, 228, Ill., 522, 81 N. E., 1107; Spier v. Baker, 120 Calif., 370, 41 L. R. A., 196, 52 Pac., 659.

In Cooley's Constitutional Limitations, page 753, it is declared:

"Wherever the constitution has prescribed the qualifications of electors, they cannot be changed or added to by the Legislature, or otherwise than by an amendment of the constitution.''

In Black on Constitutional Law, page 648, it is said;

"Where the constitution of a State (as is usually the case) fixes the qualifications of those who are to enjoy the right of suffrage, it is the intention that the standards so set up shall remain unalterable until the popular will changes to such an extent as to involve an alteration of the organic law. In this case, it is not within the constitutional power of the State Legislature to alter, modify, or dispense with the qualifications determined by the constitution. It is not lawful to enact statutes which would either exclude persons admitted by the constitution, or admit persons whom the constitution would shut out, No new or different qualifications can be prescribed, nor can any of those named by the constitution be abrogated''

If section 2 of article 6 does not apply to voters at primary elections, neither does section 1 of that article. That section names certain classes of persons who "shall not be allowed to vote in this State." They are minors, idiots and lunatics, paupers, soldiers, marines and seamen employed in the service of the Army or Navy of the United States, and subject to such exceptions as the Legislature may make, all persons convicted of any felony Under this decision the positive prohibition of this section is of no force as to voters in primary elections. The effect of the decision is to affirm that

the Legislature has the power to say, if it chooses, that in those elections children may vote, as well as convicted felons.

The same is true with respect to section 5. To avoid interference with the exercise of the right of suffrage, it is there provided that in all cases, except treason, felony, or breach of the peace, voters shall be privileged from arrest during their attendance at elections and in going to and returning from them. Under this decision, no voter at a primary election may hereafter invoke the protection of that constitutional provision.

I hold that the right of the citizen to choose candidates for public offices is as valuable as the right to vote for them after they are chosen. In the nature of the right, there is no difference. The only difference is the occasion for its exercise. In this State, in actual result the primary election is the decisive election. No court can blind its eyes to this universally known fact. Nor can it escape the knowledge that holding the Constitution to be of no effect as to the qualifications of voters in primary elections is, in its real and actual substance, but to annul it as it relates to the qualifications of voters in the general elections.

Of what use is it to enforce the Constitution only in general elections, when, in fact, the primary elections are the decisive elections in this State in the choosing of public officers?

It will not be denied—it cannot be—that the framers of the Constitution and the people of the State in its adoption were deeply concerned that only those persons having the qualifications named in the Constitution should vote, or be entitled to vote, in the election, regardless of its name or other character, at which the elective officers of the State were to be determined. That much must be admitted. They must be credited with knowing that save in an election involving change in the State's organic law, that election would be the most vital in the affairs of the State. It is conceded that only those persons qualified according to the Constitution may vote in the general election. With the Constitution looking to the future and speaking for the future, and its mandates imperative throughout all the years of its duration; and with it an incontrovertible fact that the framers of the Constitution and the people in its adoption meant that in the selection of the elective officers of the State only persons should be privileged to vote who were qualified as by the Constitution required; what right, I ask, has this court to say, as a matter of law, that it was not intended that the Constitution should control the qualifications of voters in any election provided by law having conclusive force or vital relation in the choosing of those officers, which any future period might develop? The primary election provided by our laws is admittedly an election of that character and consequence. The language of the Constitution is plainly broad enough to include it, whatever may be the argument as to an intention to include it. Is it not fair and reasonable, therefore, to as-

sume that the Constitution was meant to include, such an election and to govern it? When the broad purpose of the Constitution in Section 1 and 2 of Article 6 is looked to, in my opinion no other conclusion is possible.

· If the Legislature is unrestrained by the Constitution in declaring what shall be the qualifications of voters in primary elections, it may not only add to the classes of persons entitled to participate in the naming of party candidates, but it may equally deprive of that right those classes now recognized as entitled to exercise it. Under this decision it would be within its authority to say that the citizen privileged under the Constitution to vote in the general election, should not be entitled to vote in the primary election of his party, notwithstanding his loyalty to it, long and honorable service in its promotion, and devoted concern for its success. If this broad and general power be conceded in the one instance, it cannot be denied in the other. The legislative power to declare what persons are qualified to enter primary elections is either controlled by section 2 of article 6, or else it is wholly exempt from the operation of that section. The decision affirms that the Legislature's authority is unaffected by it. If it is, what constitutional safe-guard protects the now qualified voter in a general election in his right to vote in the primary of his party? According to the view of the majority of this court if that right is ever threatened, he must look elsewhere than to the suffrage article of the Constitution. I believe the office of that article is to secure him in his right, and that it is an absolute protection of his right.

Who can say that it may not be threatened? Who can foretell the future? High-minded men to its honor and credit now fill the Legislature, but there was a time in our history when aliens held those seats of power and the State was under the yoke of their ruthless rule. It is in such periods as the days of Reconstruction that the value of a Constitution is most revealed, and it is against such periods that its provisions should not be rendered infirm.

It is not merely the privilege of a member of a political party to aid in the selection of its nominees; according to well know party practice it is his duty to help elect them by his vote. This decision means that the Legislature may say that women shall have the right to help decide in the choice of a party candidate, though they are powerless to vote for the candidate in the general election. For the purpose of naming the party nominees, in other words, the Legislature is held to have the power to declare that they shall be admitted to the full exercise of the rights of members of the party, but when it comes to electing those nominees by votes—the way they must be elected, if at all—the responsibility is cast wholly upon the members qualified under the Constitution to vote in the general election, at which women, it is admitted, cannot vote. This is but to say that the statutory electors, if in sufficient numbers and of similar

view, may determine the nominees of the party, but the constitutional electors shall have the burden of electing them. I deny the Legisla· ture has the power to declare in so vital a matter as the selection of the nominees of a political party, as having the full rights of members in the party, a class of persons, who are by the Constitution disqualified from performing what in its nature is among the most important of party obligations.

It is idle to say that the party may not object to the results of such a law. This case deals with the question of the Legislature's power. As it is here claimed for the appellant the validity of the power depends, not upon whether the political parties affected may consent or object to the consequences of its exercise, but upon whether the Legislature may enforce it over objection.

The contention that the provisions of the Constitution as to the qualifications of voters are not capable of practicable application to voters in primary elections and hence are not to be presumed as intended to refer to them, is in my opinion of no force. Wherein they are incapable of such application is not apparent. They were expressly made applicable to all voters in primary elections by one of the early acts of the Legislature on the subject, and they remained so until the passage of the act which is here involved—a considerable number of years. This is the only act in the history of the State where in any kind of an election prescribed by law, primary elections or other elections, the Legislature has declared that the qualifications of voters should be other than those named in the Constitution.

Waples v. Marrast, 108 Texas, 5, L. R. A., 1917A, 253, 184 S. W., 180, gives no support to the validity of this act and cannot be made authority for a holding which sustains it. The question there was not as to whether primary elections of political parties when prescribed by law were public elections in the sense of the Constitution, but whether their purpose was a public purpose for the furtherance of which the tax funds of the counties of the State might be expended. It was held that the payment of the expenses of holding such elections for the benefit of political parties was not for a public purpose; for which only, under the Constitution, the funds of the public treasury can be rightfully used. But there is nothing in the opinion which indicates that such elections are not to be treated as public elections. It expressly recognized that they are public elections, for it affirmed the right of the Legislature to require that they be held. If they are not public elections in the true sense, it is difficult to perceive upon what theory the Legislature has any right to control them. A public instrumentality may be capable of being used both for public purposes and private purposes, but its use for the latter would not change its identity or essential character.

I have not had the opportunity to review the prevailing opinion or the authorities it cites. Through no fault of its author, it reached my hands only the day before the rendition of this decision. All of

the cases cited are from other jurisdictions, except Hamilton v. Davis, recently decided by the Court of Civil Appeals for the Third District, (217 S. W., 431). If they hold that the terms "election" and "any election" used as are these terms in our Constitution, do not refer to primary elections prescribed by public law, they are in necessary conflict with Ashford v. Goodwin decided by this court, with decisions of other courts of ability, and in my opinion not sustained by reason and common sense. The Constitution, itself, is the authority which should determine this case. It is sufficient for the purpose, and in my judgment does determine it.

I have proper deference for an act of the Legislature and have no disposition to lightly set aside what it enacts as law. Any doubt as to the validity of its legislation is to be resolved in its favor. But to my mind the Constitution plainly condemns this act and I believe this court should so declare.

Opinion filed January 28, 1920.

### ON MOTION FOR REHEARING.

MR. JUSTICE HAWKINS delivered the opinion of the court.

Is the Limited Woman's Suffrage Act of 1918, chapter 34, p. 61, which seeks to confer upon women the privilege of voting in primary elections and in primary conventions, violative of section 2 of article IV of the Constitution of Texas?

That sole question was certified to our Supreme Court by our Court of Civil Appeals for the First Supreme Judicial District.

Said section 2 of article VI embodies what is known as the "suffrage clause" of our Constitution. Concededly, it restricts to "males" the privilege of voting in "any election" lying within its legal effect and operation.

To that certified question this court answered in the negative— holding that said statute is not violative of said suffrage clause. The controlling principle was that a primary election or a primary convention accomplishes no "governmental" purpose, and, in contemplation of law, concerns only a select and voluntary group of persons: and, consequently, is not an "election" within the historical meaning, or the legal effect or operation, of said suffrage clause. In that decision Chief Justice Phillips declined to concur, and filed' a dissenting opinion.

That decision of this court, as reflected in the clear yet brief majority opinion by Mr. Associate Justice Greenwood, announces no new or strange doctrine. It presents no novel principle in the construction of Constitutions.

Whether that decision be right or wrong, each and every principle upon which it rests is supported by an overwhelming weight of legal authority throughout the United States. That, at least, is a plain, stubborn, undeniable fact, which said dissenting opinion does not even question. See cases cited in said majority opinion.

Moreover, and of greater present importance, is the additional demonstrable fact that said decision of this court in this case is strongly supported, in principle, by four unanimous decisions of this court, rendered prior to the enactment in this State of any statute relating to woman suffrage. Graham v. City of Greenville, 67 Texas, 62, 2 S. W., 742; State v. Waxahachie, 81 Texas, 626, 17 S. W., 348; Waples v. Marrast, 108 Texas, 5, 184 S. W., 180; Beene v. Waples, 108 Texas, 140, 187 S. W., 191. In the first two cases this court held the provision of our Constitution that "in all elections by the people the vote shall be by ballot" (Sec. 4, Art. VI), inapplicable to the statutory "vote" on annexation of adjoining territory to a city. (R. S. 1879, art. 503; R. S., 1911, art. 781.) Each of the latter two cases involved the constitutionality of a primary election statute, and in each the inherent and radical distinction existing between "primary elections" and "general elections" was clearly drawn and emphasized, and, in each instance, that distinction, involving a clear-cut *classification* by this court of "elections" of essentially different kinds, was treated as a sufficient basis, or test, for determining the constitutionality or unconstitutionality of a primary election statute. In both of those cases this court classified "elections" as being either "governmental," including "general elections," or non-governmental, including "primary elections."

In Waples v. Marrast, *supra*, in 1916, in a clear and forcible opinion by the author of the dissenting opinion in the present case, this court declared, without a dissenting voice, that any primary election is, essentially, merely *advisory*, rather than *of final effect*, in that it does not determine, in contemplation of law, who shall fill any office, or whether any particular "governmental" policy shall or shall not prevail, but, on the contrary, is for only "party" purposes, affecting only some of the people, in contradistinction to "governmental" or "public" purposes, affecting *all* the people, and that, consequently, payment of expenses of a primary election out of public revenues derived from taxation is inhibited by that clause of our State Constitution which declares that "taxes shall be levied and collected . . . for *public purposes* only," (Sec. 3, Art. VIII), and also by that clause thereof which denounces the use or "grant" of "public money in aid of or to any individual, association or corporation whatsoever," (Sec. 52, Art. III). Accordingly, in that case, and solely upon that ground, this court held the entire Presidential Primary Act of 1913 unconstitutional and void.

Shortly afterward, during the same term, in Beene v. Waples, in an opinion prepared by this writer, this court expressly and plainly, and again without dissent, reaffirmed the doctrine or principle so declared and upheld in Waples v. Marrast, citing that case in its support, and declaring that if our Senatorial Primary Election Statute, then in question, "should be construed as meaning that the election officers referred to therein . . . are

to be paid, for their services, out of public funds, such provision for payment, is plainly, unconstitutional, as directing a misuse of public funds;" but that statute was given a different construction, saving it from the taint of such invalidity.

The gist of the principle, or doctrine, which those two former unanimous decisions of this court established in this State *as of controlling importance in determining the validity or invalidity of primary election statutes,* is, undeniably, and, simply, that, unlike general elections, primary elections are not for any truly "public" or "governmental" purpose; or, in the graphic language of our Chief Justice, in Waples v. Marrast, "they perform no governmental function."

The present case is, therefore, the third case in which the hereinabove stated distinction between primary elections and governmental elections has been made, squarely and unmistakably, the basis of a decision of this court in passing upon the constitutionality of a primary election law; yet this is the first instance in which any member of this court has dissented from the full and logical application of the above stated doctrine or principle to the facts of the case or question then before the court for decision, even though, in the first case, it resulted in striking down an Act of the Legislature. However, in the first two cases the right of women to vote in a primary election was not involved.

That selfsame doctrine, or principle, involving that selfsame *classification* of elections, which, thus, was so clearly enunciated, and so firmly fixed in the jurisprudence of Texas, by repeated decisions of this court, in which all members, including our present Chief Justice, heartily concurred—a doctrine or principle strongly upheld by so many of said cited decisions in other States—forms one of the two cornerstones upon which rests the decision of this court in the present case. The other cornerstone thereof is the proposition that, under our form of government, it is the duty of the courts to uphold, as valid, a legislative enactment unless its unconstitutionality is clear and unquestionable. Said statute is not *clearly* unconstitutional. To that rule, although not to its application in this case, said dissenting opinion of our Chief Justice yields full assent, in saying, as it does with reference to our Legislature, "any doubt as to the validity of its legislation is to be resolved in its favor." As to the correctness of that rule, in testing validity of statutes, there is no difference of opinion whatever; anywhere, among the authorities.

Except as restricted by the organic law of the land—the Constitution of the United States or the Constitution of the State—a Legislature has, of course, full power and authority to deal, as it may see fit, with the subject of suffrage in any election which may be required or authorized by law. That proposition is axiomatic.

That much being true, the declaration of Chief Justice Phillips, in his dissenting opinion in the present case, that said decision of this court therein "subverts the Constitution of this State and makes of it a vain and useless document" at once is seen to be of deep and broad significance. It not only challenges the correctness of that decision, but, in logical effect, it arraigns the general soundness of the principle enunciated by himself, for this court, in Waples v. Marrast, *supra,* and, by necessary implication, it includes, also, within said quoted and far reaching indictment, numerous carefully matured and similar decisions of many learned and distinguished jurists of various other States which uphold, as not repugnant to similar suffrage clauses, the power of their own Legislatures to prescribe different qualifications for voting in primary elections.

Can it, then, really be true that thus, through the passing years, the carefully considered and well settled decisions of so many reputable courts of last resort in other States have done such destructive violence to the Constitutions of their own States, in construing a suffrage clause which, our Chief Justice asserts, "is so simple and plain as not to admit of construction or refinement by courts?" And in applying to said Limited Woman's Suffrage Statute of 1918, as a test of its validity, the hereinabove stated doctrine, or principle, concerning *primary elections,* which, formerly, this court had enunciated as a test of statutory validity, in Waples v. Marrast, and had reiterated in Beene v. Waples, even prior to the enactment of that statute, did this court indeed err? If so, the situation is quite unusual, calling for a complete and prompt reversal of said decision in the present case—ere the ending of this term shall forever terminate this court's present unquestionable power and authority to take such action in this case.

Coming from their exalted source, the above quoted declarations of our Chief Justice in said dissenting opinion—first, that said suffrage clause is "so simple and plain as not to admit of construction or refinement by the courts," and, second, that said decision in the present case "subverts the Constitution of this State," well may cause the other members of this court candidly and patiently to examine, anew, the foundations of their own faith in the soundness of their decision in this case, and, if said decision be found unsound, to reverse themselves; or, if it be found correct, to reiterate, in somewhat more extended form, and, if possible, to emphasize, the reasons which impel its affirmance.

Certainly this court should not permit any erroneous decision to stand; and where, as in this instance, the case involves a great constitutional question upon which conflicting decisions have been rendered by Supreme Courts of different States, and upon which the Supreme Court of one State reversed its own earlier holding, and upon which, in several States, members of the same Supreme

Court have written conflicting opinions, and upon which the members of even this court, after painstaking research and careful study of the question, have been unable to agree, it is of prime importance that this court's final decision of that question shall be unquestionably sound and correct.

Moreover, the motion and argument of the tax collector, Schneider, for a rehearing, prepared and filed in this court by his attorneys, and covering fifty-nine printed pages, is entitled to this court's careful consideration.

But is said original decision of this court in this case, even though so thoroughly backed up and supported by so many decisions of other courts, and by various former decisions of this very court, nevertheless erroneous? Let us see.

Do primary elections and primary conventions really lie within the historical meaning, and the legal effect and operation, of our said suffrage clause? That is the very heart of said certified question.

The decision of this court in this case proceeded upon the view that the word "election" as used in said suffrage clause, is susceptible of more than one meaning and is, therefore, open to construction by the courts. The declaration of said dissenting opinion is that the word "election" as there used, is "plain, simple and unmistakable," "so simple and plain as not to admit of construction or refinement by courts." That is the precise point of divergence between those opinions.

At the outset it must be conceded, candidly, that to the definition of "electors" in the suffrage clause of a Constitution is applicable the maxim "the mention of one is the exclusion of the other," and, because of that restrictive effect, the Legislature is powerless validly either to add to or to take from such constitutional qualifications of voters in any "election" really lying within the legal scope and operation of that suffrage clause. It follows that if, in answering said certified question, the full "rigor of the phraseology" of said suffrage clause is to be applied, literally—if the word "election" in that clause was there used by our fathers in its broadest etymological significance, if it is as inelastic as cast-iron, if it is, indeed, wholly "unambiguous," and, consequently, not open to "construction" by the Legislature and the courts—then the conclusion voiced in said dissenting opinion in this case is sound, and said statute of 1918 should be held unconstitutional and void. But upon no other theory or view whatsoever can that conclusion rationally be maintained. Here, then, we have the crux of the whole matter.

Whether "election" as used in such a suffrage clause does or does not embrace "primary elections" has been, frequently, a mooted question. In most of the States where it has arisen that question has been decided negatively; but in a few States it has been decided affirmatively. To say the least of it, history demonstrates that, upon

that issue, there have been numerous irreconcilable conflicts between decisions of courts of other States, and, in certain instances, as in this case, between opinions of members of the same court. If the word "election," as used in such a suffrage clause, is not, indeed, ambiguous, why have so many trained jurists in other States disagreed as to its full meaning, and legal effect and operation, many holding, as do a majority of this court, that it *does not,* and a few declaring, as does our dissenting member, that it *does,* include "primary elections?" Why this lawsuit? Why the case of Hamilton v. Davis, Tax Collector, 217 S. W., 431, from another portion of this State, which was decided, here, on the same day as this present case? And why was said certified question in this case sent by a Court of Civil Appeals to the Supreme Court for answer? And why, after exhaustive research and very careful consideration of that very issue, have the majority and the minority of even the Supreme Court been unable to agree, even as to whether the word "election" as used in said suffrage clause, is or is not ambiguous—calling for "construction" by this court? What better or fairer, even though not conclusive, practical tests of ambiguity of language can be devised or applied? Upon the issue as to the true meaning and legal operation of that word, "election," as intended by such a suffrage clause, there certainly has existed, and, it seems, there still exists, a considerable difference of opinion among men whose carefully matured opinions on that very point are entitled to respectful consideration. The *ambiguity* of "election," as used in said suffrage clause, therefore, fairly and reasonably may be regarded and treated as definitely established.

Reason and all the authorities agree that where the language of a Constitution or of a statute is ambiguous, "construction" thereof becomes necessary. That much is conceded by said minority opinion.

Black's Law Dictionary (2 ed.), defines "construction" thus: "The process, or the art, of determining the sense, real meaning, or proper explanation of obscure or ambiguous terms or provisions in a statute, written instrument, or oral agreement, or the application of such subject to the case in question, by reasoning in the light derived from extraneous connected circumstances or laws or writings bearing upon the same or a connected matter, or by seeking and applying the probable aim and purpose of the provision."

The decisions of our own Supreme Court, and of perhaps every appellate court in the United States, are replete with "constructions" of ambiguous provisions of State Constitutions. 4 Enc. Dig. Tex. Rpts., 388, note 1 and cases cited. Constitution of Texas, Annotated (Harris), pages 52-901.

The provision of section 3 of article VII of our Constitution relating to the levy and collection, by school districts, of advalorem taxes "for the further maintenance of public free schools, and the

erection and equipment of school buildings therein" was *construed* by this court, and was held to include " 'sites,' and land on which to erect the buildings." The decision was unanimous, our present Chief Justice concurring. The opinion, by Chief Justice Brown, declared: "The literal construction of the Constitution insisted upon would destroy the bonds heretofore issued by school districts and create confusion in the management of the public free schools. But we have no hesitancy in holding the granting of the authority to build school houses implies the authority to acquire the land on which they are to be erected. Lewis' Sutherland Statutory Construction, vol. 2, secs. 502, 503, 504." Glass v. Pool, 106 Texas, 266, 166 S. W., 375. Verily, "the letter killeth, but the spirit giveth life." 2 Cor., 3, 6.

See, also, Aransas Co. v. Coleman-Fulton Pasture Co., 108 Texas, 216, 191 S. W., 553, wherein the word "roads," as used in subdivision (c) of section 52 of article III of our State Constitution, was *construed* by this court, and was held to apply to a certain roadway, including a reinforced concrete bridge more than three thousand feet in length across an arm of the sea. In that case this court said, through Chief Justice Phillips: "Concretely, therefore, the question for decision is the sense in which the term 'roads' is used in section 52 of article 3 of the Constitution. . . . In different provisions of the Constitution, namely section 56 of article 3, section 9 of article 8, section 2 of article 11, and section 24 of article 16, roads and bridges are dealt with as distinct subjects. In section 9 of article 8, the construction of each is recognized as a distinct purpose of taxation. Inasmuch as the term 'roads' is very plainly used in these sections in a specific sense, it is urged by the defendants in error that the same restricted meaning should be given it in the construction of section 52 of article 3. Such was the view of the Court of Civil Appeals. There is force in the position as a general rule of construction. But the sense in which a term is used in other provisions of the Constitution is not a conclusive test of its meaning in a particular provision. The spirit, purpose and scope of the particular provision are all to be consulted in the effort to determine with certainty the meaning of its terms."

If the word "roads," as used in our Constitution, is indeed thus subject to "construction," and even entitled to *varying meanings*, according to the context, may not the word "election" as used in that same instrument, although a word in general use by the plain people, be subject, likewise, to "construction" by courts, in ascertaining and carrying out the purpose of those who made our Constitution, thereby, in the present case also, leaving the Legislature without unwarranted restrictions in the exercise of its broad law-making powers?

See, also, Cox v. Robison, 105 Texas, 426, 150 S. W., 1149, the opinion being by our present Chief Justice. Therein this court *construed, in the light of history,* the words "releases" and "owner," as used in the declaration of our Constitution that "the State of Texas hereby releases to the owner or owners of the soil, all mines and minerals that may be on the same, subject to taxation as other property." Sec. 7, Art. XIV. The history of the matter was held to require that said provision of the Constitution be construed as operating retrospectively only, and not prospectively. No fine distinction between the "construction" and the "exposition" of Constitutions was drawn.

Such hereinabove mentioned ambiguity in the meaning and legal effect of the word "election" in our said suffrage clause existing, it is, undeniably, not only the proper function, but the duty, of this court, in answering said certified question, properly to construe that quoted word before testing, thereby, the validity of said legislative enactment of 1918 relating to restricted woman suffrage.

In construing said word "election," as it stands in said suffrage clause—in ascertaining its true and full legal operation and effect—certain long established and generally accepted canons of constitutional construction are applicable, and must prevail. The result which logically must follow is one for which neither this court nor its members are in any sense responsible.

Due consideration and weight (although not necessarily conclusive force), should be given by the courts to a construction placed by the Legislature upon the State Constitution. Chambers v. Fisk, 22 Texas, 504; Willis v. Owen, 43 Texas, 41; Holmes v. State, 44 Texas, 631; Cook v. Brown, 45 Texas, 73; Ft. Worth v. Davis, 57 Texas, 225; Robertson v. Breedlove, 61 Texas, 316; Barker v. Torrey, 69 Texas, 7, 4 S. W., 646; Galveston H. & S. A. Ry. Co. v. State, 77 Texas, 367, 12 S. W., 988; State v. McAllister, 88 Texas, 284, 31 S. W., 187, 28 L. R. A., 523; Bahn v. Starcke, 89 Texas, 203, 59 Ann. St., 40, 34 S. W., 103; Brown v. Galveston, 97 Texas, 1, 75 S. W., 488; Cox v. Robison, 105 Texas, 426, 150 S. W., 1149; Bowser v. Williams, 6 Texas, Civ. App., 197, 25 S. W., 453; Hovey v. State, 119 Ind., 386, 21 N. E., 890.

"Great deference is due to a legislative exposition of a constitutional provison." Sedg. on Stat. and Const. Law, p. 412 and c. c.

"In case of doubtful interpretation, a long-settled and well-recognized judicial interpretation, or even legislative or executive construction within the sphere of their respective functions, might be sufficient to turn the balanced scale." Willis v. Owen, *supra.*

"The rule is that, a law will not be declared unconstitutional unless it is clearly so, and in cases of doubt it will be held valid. The opinion of the Legislature of its constitutional power is entitled to great weight." Barker v. Torrey, *supra.*

In discussing the effect which courts should give to a construction placed by the law-making department upon an ambiguous provision of a State Constitution, the Supreme Court of Indiana through Elliott, C. J., said in Hovey v. State, *supra*.

"As there is some warrant in the Constitution for the claim of the legislative right to appoint the governing officers of the benevolent institutions, it is our duty to ascertain what practical exposition has been given to the Constitution, and if we find a principle established by long continued practice, we must yield to it, unless we are satisfied that it is repugnant to the plain words of the Constitution. We are far from asserting that the plain provisions of the Constitution may be broken down or overleaped by practical exposition, but what we do assert is, that where, as here, there are provisions not entirely clear and free from doubt, practical exposition is of controlling force. Our own and other courts have time and time again adjudged that practical exposition is of controlling influence wherever there is need of interpretation. The language employed by the courts is strong, and the current of opinion is unbroken. . . . But it is unnecessary to quote the expressions of the courts, for harmony reigns throughout the whole scope of judicial opinion upon this subject. Board, etc., v. Bunting, 111 Ind., 143; Weaver v. Templin, 113 Ind., 298, 301; Stuart v. Laird, 1 Cranch, 299; Martin v. Hunter, 1 Wheat., 304; Cohens v. Virginia, 6 Wheat., 264; Ogden v. Saunders, 12 Wheat., 213, 290; Minor v. Happersett, 21 Wall., 162; State v. Parkinson, 5 Nev., 15; Pike v. Megoun, 44 Mo., 491; People v. Board, etc., 100 Ill., 495; State v. French, 2 Pinney (Wis.), 181."

A kindred rule is that where a statute is ambiguous—open to construction—a construction given it by even the head of an executive department of the State government will be followed and upheld by the courts, unless such construction is clearly erroneous. Hancock v. McKinney, 7 Texas, 384; Johnston v. Smith, 21 Texas, 722; Dean v. State, 54 Texas, 315; Smith v. McGauhey, 87 Texas, 61, 26 S. W., 1073; Houston & T. C. Ry. Co. v. State, 95 Texas, 507, 68 S. W., 777; McGee v. Corbin, 96 Texas, 35, 70 S. W., 79; Tolleson v. Rogan, 96 Texas, 424, 73 S. W., 520; State v. Timme, 54 Wis., 340, 11 N. W., 785.

Judge Cooley, in his great work on Constitutional Limitation (6 ed. p. 83), said: "Great deference has been paid in all cases to the action of the executive department, where its officers have been called upon, under the responsibilities of their official oaths, to inaugurate a new system, and where it is to be presumed they have carefully and conscientiously weighed all considerations, and endeavored to keep within the letter and the spirit of the Constitution. If the question involved is really one of doubt, the force of their judgment, especially in view of the injurious consequences that may

result from disregarding it, is fairly entitled to turn the scale in the judicial mind.''

In Tolleson v. Rogan, *supra,* it was said: ''While, as this court has frequently held, actions of such officers in plain opposition to law cannot be upheld, it is equally true they are entitled to great weight in determining the true construction of doubtful and indefinite regulations made for their guidance.''

In State v. Gunter, 36 Texas, Civ. App., 381, 81 S. W., 1028, the statute and a later Act amending it were involved in such uncertainty on the point presented as to impel the courts to adopt and follow the construction given to said statutes by the Attorney-General and by the Commissioner of the General Land Office. A writ of error was refused by this court.

Both of the hereinabove stated rules on construction involve recognition of respect due to co-ordinate departments of government. Everywhere they are regarded as sound, and such constructions, unless clearly unsound, are regarded as being of persuasive force.

Already, and aside from the decision of this court in this case, said suffrage clause has been treated as *open to construction,* and has been *construed,* in several instances, by others, who also, were under a solemn oath of office faithfully to discharge and perform their duties according to the best of their skill and ability, ''agreeably to the Constitution . . . of this State.'' Const. Tex., Art. XVI, Sec. 1.

In the first instance the Legislature construed said suffrage clause as not prohibiting the valid enactment of said statute of 1918, which undertook, for the first time in Texas, to confer upon *women* the privilege of participating in *party councils.* That legislative action obviously was based upon the belief that the word ''election,'' as used in said suffrage clause does not, in legal effect, include primary elections and primary conventions. Galveston, H. & S. A. Ry. Co. v. State, 77 Texas, 367, 12 S. W., 988; Railroad Commission v. Railway, 90 Texas, 340, 36 S. W., 750; Brown v. City of Galveston, 97 Texas, 1, 75 S. W., 488; Ashford v. Goodwin, 103 Texas, 491, 131 S. W., 535, Ann. Cases, 1915A, 699; Lewis' Sutherland on Stat. Const., sec. 82.

''Each legislator is required to take the official oath prescribed by the Constitution, which pledges him to discharge his duty in conformity with that instrument. The enactment by the Legislature of the charter of Galveston involved the consideration, by each member of both houses and the governor, of the question now before us, that is, each must have determined that the bill did not violate the Constitution of the State of Texas in any particular.'' Brown v. City of Galveston, *supra.*

Enactment of said limited woman's suffrage statute of 1918 amounted, necessarily, to a legislative *classification* of ''elections,'' into two classes, to-wit: first, elections to which said suffrage clause

*does* apply—such as "general elections" in which, of course, only "males" may be permitted to vote, and, second, elections to which said suffrage clause *docs not* apply—such as "primary elections" and "primary conventions." Thus, while distinctly recognizing that, as related to elections of said first class, said suffrage clause is, indeed, *restrictive* in meaning and in legal effect, denying to the law-making department power or authority validly to pass any statute authorizing *women* to vote in elections of *that class,* the Legislature, in enacting said statute of 1918, deliberately and solemnly asserted its belief that such restrictive effect of said suffrage clause does not extend to or embrace elections of said *other class*—including primary elections and primary conventions— and that, as a necessary consequence, the Legislature was free, under the Constitution, and in the exercise of its general legislative powers, validly to enact said statute of 1918, conferring upon women the privilege of voting in elections of the *latter class.* Its general legislative power is not restricted except by the Constitution of the United States and the Constitution of this State. Brown v. Galveston, 97 Texas, 1, 75 S. W., 488; Lytle v. Halff, 75 Texas, 128, 12 S. W., 610; Harris Co. v. Stewart, 91 Texas, 143, 41 S. W., 650; Cooley, Const. Lim., 200-201.

Courts must assume that in enacting a statute the Legislature was familiar with previous decisions of the Supreme Court affecting the subject-matter. Wright v. Tipton, 92 Texas, 168, 46 S. W., 629.

It seems clear that in 1918, in the enactment of that statute relating to primary elections, the Legislature undertook to profit by experience, and to avoid the mistake into which it had fallen in 1913 in the enactment of the hereinabove mentioned Presidential Primary Election Statute, which, meanwhile, in 1916, had been held void, by said decision of this court in Waples v. Marrast. That former legislative error consisted, in 1913, solely and simply, in classifying primary elections in the same class with "general elections" and other *"governmental"* elections, and, as a consequence, in undertaking, to authorize payment of primary election expenses out of public revenues. That was the very thing that this court, in Waples v. Marrast, and again in Beene v. Waples, (both prior to 1918), expressly had declared violative of section 3 of article VIII and also of section 52 of article III of our Constitution, although, in each of those unanimous opinions, the authority of the Legislature to authorize payment of expenses of elections of *a different class,* embracing "general elections," out of such funds, was recognized and expressly declared. Accordingly, in making the classification of elections which, as hereinabove shown, the enactment of said statute of 1918 necessarily involved, the Legislature evidently undertook intelligently and faithfuly to observe, and, certainly did follow, strictly, the precise lines of demarcation *in classification of elections* which the judicial department of the government, in those two

earlier cases, distinctly had marked out and defined, and had applied, as a test of validity of the two primary election statutes of 1913 which, respectively, were involved in those cases.

Said evident and successful attempt of the Legislature in 1918, to adopt and follow said antecedent judicial classification of ''elections,'' as a test of the constitutionality of primary election statutes, is a fact worthy of note, in tracing the history of primary election statutes in Texas.

Why should that triply affirmed classification of elections be now repudiated?

Said statute of 1918 (House Bill No. 105), passed the House of Representatives by a vote of ''yeas 84, nays 34.'' It passed the Senate by a vote of ''yeas 18, nays 5, 4 pairs.'' That means, necessarily, that 102 members of the Legislature considered H. B. 105 not repugnant to said suffrage clause, section 2, article VI, or to any portion of our State Constitution, but in all respects valid. The opposing votes did not necessarily question its constitutionality; but, if they be construed as so doing, it means no more than that 47 members of the Legislature represented in the voting considered the bill violative of *some* provision of our organic law—probably of said suffrage clause. The net result, upon even that theory of the vote, would be that more than two-thirds of the stated aggregate number, by their recorded votes, solemnly affirmed the entire constitutionality of the measure, and less than one-third questioned it, their recorded vote tending, at most, *to raise a doubt* concerning the validity of that measure.

Moreover, instead of vetoing said H. B. 105 as being obnoxious to said suffrage clause, or permitting that Bill to become a law without his signature, the Governor endorsed upon it his affirmative approval, thereby, in legal effect, declaring his belief in the entire constitutionality of that measure.

In the second instance said legislative construction of said suffrage clause received high judicial sanction.

In Hamilton v. Davis, the District Court of McLennan County, Fifty-fourth Judicial District, a constitutional court of general original jurisdiction, sustained a general demurrer to a petition which sought an injunction to restrain the tax collector of that county from issuing a poll tax receipt to any woman pursuant to said statutes of 1918. As grounds for such relief that petition expressly alleged that said statute was repugnant to said suffrage clause, section 2 of article VI, and to several other therein particularly mentioned sections of our Constitution. A general demurrer to said petition was sustained by the District Court, upon a ground or grounds not disclosed by the record in that case. However, upon appeal therein, that judgment, refusing an injunction, was affirmed by our Court of Civil Appeals for the Third Supreme Judicial District, upon the ground that said statute of

1918 (here under attack), is constitutional and valid, as well as upon the ground that, in any event, the petitioner had an adequate remedy at law in the form of a contest of the election. Hamilton v. Davis, 217 S. W., 431. Under our judicial system that high court is clothed with broad appellate jurisdiction, much of which is final. That court declared: "It is the contention of appellant that 'election' as that term is used in section 2, article 6, of the Constitution of this State, in which the qualifications of voters at 'an election' are stated, includes primary elections. With this we do not agree;'' citing and quoting from Waples v. Marrast, *supra,* and numerous cases from other States.

But not all of the directly pertinent Texas judicial decisions down to the appearance of the present case in this court, are in harmony. In this very case the District Court of Fayette County, Twenty-second Judicial District, another constitutional court of general original jurisdiction, sustained a general demurrer to the petition of plaintiff praying for a writ of mandamus to compel the tax collector of Austin County to issue to her a tax receipt, pursuant to said statute of 1918, the ground of that decision being, it appears, that said statute was "unconstitutional and void." That decision of the District Court in this case conflicts, squarely with said subsequently rendered decision of said Court of Civil Appeals for the Third District, in Hamilton v. Davis. That very conflict suggests a grave doubt, at least, as to whether said statute of 1918 is valid or invalid. Evidently it was because of that doubt that, instead of deciding that question, the Court of Civil Appeals for the First District certified it to this court for answer. Thus it appears that before this case reached this court the constitutionality of said statute had been solemnly affirmed by 102 members of the Legislature, and by the Governor, and by the unanimous decision of a Court of Civil Appeals consisting of three members, totalling 106 State officers, besides the Attorney General, who appeared in Hamilton v. Davis and in the present case, in support of said statute. Moreover, most of the county tax collectors, all over the State have observed and enforced it as being valid.

Under such circumstances, involving upon one hand, the decision of one District Court holding said statute of 1918 invalid, and the certificate of one Court of Civil Appeals implying, although not expressing, doubt upon that point, and, upon the other hand, the conflicting construction so given to said suffrage clause by 102 legislators and the Governor, and the Attorney General, and by another Court of Civil Appeals, and in view of said two unanimous and comparatively recent supporting decisions of this court in Waples v. Marrast and in Beene v. Waples, and the numerous hereinabove mentioned antecedent decisions of supreme courts of other States holding, squarely, that such suffrage clauses are not applicable to primary elections, the majority of this court do not believe, and

are unwilling to hold, that said Texas statute of 1918 is *clearly* repugnant to our said suffrage clause, section 2, article VI. It follows that said certified question must be answered negatively.

That the courts should uphold a statute as valid unless it is clearly unconstitutional is well settled by the authorities everywhere, and is expressly conceded by said dissenting opinion in this case. The settled and oft repeated decisions of this court, rendered prior to the enactment of said statute of 1918 are, very clearly, to this effect: Every intendment and presumption being in favor of the constitutionality of a statute, it should not be held invalid unless its unconstitutionality be made to appear *beyond any reasonable doubt.* Sutherland v. De Leon, 1 Texas, 250; 'Orr v. Rhine, 45 Texas, 345; Brown v. Galveston, 97 Texas, 1, 75 S. W., 488; Ashford v. Goodwin, 103 Texas, 491, Ann. Cases, 1915A, 699, 131 S. W. 535; St. Louis S. W. Ry. Co. v. Griffin, 106 Texas, 477, L. R. A., 1917B, 1108, 171 S. W., 703; Glass v. Pool, 106 Texas, 266, 166 S. W., 375; White v. White, 108 Texas, 570, L. R. A., 1918A, 339, 196 S. W., 508. To the same effect are: Powell v. Pennsylvania, 127 U. S., 684, 8 Sup. Ct., 995, 32 Law Ed., 253; Labauve v. Michel, 121 La., 374, 46 So., 430; Beall v. Beall, 8 Ga., 210; Parkham v. Justices, 9 Ga., 341; Hanna v. Young, 84 Md., 179, 35 Atl., 674, 34 L. R. A., 55, 57 Am. St. Rep., 396; Kelso v. Cook, 184 Ind., 173, Ann. Cases, 1918E, 68, 110 N. E., 987; Morrow v. Wipf, 22 S. D., 146, 115 N. W., 1121; People v. Wright, 6 Colo., 92; Mayor v. Shattuck, 19 Colo., 104, 41 Am. St. Rep., 208, 34 Pac., 947; Miami Co. v. Dayton, 92 Ohio, 215, 110 N. E., 726; De Walt v. Bartley, 146 Pa., 529, 15 L. R. A., 771, 28 Am. St. Rep., 814, 9 R. C. A., 1025, section 42, and note 2; Black, Const. L., p. 61.

"It has been said by an eminent jurist that when courts are called on to pronounce the invalidity of an act of the Legislature, passed with all the forms and ceremonies requisite to give it the force of law, they will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light upon the subject, and never declare a statute void, unless the nullity and in-validity of the act are placed, in their judgment, beyond reasonable doubt. A reasonable doubt must be solved in favor of the Legislative action, and the act be sustained." Cooley's Constitutional Limitations (6 Ed.), p. 216.

In Powell v. Pennsylvania, *supra,* the Supreme Court of the United States declared: "every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt."

In Ashford v. Goodwin, *supra,* upon which said dissenting opinion in this case places great reliance, this court through Judge Brown, said: "When the Legislature passed that Act they must, in the discharge of their duty, have determined that the power to so enact

was conferred upon that body by the language we have quoted above from section 8 of article 5 of the Constitution as amended. The Legislature having determined that the power was granted to that body to pass the law, this court must sustain it unless its invalidity be apparent beyond a reasonable doubt." That declaration formed the main basis of this court's decision in that case.

"We know of no rule of law that would authorize us to say that an act of the Legislature is unconstitutional unless it be clearly so." Sutherland v. De Leon, *supra.*

"The Act should be upheld by the court unless it is clearly unconstitutional." White v. White, *supra.*

Again, this court said:

"If the statute is not manifestly in conflict with some provision of the Constitution, then we must sustain and construe it as we find it expressed. . . . 'Statutes cannot be declared invalid on the ground that they are unwise, unjust, unreasonable or immoral, or because opposed to public policy, or the spirit of the Constitution. Unless a statute violates some express provision of the Constitution it must be held to be valid.' Lewis' Sutherland, Statutory Construction, vol. 1, sec. 85. The law in this respect has not been shown to be in conflict with the Constitution in any particular, therefore no court in this State has power to right that wrong, if it be such." Glass v. Pool, *supra.*

In Railway v. Griffin, *supra,* this court said: "If, by reasonably fair construction it appears that the Legislature was empowered to enact the law, this court will recognize it as valid—that is, a serious doubt of the power must be resolved in favor of the validity of the law." In support of that proposition this court there quoted as follows from Lewis' Sutherland on Statutory Construction, sec. 82.

"Every presumption is in favor of the validity of an Act of the Legislature, and all doubts are resolved in support of the Act. 'In determining the constitutionality of an Act of the Legislature, courts always presume in the first place that the Act is constitutional. They also presume that the Legislature acted with integrity, and with an honest purpose to keep within the restrictions and limitations laid down by the Constitution. The Legislature is a coordinate department of the government, invested with high and responsible duties, and it must be presumed that it has considered and discussed the constitutionality of all measures passed by it.' The unconstitutionality must be clear or the act will be sustained."

Our Court of Criminal Appeals, in an opinion by Judge Ramsey, declared: "The rule is universal that the courts will not declare an Act of the Legislature unconstitutional unless such infirmity and vice clearly appears." Solon v. State, 54 Texas, Crim. Rep., 262, 114 S. W., 349.

But, as hereinabove indicated, and as succinctly yet clearly and strongly set forth in said majority opinion in the present case, there

is another, and separate, and largely independent, and entirely sufficient and satisfactory reason which impels the same negative reply to said certified question. It is a reason which goes to the merits of that question, leaving wholly out of consideration, for the time, any and all weight and importance which has been given, hereinabove, to the stated legislative construction of our said suffrage clause as not prohibiting the enactment of said statute of 1918.

Upon the merits, then, the question recurs: Are primary elections and primary conventions "elections" within the historical and generally accepted meaning, and the legal effect and operation, of said restrictive provisions of our said suffrage clause, section 2 of article VI? By what standards or tests should that question be answered, unless it be by those which generally have been applied, with controlling force, by the best law writers and by practically all Supreme Courts throughout the United States, including Texas?

Already, the word "election," as employed in said suffrage clause has been shown, hereinabove, to be ambiguous, necessitating, in this case, construction by the courts.

The primary purpose of all construction of language is to try out its intendment—to ascertain its true meaning in the context. So, in construing a statute, the purpose is to ascertain the legislative intent, which is ascertainable from the language employed as tending to accomplish the legislative design and purpose. When that language has a well settled meaning and legal significance it is presumed to have been used in that sense. Thus, when our Legislature brings over from a sister State, and adopts, in identical or substantially similar terms, a statute which has received a settled construction from the courts of the State from which it was so borrowed, the courts of this State customarily apply to it the same construction which it had received in the sister State. That is done in recognition of a generally accepted rule of construction, and upon the presumption and belief that the Legislature expected and desired that such rule of construction would be applied by the courts in ascertaining and declaring, and in enforcing, the true legislative intent and purpose. What better test could there be? That rule of statutory construction has prevailed in Texas, and elsewhere, since long prior to the enactment by our Legislature of said restricted woman's suffrage statute in 1918. De Cordova v. Galveston, 4 Texas, 470; Munson v. Hallowell, 26 Texas, 481, 84 Am. Dec., 582; City of Tyler v. Railway, 99 Texas, 497, 91 S. W., 1, 13 Ann. Cas., 911; Green v. G. U. O. of Odd Fellows, 106 Texas, 225, 163 S. W., 1071; McDonald v. Hovey, 110 U. S., 619, 4 Sup. Ct., 142, 28 L. Ed., 269; Black on Interpretation of Laws, p. 361 and cases cited.

In De Cordova v. Galveston, *supra,* this court, through Chief Justice Hemphill, did not hesitate to say:

"In attempting to ascertain the intent of the prohibition, we can derive material assistance from the examination of the constitutions of other States, in which similar restrictions are to be found, and from the decisions of the enlightened tribunals by which such provisions have been considered and expounded."

In Munson v. Hallowell, *supra*, it was said by this court:

"It cannot be doubted that when a statute which has been borrowed by us from England or some of the older American States, has, previous to our enactment of it, received a settled and uniform construction by the courts of the country from which we have taken it, our courts will give to it a similar construction. . . . Whether the construction here indicated is the one we should place upon the statute if it were a question of first impression, unaffected by previous judicial opinion, is not now necessary to be determined. Its construction has been settled by a long series of decisions reaching back in England and America to the time of its enactment. If under these circumstances we were to give it a different interpretation from that which it has heretofore uniformly received, we think we should with much more propriety be subject to the charge of judicial legislation, than when we give it the construction which has heretofore almost invariably been given to it, *although its mere letter might lead to a different conclusion.*"

In City of Tyler v. Railway, *supra*, this court said:

"It is the settled rule of construction in England that a contract which by its terms is capable of being performed within one year from the date of its making, by one party, and which has been fully performed by such party within the year, is not within their Statute of Frauds, which is in the same language as ours. . . . The English construction of that clause of the statute of frauds . . . is followed by the courts of the following States: Alabama, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland. Minnesota, Missouri, Nebraska, New Hampshire, New Jersey, Rhode Island, South Carolina, Texas, Virginia, and Wisconsin. . . . Donellan v. Read, which first construed the statute of frauds of that country, was decided in 1832, and in 1840 the congress of the Republic of Texas embodied the same language that was construed in that case in the statute of frauds enacted by that congress, on the 16th day of March, 1840. So closely did the congress follow the English statute that the conclusion is irresistible that the Texas statute was in fact copied from that of England. Hart. Dig., 1451. It is fair to presume that the members of the congress which enacted that law were advised of the construction which the courts of England had placed upon the language they then embodied in the statute of frauds of the republic; and we may also presume that the legislators used these words with the intent that they should receive the same construction that had been placed upon them by the English court. Moffet v. Moffet, 67 Texas, 642; Johnson v. Hans-

com, 90 Texas, 321; Morgan v. Davenport, 60 Texas, 234; Munson v. Hallowell, 26 Texas, 475; Snoddy v. Cage, 5 Texas, 106; Trigg v. State, 49 Texas, 645; Brothers v. Mundell, 60 Texas, 240.''

That same rule of construction is applicable, for like reasons, to the construction of Constitutions. Mellinger v. Houston, 68 Texas, 37, 3 S. W., 249; Robertson v. State, 63 Texas Crim. Rep., 216, 142 S. W., 533, Ann. Cas., 1913C, 440; Brown v. Walker, 161 U. S., 591, 16 Sup. Ct., 644, 40 L. Ed., 819; State v. Blaisdell, 18 N. D., 31, 119 N. W., 360; Black on Interpretation of Laws, Rule 21, p. 32.

In construing that portion of section 10 of article 1 (Bill of Rights) of our State Constitution which declares that in all criminal prosecutions the accused ''shall be confronted with the witnesses against him'' our Court of Criminal Appeals, which is our court of last resort in criminal cases, traced the history of that clause, and said: ''So, when Texas adopted this clause, it was no announcement of a new right to a person accused of crime, but was simply a preservation of a right that was a part of the law of England, of this Union, and of almost every State therein, and in arriving at a proper construction thereof, and to give the language its proper meaning, we must look to the decisions of England, of the United States, and the courts of the different States in the Union, for of such of them as were in existence at the birth of the Texas Republic they had long had this principle embodied in their system of government, and it is a well-known rule of law that, when we adopt a phrase or borrow a provision from the Constitution or laws of another State or country, we adopt that clause with the construction placed thereon by the courts of that State or country.'' Robertson v. State, *supra.*

In construing the suffrage clause of the Constitution of North Dakota the Supreme Court of that State said:

''Courts in construing constitutional or statutory provisions which have been taken from another State almost invariably hold that the Legislature or the Constitution makers are presumed to have adopted it with knowledge of the construction or interpretation given it by the courts of the State whence it comes, and therefore to have adopted such construction or interpretation. 2 Lewis Suth. Stat. Const. 404; White v. Chicago, etc., Ry. Co., 5 Dak., 508, 41 N. W., 730; Sanford v. Duluth & D. Elevator Co., 2 N. D., 6, 48 N. W., 434; Jasper v. Hazen, 4 N. D., 1, 58 N. W., 454, 23 L. R. A., 58; Cass County v. Imp. Co., 7 N. D., 528, 75 N. W., 775; Oswald v. Moran, 8 N. D., 114, 77 N. W., 281; Bank v. Gutterson, 15 S. D., 486, 90 N. W., 144.'' State v. Blaisdell, 18 N. D., 31, 119 N. W., 360.

''It is an established rule of construction that whenever, in framing a constitution, provisions from the constitutions of other States are adopted, the judicial constructions of all such provisions

from the other States are presumed to have been also adopted.''
8 Cyc., 39, citing cases.

''When provisions have been adopted into the constitution of the
State, which are identical with or similar to those of other States,
it will be presumed that the framers of such constitution were con-
versant with, and designed to adopt also, any construction previ-
ously placed on such provisions in such other States.''    12 Corpus
Juris, p. 717, citing cases from twenty-two States.

Similarly, although with less compelling force, when a suffrage
clause is imported, literally or substantially, into a State Con-
stitution from the Constitutions of other States even prior to con-
structions thereof by the courts of the States whence, it comes,
subsequent constructions thereof by the courts of the States from
which such clause was imported are strongly persuasive of the sense
in which such clause was incorporated into the organic law of the
adopting State.    Thus, in Mellinger v. Houston, supra, this court,
through Mr. Justice Stayton, said:

''The section of the Constitution which declares that 'no citizen
of this State shall be deprived of life, liberty, property, privileges
or immunities, or in any manner disfranchised, except by the due
course of the law of the land,' is written in plain language, but had
not been so fully construed, as to its operation on laws retroactive
in character, when the Constitution was adopted, as has it since
been by the decision of the Supreme Court of the United States,
to which we have referred; but it must be held that the people
intended, by that clause of the Constitution, in so far as it is
identical with the fourteenth amendment, to place thereby just
such restrictions on the powers of the Legislature as the highest
court in the nation has declared is the true construction of like
language made a part of the Constitution of the United States
for the purpose of placing a limitation on the power of the
Legislatures of the several States.''

Similarly significant, in the phraseology of a suffrage clause
is the use (as in Sec. 2, Art. VI of our own Constitution), of the
words ''an election,'' and ''any election,'' without addition thereto
of such words as ''which is now or hereafter may be authorized by
law,'' which additional words, and words of more or less similar
effect, were in the suffrage clauses of various States when our Con-
stitution was adopted.    In several such States such additional
words have been held greatly to enlarge the field in which their
suffrage clauses were designed to operate, extending their legal
effect to include *all statutory elections*, as well as elections expressly
required or plainly contemplated by the Constitution itself.

Almost every clause in a State Constitution has a fixed significance
—a historic meaning—in the light of which it must be construed
and applied.    So it. is with our suffrage clause.

In construing the hereinabove quoted provision of section 7 of article XIV of our Constitution, concerning mines and minerals, this court, in an opinion prepared by the author of the dissenting opinion in the present case, in 1912:

"Its terms must be considered as of such dignity and be given all the effect that their nature imposes. But its effect is controlled by the intent that lay behind it on the part of the people who wrote it into the present Constitution . . . It is a rule of universal observance in the construction of constitutions that it will be presumed that the language used was carefully selected. Mellinger v. City of Houston, 68 Texas, 44; and we are at liberty to extend that presumption to the use of the language of this provision." And, therein, two ordinary words of said section 7, "releases" and "owner," were treated as requiring "construction" by the court, and were construed in the light of their antecedent and historic use and meaning in that context. Cox v. Robison, 105 Texas, 426, 150 S. W., 1149.

Whether a particular statute does or does not conserve a wise public policy is a question in which courts are not concerned. That is a realm in which, in the absence of inhibition in the organic law of the land, the law-making department of our State government is supreme. Napier v. Hodges, 31 Texas, 287; English v. State, 35 Texas, 473, 11 Am. Rep., 374; Treasurer v. Wygall, 46 Texas, 447.

A primary election, being merely a method, or device, for selecting candidates to be voted for, later, by qualified electors of no party, and of all parties, is not an "election" within the common-law definition of that word, primary elections being unknown to the common law. State v. Woodruff, 68 N. J. L., 89, 52 Atl., 49; State v. Swanger, 212 Mo., 472, 111 S. W., 7.

As between statutes affecting private rights, and statutes involving political matters only, courts usually are more liberal in upholding the constitutionality of statutes of the latter class. State v. Michel, 121 La., 374, 46 So., 430.

The list of cases cited in the majority opinion in this case, and herein, respectively, on the merits of the present issue, embraces two lines of decisions dealing with legislative authority over the elective franchise as related to restrictive suffrage provisions of State Constitutions. Some of those decisions did not and some of them did, involve primary election statutes; yet all of them involved a construction of the word "election" in a suffrage clause. A number of those decisions expressly upheld the power of the Legislature to extend to women the privilege of limited suffrage—the right to vote in *only certain designated classes of elections*—even though the State Constitution contained a suffrage clause identical with, or substantially similar to, said suffrage clause of the Constitution of Texas. Among them were elections for various pur-

poses not expressly provided for by the Constitution of that particular State, and not fairly in contemplation thereof, but authorized by *statute only,* to select, *finally, a purely statutory public officer,* or to determine, *finally,* some *purely statutory* and strictly *governmental policy.*

Of still closer applicability to the present case are quite a number of said cited decisions which uphold, expressly and specifically, the validity òf various *primary election statutes,* upon the view, and for the declared reason, that "primary elections" are not "elections" in contemplation of suffrage clauses such as ours.

Both of those extended lines of decisions enumerate the principle, or doctrine, that the particular class or character of election then before those courts, respectively, was not within the scope, or meaning, or legal operation, of such a suffrage clause of a State Constitution. In that respect the controlling principle in each is common to both lines of decisions and also to the present case. Logically the legal effect of the great number and weight of the adjudicated cases is to leave the authority of the Legislature over party primaries untrammeled by the suffrage clause of our social compact.

Elsewhere than in Texas "election," as used in various *statutes,* has been treated, generally, as "open to construction," and has been variously construed by courts of many States.

Primary elections have been held not to be "elections" within the meaning of various *statutes* relating to "elections," as follows:

(a) Against betting "upon any election." Lillard v. Mitchell, (Tenn. Ch. App.), 37 S. W., 702; Commonwealth v. Helm, 9 Ky. L. Rep., 532; Dooley v. Jackson, 104 Mo., App., 21, 78 S. W., 330.

In Dooley v. Jackson, a Missouri statute declared that bets on any "election authorized by the Constitution and laws of the State" are gaming. And another statute of that State authorized the maintenance of actions to recover money bet thereon. Held: said statutory provisions were limited to constitutional elections for the selection of persons to a public office, and did not apply to primary elections for the selection of candidates. The court said: "We think it is clear that the word 'election,' as used in the statute, is used in its political sense, and in the same sense in which it is used in the Constitution, and means an election for public office, and does not include à primary election for the purpose of nominating a candidate for public office; and also that a primary election is not an election authorized by the Constitution."

(b) Against giving bribes to influence the result of an election. Kelso v. Cook, 184 Ind., 173, 110 N. E., 987, Ann. Cases, 1918E, 68; People v. Cavanaugh, 112 Cal., 674, 44 Pac., 1057. See Leonard v. Commonwealth, 112 Pac., 607, 4 Atl., 220, discussed hereinafter.

(c) Against fraud in conducting elections. State v. Woodruff, 68 N. J. L., 89, 52 Atl., 294.

(d) Authorizing the use of voting machines at all elections. Line v. Board, 154 Mich., 329, 117 N. W., 730, 18 L. R. A. (N. S.), 412, 16 Ann. Cas., 248. In that case the Supreme Court said: "A primary election is not an election to public office. It is merely the selection of candidates for office by the members of a political party in a manner having the form of an election. . . . The elections referred to are the elections where persons are given public offices by a plurality of the votes of all the electors voting thereat."

Under a Constitution defining qualified "electors" as male persons, but declaring women "competent to vote for all school officers and upon all questions pertaining solely to school matters," and a statute (which was in force prior to the adoption of the section of the Constitution which gave to women such restricted right of suffrage), requiring registration of all persons qualified to vote at the ensuing election" and "of all qualified electors," the Supreme Court of North Dakota held that women were not "electors" within contemplation of said Constitution, and were not within the operation of said registration statute, and hence were entitled, without having registered, to vote at an election for superintendent of schools. Wagar v. Prindeville, 21 N. D., 245, 130 N. W., 224.

In several States, statutes designed to secure purity in elections have been held applicable to primary elections. Such decisions proceed upon the theory that primary elections have become a part of our political system to such an extent that it may be presumed that the Legislature intended by such statute to secure the purity of such elections upon both the day for choosing candidates and the day for voting upon the candidates for office. Strassburger v. Burk (Md.) 13 Am. L. Reg., 607.

In that cited Maryland case was held void a contract whereby one of the parties, for a consideration, was to give his political influence in favor of the other and also to furnish lager beer and cigars to the voters at a non-statutory primary election. Such a contract was held violative of public policy and of a penal statute denouncing such contracts by a candidate at "any election." The court said:

"It is clear, then, on authority, and it is equally clear on principle, that the whole contract in this case, if the election had been one appointed by law, would be illegal and void, because it would be in violation of the policy of the statute as well as immoral and injudicious in tendency. But it is contended that this was a primary election not held under the authority of law, but merely a voluntary expression of the opinions of the Democratic voters who chose to attend, and therefore that the considerations of public

policy which apply to legal elections have no application to it. These primary elections, however, although they are not prescribed by law, are recognized and sanctioned by it, in that the Act of 1867, chapter 367, makes it the duty of the Board of Police Commissioners 'to preserve order at primary meetings and elections;' in fact they have grown to be an essential part of our political system. Imperfect and unsatisfactory and liable to gross abuse as they are, they constitute almost the universal mode by which candidates everywhere are now brought before the people for their suffrages. If they are tainted by fraud or corruption, our political institutions are contaminated at their source. The same principles of public policy, therefore, which apply to elections ordained by law must for the same reasons be applicable to the primary elections.''

That Maryland opinion brings out, clearly, the *quasi* ''public'' character of primary elections even when not authorized by either constitution or statute, invoking the exercise of *the police power* of the State, even though they are merely ''political institutions,'' and not in any sense a part of the actual machinery of government. Said decision likewise discloses the considerations of public policy which, in certain cases, has induced courts to extend to statutory primary elections certain provisions of laws designed to promote purity in elections.

Likewise, in Indiana, it was held that a primary election is an election within the statute regulating the sale of liquor. State v. Hirsch, 125 Ind., 207, 24 N. E., 1062, 9 L. R. A., 170, discussed hereinafter.

In such instances the courts have construed the statutes liberally to accomplish the legislative purpose, giving due consideration to the evil to be remedied and the appropriateness of the proposed remedy.

Elsewhere than in Texas, also, and likewise, ''election,'' as used *in even the suffrage clauses of State Constitutions,* has been treated, generally, as ''open to construction,'' and has been construed, by the courts of numerous States. Although such constructions have not been uniform, most of them are to the effect that ''election'' as used in the suffrage clause of a State Constitution does not include non-constitutional and non-governmental elections, such as party primaries.

The Constitution of Kentucky conferred the privilege of suffrage on free white males. Held: ''This qualification for electors was intended to apply in the election of *Constitutional officers,* as distinguished from those *created by Legislative Act.*'' Buckner v. Gordon, 81 Ky., 670. Their Constitution provided, also, that ''all elections shall be free and equal.'' Held: ''That section of the Constitution has no reference to primary elections, but applies only to general elections.'' The court said: ''If the word elections, as used in .the Constitution, includes primary elections, the Constitu-

tion effectually prohibits the holding of primary elections at all."
Montgomery v. Chelf, 118 Ky., 766, 82 S. W., 388. See, also
Ledgerwood v. Pitts, 122 Tenn., 571, 125 S. W., 1036; Kelso v.
Cook 184 Ind., 173, 110 N. E. 987, Ann. Cases, 1918E, 68. However,
a similar provision in the Constitution of Illinois was held appli-
cable to primary elections.

In certain cases "election" in the suffrage clause of a Con-
stitution has been held to apply to public "officers" only. Cogge-
shall v. Des Moines, 138 Ia., 730, 128 Am. St. Rep., 221, 117 S. W.,
309; Callam v. City of Saginaw, 50 Mich., 7, 14 N. W., 677; Mayor
v. Shattuck, 19 Cal., 104, 41 Am. St. Rep., 208, 34 Pac., 947; Thornton
v. Washington, 3 Wash. T., 482, 17 Pac., 896; Woodley v. Town
Council, 44 S. C., 374, 22 S. E., 410; Menton v. Cook, 147 Mich.,
540, 111 N. W., 94; Commonwealth v. Steele, 97 Ky., 27, 29 S. W.,
855; Willis v. Kalmbach, 109 Va., 475, 64 S. E., 342, 21 L. R. A.
(N. S.), 1009; Belles v. Burr, 76 Mich., 1, 43 N. W., 24.

Coggeshall v. Des Moines, _supra_, is to the effect that the provi-
sions of section 1 of article II of the Constitution of Iowa, restrict-
ing to males the right "to vote at all elections which are now or
may hereafter be authorized by law" does not render invalid the
provision in section 1131 of the Iowa Code that "the right of any
citizen to vote at any city, town or school election on the question
of issuing any bonds for municipal or school purposes, and for the
purpose of borrowing money, or on the question of increasing the
tax levy, shall not be denied or abridged on account of sex." The
power of the Legislature to permit women to vote on issuance of
bonds was upheld. The view of the court was that "elections,"
as employed in their suffrage clause, relates only _to public officers
contemplated by the Constitution itself_, and does not even include
elections on questions of _governmental policy_, especially where the
result of such election is, at most, merely _advisory_.

In a latter Iowa case (In re Carragher, 149 Ia., 225, 128 N. W., 352,
31 L. R. A. (N. S.), 321, Ann. Cases, 1912C, 972), the Supreme
Court of the State, after quoting said suffrage clause, said:

"The Legislature cannot add to or take from these qualifications,
and until the people shall have changed this feature of their funda-
mental law, a woman cannot be qualified elector in the con-
stitutional sense of the term. . . . This is not inconsistent
with Legislative power to authorize women to vote on questions of
public policy or administration submitted to the popular vote and
_not including the election or choice of officers;_" citing Coggeshall
v. Des Moines.

Section 1 of article VII of the Colorado Constitution conferred
upon males the privilege of suffrage "at all elections." In holding
that the Legislature might prescribe _other qualifications_ for elec-
tions concerning annexation of contiguous cities and towns, the
Supreme Court of that State said: "It is manifest that some

restriction must be placed upon the phrase all elections, as used in section 1, else every person having the qualifications therein prescribed might insist upon voting at every election, private as well as public, and thus interfere with the affairs of others in which he has no interest or concern. In our opinion, the word, *elections* thus used, does not have its general or comprehensive signification, including all acts of *voting, choice* or *selection*, without limitation, but is used in a more restricted political sense—as elections of public officers. This view is consistent with the title of article 7, 'Suffrage and Elections.' " Mayor v. Shattuck, 19 Col., 104, 41 Am. St. Rep., 208, 34 Pac., 947. In that case the court referred to In re Nominations to Public Offices, 9 Colo., 631, 21 Pac., 474, as being "a judicial decision of our own State, limiting somewhat the phrase, *all elections,* as used in article 7." In that cited case, in upholding the constitutionality of a statute designed to correct abuses in the nomination of candidates for public offices the court had said: "The abuses sought to be corrected by the provisions of the bill are of the gravest character and are a proper subject of legislation *entirely within the legislative power,*" citing Leonard v. Commonwealth, 112 Pa. St., 607, 4 Atl., 220.

The Constitution of Maryland, in section 1, article 1, conferred upon male citizens only the right to vote "at all elections hereafter to be held in this State." In construing that provision the Supreme Court said: "It is only at elections which the Constitution itself requires to be held, or which the Legislature under the Mandate of the Constitution makes provision for, that persons having the qualifications set forth in said section 1, article 1, are by the Constitution of the State declared to be qualified electors." Accordingly that court declared: "We regard it as an unreasonable inference to suppose that municipal elections . . . can be properly termed elections under the Constitution, such as State and County Elections." Hanna v. Young, 84 Md., 179, 35 Atl., 674, 34 L. R. A., 55, 57 Am. St. Rep., 396, citing Florida v. Dillon, 32 Fla., 545, 14 So., 383, 23 L. R. A., 124; McMahon v. Mayor, 66 Ga., 217, Buckner v. Gordon, 81 Ky., 666; Mayor v. Shattuck, 19 Col., 104.

The Constitution of Virginia (Article 2), gave to male electors only the privilege of voting "for members of the General Assembly and all officers elective by the people." The 18th section of the attached schedule provided: "In *all elections* held after this Constitution goes into effect, the qualifications of electors shall be those required by article 2 of this Constitution."

In a case involving the validity of a statute the Supreme Court of Appeals held that the first quoted provision did not prevent the legislature from prescribing different qualifications for persons which shall vote upon the question of licensing the sale of intoxicating liquors, and that the second quoted provision referred *solely to elections provided for by the Constitution.* Willis v. Kalmbach,

109 Va., 475, 64 S. E., 342, 21 L. R. A. (N. S.), 1009. The court said: "This phrase 'all elections' has been frequently construed by the courts of other States;" citing note in 14 L. R. A. (N. S.), 850; Valverde v. Shattuck, 19 Colo., 104, 34 Pac., 947, 47 Am. St. Rep., 208; Graham v. Greenville, 67 Texas, 62, 2 S. W., 742; State v. Cook, 126 Ala., 600, 28 So., 745; Hanna v. Maryland, 84 Md., 179, 34 L. R. A. 55, 57 Am. St. Rep., 396, 35 Atl., 674, and other cases. And the court added: The phrase 'all elections,' as must have been known to the learned lawyers in the convention had, in many States, been held to refer only to such elections as had been prescribed by the Constitution itself; and indeed at the time the schedule was adopted, there was no decision to the contrary." The force of that decision is emphasized by the fact that the same Constitution declared: "The General Assembly shall have full power to enact local option or dispensary laws, or any other laws controlling, regulating or prohibiting the manufacture or sale of intoxicating liquors." Thus the term "all elections," as used in the Virginia suffrage clause, was denied applicability to an election which that Constitution expressly declared to be within the full power of the law making department to authorize.

In many States it has been held if an *office* be of legislative creation, in contradistinction· to a constitutional office, the Legislature may prescribe qualifications of voters at a final election to fill such office. 15 Cyc., 282-3, citing cases from Arkansas, California, Indiana, Michigan, Nevada, New Jersey, North Carolina, Ohio, Pennsylvania, Rhode Island, Utah, Wisconsin, Florida and Kentucky. See, especially, Scown v. Czarnecki, 264 Ill., 305, L. R. A., 1915B, 247, Ann. Cases, 1915A, 772, 106 N. W., 276, and quotation from it in the majority opinion in the present case.

Frequently it has ·been held that if the *matter* to be voted upon be one outside of the provisions of the Constitution, and therefore one of merely legislative provision, the· Legislature may prescribe the qualifications of voters thereon. 15 Cyc., p. 299 and cases cited. See, also, Opinion of Justices, 115 Mass., 602; Coggeshall v. Des-Moines, *supra;* Seaman v. Baughman, 82 Ia., 216, 47 N. W., 109, 11 L. R. A., 354.

Unless it is expressly made so, a general election law is not applicable to primary elections, which are merely creations of political parties and associations, and may be held at such times and places and on such terms and conditions as may seem fit. But the legislature may recognize the existence of political parties, and within reasonable limits regulate the means by which partisan efforts shall be protected in exercising individual preferences for party candidates. And this is the general purpose of primary election laws, which are designed to secure to individual voters a free expression of their will. Among other things the primary

laws usually make provision for the enrollment of the voters of the different political parties in order to prevent all persons whatever from voting in the party primaries except such as are entitled to do so." 15 Cyc. 332-3.

Among the decisions in other States, involving the validity of certain primary election statutes, as directly related to certain provisions of State Constitutions, are these:

A compulsory primary election statute of Tennessee was attacked as being repugnant to two sections of the Constitution of that State, the first of which (Sec. 5, Art. I), declared that "elections shall be free and equal," and the second of which (Sec. 1, Art. IV), restricted to males the right "to vote for members of the general assembly and several officers for the county or district in which he resides," etc. The Supreme Court said:

"The first inquiry, therefore, presented for our examination, is whether or not these provisions of the Constitution have any application at all to primary elections. Admittedly no such thing could have been in contemplation by the framers of the Constitution when they came to formulate the election and suffrage clauses of that instrument, for at that time no such thing as a primary election had ever been suggested. The object of this modern invention of political parties is primarily for the purpose of permitting and requiring the entire electorate of that party to participate in the nomination of candidates for political office. The plan is simply a substitution for the caucus or convention. It is true, as stated, it is a part of the political machinery that starts the candidate on his way, and the political party is thereby enabled to crystallize and concentrate its vote on that particular candidate who is chosen as the representative and expositor possibly of their political views; but the limitations and safeguards of the Constitution apply exclusively to the final election when the officer is chosen in the mode required by the Constitution." Ledgerwood v. Pitts, 122 Tenn., 571, 125 S. W., 1036. Did that decision, under which a statute permitting women to vote in primary elections would be valid, "subvert" the Constitution of Tennessee?

And in that case, after mentioning several cases there cited by counsel in support of the proposition that compulsory primary elections are "elections" within the purview of the Constitution, (including Spier v. Baker, 120 Cal., 370, 41 L. R. A., 196, 52 Pac., 659, and People v. Board, 221 Ill., 9, 5 Ann. Cases, 562, 77 N. E., 321, both cited in the present case by our Chief Justice), the Tennessee court said: "We do not subscribe to the reasoning of these cases, and, moreover, they are opposed to the great weight of authority."

The Constitution of Ohio defined the qualifications of an "elector," limiting the electoral privilege to males, and provided that electors should be entitled to vote "at all elections." A primary

election statute of that State was attacked as invalid upon the ground that it added qualifications not prescribed by the Constitution, in that it required that the elector should have voted at the last general election with the political party holding such primary. On that subject the Supreme Court said:

"If this contention is sound, then every elector has the constitutional right to vote at the primary election of every party. . . . A primary election held merely to name the candidates of a political party is not an election within the meaning of this section of the Constitution." State v. Felton, 77 Ohio St., 554, 84 N. E., 85, 12 Ann. Cas., 65.

The Constitution of Indiana restricted to males the privilege of voting "in all elections not otherwise provided for by this Constitution;" it provided that "all elections by the people shall be by ballot;" and it declared that "all elections shall be free and equal." In holding those and other provisions of that instrument inapplicable to compulsory "primary elections" the Supreme Court of that State said, in 1895:

"In determining the question of the application of section 2 of article 2, *supra,* to this act it is insisted that the term 'all elections' must necessarily comprehend the broadest definition of the word 'election;' that a primary election clearly falls within the scope of the definition of 'all elections' though it be conceded that there is a radical difference between an election of public officers and a primary one to select candidates for office by a political organization. . . . To claim that the people . . . intended the term 'all elections' to include elections of officers of churches, private corporations and militia companies would be absurd, and we are forced to conclude that a limited definition must be accorded the term. Conceding some limitations, however, is the term still broad enough to include primary elections? The intent of the people in adopting a constitutional limitation must be given effect when ascer· tained. In seeking this intent, if concealed in ambiguous phraseology, courts may properly resort to other relevant provisions of the instrument, to the history of the times, the then existing laws, the mischiefs existing, and the appropriate remedies." Further on, after referring to section 2, art. 2, of their Constitution, prescribing disqualification as a punishment for bribery in securing one's own election to an office, the court quoted from and reaffirmed its former decision in Gray v. Seitz, 162 Ind., 1, 69 N. E., 456, wherein it was said:

"It seems perfectly clear that section 6, article 2 . . . applies only to bribes . . . given or offered to secure the election of a candidate at a final or popular election. No mention is made of a primary election, and the language used refers exclusively to the election by virtue of which title to the office is claimed." The court continued: appellant Kelso claims that the opinion declares

an erroneous doctrine. We cannot assent to such conclusion. . . . To assume that section 2, article 2, covers primary elections, implies that no lawful primary can be held. . . . If that section controls, any elector of the precinct, though avowedly an adherent of no party may participate upon equal terms with party adherents in selecting its candidates, and the adherent of one party, with only single candidates for nominations, might, with safety to his own party, go into the camp of his political adversary and maliciously vote for its most unworthy candidates with the deliberate purpose of wrecking it." Kelso v. Cook, 184 Ind., 173, 110 N. E., 987, Ann. Cases, 1918E, 68.

The Washington Primary Election Law of 1907 contained section 121, imposing, as a condition for participation in the primaries, a pledge of party fealty. In sustaining its validity the Supreme Court of that State said:

"It is contended that this section adds a requirement to the qualifications of electors, in addition to the constitutional requirements, and for that reason renders the entire act void. Were the primary election so far such an essential part of the general election as to make the Constitutional provision relating to the qualification of electors entitled to vote at the general election applicable thereto, then there would be force in this objection; but we do not think the sections of the Constitution providing the qualifications of electors applicable to the primary election provided for by this statute. It is not the purpose of the Primary election law to elect officers. The purpose is to select candidates for office to be voted for at the general election. Being so, the qualifications of electors provided by the Constitution for the general election can have no application thereto." State v. Nichols, 50 Wash., 508, 97 Pac., 728. Did that decision do destructive violence to the Constitution of that State?

The Supreme Court of Nevada said:

"Counsel for appellant seemingly fail to appreciate that the electoral test of an elector spoken of in the Constitution is for the election of public officers, and not for the election at which party nominees are selected." Riter v. Douglass, 32 Nev., 400, 109 Pac., 444.

The Constitution of North Dakota, in section 121, restricted to "males" the definition of "a qualified elector." The Legislature there enacted a statute providing for a classification of qualified "electors" according to their political beliefs, supported by affidavit of party fealty, and restricting, accordingly, participation in "primary elections." In a suit to test its constitutionality the respondent, and also the Attorney General, contended that "a primary election is an election within the meaning of that term as used in the Constitution, and the qualifications of electors at such primary are the same as at general elections: and that chapter 213 of the laws of 1911, by exacting an oath of party allegiance as a

condition precedent to the right to vote at the primaries, is in effect requiring an additional qualification of an elector as a condition precedent to his right to vote besides those mentioned in section 121, defining his qualifications and guaranteeing every male person with those qualifications, who shall have resided in the precinct for a certain time 'next preceding an election shall be a qualified elector at such election."

The court said: "Logically, the first question to determine is whether the primary election is an election within the meaning of section 121, as amended, . . . In our State, the primary is the means of nomination of all officers, State, district, and county, as well as the method of choice by election, instead of nomination, of all party committeemen and delegates belonging to the party organizations of those parties entitled to participate at the primaries. The election is held at public expense and is state-wide, all nominations occurring throughout the State at the same election. In one sense the state-wide primary is a state-wide election. As to time and method used to accomplish the results, it is such. But as to *purpose and results achieved, as to nominations made, it is in no sense an election,* unless it be a party or partisan election." State v. Flaherty, 23 N. D., 324, 136 N. W., 80, 41 L. R. A. (N. S.), 132. The statute was held valid. Inferentially the court there assumed that the Legislature would be powerless to provide such a test of party fealty as a condition precedent for participation in a "general election;" hence the importance which that court attached to the inquiry as to whether a "primary election" was or was not an "election" within the meaning of said suffrage clause. The decision of that court rested upon its negative reply to that question.

It must be admitted that in a former case that court had declared that a "primary election" was an "election" within the meaning of their suffrage clause. Johnson v. Grand Forks County, 16 N. D., 363, 125 Am. St. Rep., 662, 113 N. W., 1071, decided in November, 1907, the opinion of the court in that case being by Spalding, Justice; but the force of that earlier pronouncement was impaired, at the time, by the fact that the case was not such as to render any decision on that point necessary; and in two later cases, by that same court, it was referred to, substantially, as *dictum.* More than four years later, in March, 1912, in a case having the same style, reported in 22 N. D., 613, 135 N. W., 179, the same court, *through the same spokesman,* expressly pretermitted a decision as to whether a primary election was an "election" within the meaning of that word as used in the Constitution of North Dakota, saying, with reference to said former decision:

"The writer, at least, has been long of the opinion that a discussion of that question was unnecessary in the former case, and that, while the primary election may not be an election, within the terms and meaning of the Constitution, fixing the qualifications of

voters and candidates, to the full extent which that opinion appears to hold, yet that the legislative assembly cannot add to or take from such qualifications, *further than is necessary to effect the purpose sought to be accomplished in ⸜providing a primary election law.*" And the court added this: "We, however, do not pass upon this question, further than to say that, conceding, for the purposes of argument, all that appellant says in his brief would not change the result, and this question not having been discussed by respondent, and only suggested by appellant, and no authorities cited which are in point, we leave it for consideration when it is properly raised and discussed by counsel."

Some two months still later, in State v. Flaherty, *supra,* the same court said:

"Although the questions here involved were not necessary to a decision of those questions, the court in the former held a primary election to be an election within the meaning of section 121 of the State Constitution. Johnson v. Grand Forks County, 16 N. D., 363. . . . This court has later in Johnson v. Grand Forks County (22. N. D., 613), 135 N. W., 179, during this present year, qualified the holding in the other case of the same title, 16 N. D., 363, 125 Am. St. Rep., 662, 113 N. W., 1071." And thereupon, in State v. Flaherty, the question as to the restrictive effect of their suffrage clause, (Sec. 121), being squarely before the court and carefully briefed by both sides, that court, reversing its former holding on the point, as above indicated, answered that question *negatively,* and expressly declared that although in that State primary elections were state-wide and "held at public expense," and while a primary election is, therefore, "in one sense . . . a state-wide election," nevertheless, "as to purpose and results achieved, as to nominations made, it is in no sense an election, unless it be a party or partisan election." The repudiated doctrine is that upon which the dissenting opinion in the present case mainly rests.

Article 7 of the Minnesota Constitution conferred upon male persons the right to vote "for all officers that now are or hereafter may be elective by the people." Concerning it, as related to primary elections, the Supreme Court said: "If the election of candidates to the position of nominees is an election within the meaning of article 7 of the Constitution, then the primary law, as above construed is unconstitutional. It would, in certain cases, deprive the voter of his privilege to exercise the elective franchise. . . . But it is very clear that the election of nominees provided for in the primary law is not the election referred to in the Constitution . . . By 'officers' is meant the executive or administrative agents of the state or the governmental subdivisions thereof, and the election mentioned has reference only to the selection of persons to

fill such offices. The election thus defined cannot reasonably be given so broad an interpretation as to include the selection of nominees for such offices.'' State v. Johnson, 87 Minn., 221, 91 N. W., 841. Did that decision, under which the Minnesota Legislature validly might have permitted women to vote in party primaries, render the Constitution of that State ''a vain and useless document ?''

From the foregoing it is evident that the broad rule laid down by courts, generally, outside of this State, is that such suffrage pro· visions of State Constitutions refer, usually, to governmental elections, such as ''general elections,'' and are not applicable to primary elections and primary conventions.

The undeniable truth about the whole matter is that the .weight of authority throughout the country, in numbers and in cogency of reasoning, sustains the original decision of this court in the present case.

To the same effect are all of the most applicable, as well as the latest, prior decisions of our own Supreme Court. Graham v. City of Greenville, State v. Waxahachie, Waples v. Marrast, and Beene v. Waples, all *supra*. *There has been no decision of this court to the contrary.*

Graham v. Greenville, 67 Texas, 62, 2 S. W., 742, decided in 1886, involved a construction of a kindred clause in the same Suffrage Article of our Constitution, and presented a question of legislative power to provide for annexation, to a city, of adjoining territory, otherwise than by ''a public election'' at which all votes should be cast ''by ballot,'' it being provided, then as now, by our Constitution that ''in all elections by the people the vote shall be by ballot.'' Art. VI, Sec. 4.

The applicable statute provided for such annexation ''whenever a majority of the inhabitants qualified to vote for members of the State Legislature . . . shall vote in favor of becoming a part of said city,'' etc. R. S. 1879, art. 503. No public election was held; but the ''vote'' on annexation was taken, simply and solely, by a written petition, reciting that ''we the undersigned, whose names are hereto subscribed, declaring our vote in favor of or against annexation of territory,'' etc., the names of subscribers appearing beneath, in parallel columns, headed, respectively, ''For Annexation'' and ''Against Annexation,'' a large majority of the names being in the first column. Thereupon, by ordinance and proclamation, the additional territory was declared annexed to the city. The suit was to test the validity of such annexation, the ground of attack being that the vote was ''taken otherwise than by ballot,'' which was alleged to be in contravention of said section 4.

This court held the annexation valid, and in· so doing expressly declared said provision of section 4 *inapplicable to the facts of that*

*case,* in that there had been no "public election" to which said provision of the Constitution could apply.  The court held that the Legislature had full authority to prescribe the manner in which the wishes of a majority of the residents of the adjoining territory were to be ascertained—in manner directed by said statute "as well as by the votes given at a public election."  "Yet (this court declared), it is only in the *latter case* that the provision of the Constitution as to voting by ballot would have any application." That opinion was prepared by Chief Justice Willie, and was fully concurred in by Mr. Justice Stayton and by Mr. Justice Gaines, each of whom, in turn, afterward became Chief Justice of this court.  In so declaring that such taking of a statutory "vote" on annexation did not constitute an "election" within the meaning of section 4 of that Article of our Constitution which for more than forty years has been entitled "Suffrage," did that trio of distinguished jurists "subvert" or "impoverish" that Article, and render it "vain and useless?"

That decision was affirmed and followed by this court, unanimously in State v. Waxahachie, 81 Texas, 626, 17 S. W., 348 (decided in 1891), the opinion being by Mr. Justice Henry. See, also: Seaman v. Baughman, 82 Ia., 216, 47 N. W., 1091, 11 L. R. A., 354; Pritchard v. Magoun, 109 Ia., 364, 46 L. R. A., 381, 80 N. W., 512. Obviously, on principle, and under the authorities generally (and especially according to each of the tests prescribed by Chief Justice Phillips in Waples v. Marrast, *supra*), the taking of said statutory "votes" on annexation came nearer being a "public election," on a "governmental" issue, than does the *making of nominations of candidates,* by party primaries.  If, as this court unanimously held in those two cases, such statutory and *final* "voting" on annexation did not constitute such "a public election" as to render applicable said provision of Article VI concerning the *manner* of voting, ("by ballot,") how, reasonably, can it be said (and why should this court now hold), that the making, in political primaries, *of nominations of candidates* for offices (to be *finally* voted upon, in the general election, by all qualified "electors"), constitutes such a "public election" as to render applicable to it the provisions of that same Article stipulating *who may cast those ballots?*

Both on the facts and because both Graham v. Greenville and State v. Waxahachie involved the construction of the word "election" as used in one and the same Article of our Constitution, and it being the Article dealing directly and exclusively with "Suffrage." those cases are much more analogous to the present case than is Ashford v. Goodwin, 103 Texas, 491, Ann. Cases, 1915A, 699, 131 S. W., 535, which is relied upon by our Chief Justice, and which deals with a different subject-matter, under a different Article, (Article V), directly involving *jurisdiction of courts.*  Ashford v. Goodwin will be discussed hereinafter.

The meaning and legal effect of Waples v. Marrast, 108 Texas, 5, L. R. A., 1917A, 253, 184 S. W., 180, and its direct and controlling applicability to the certified question in the present case, in support of the negative answer heretofore made thereto, are certain. The opinion therein is clear and unambiguous. The issue was whether, constitutionally, the Legislature might authorize the expenditure of "public" funds in payment of primary election expenses. The decision was in the negative. Thereby the Presidential Primary Election Statute of 1913, which undertook so to do, was held void, as being repugnant to the restrictive provisions of article III, section 2, and of article VIII, section 3, of our State Constitution, which declares, in substance, that "public" funds shall not be used for other than public purposes. Why did this court so hold? Its unanimous opinion in that case, prepared by Chief Justice Phillips (who wrote the dissenting opinion in the present case), declared, in substance, that it was simply because "primary elections" are not for any "governmental" purpose, but are for merely "party" purposes. Note that fundamental distinction. It fits the certified question in the present case even as a glove fits the hand.

Our State Constitution does not inhibit payment of expenses of "general elections" out of public funds. That proposition receives universal assent. In Waples v. Marrast the power of the Legislature to authorize payment of expenses of general elections, out of public funds, was expressly *declared*, but corresponding power of the Legislature to authorize payment of expenses of "primary elections" out of such funds was expressly *denied*. The line of cleavage is very plain. Thus the question as to the constitutionality of that primary election statute was declared to turn upon *the character of the "election."* Under the test there prescribed, if the "election" should happen to be a "governmental" election—such as a "general election"—a statute authorizing payment of its expenses out of "public" funds would be valid; but, if the "election" should happen to be a *"non-governmental election*—such as a "primary election"—a statute authorizing payment of its expenses out of such funds would be invalid. In that opinion, in contrasting "primary elections" with "general elections" the searching language of Chief Justice Phillips concerning "primary elections" was: "They perform no governmental function. They constitute no governmental agency." "They do not concern the general public." "Political parties are political instrumentalities. They are in no sense governmental instrumentalities." All that being true, the statute then before the court was unconstitutional, beyond all reasonable doubt.

Obviously the effect of said decision in Waples v. Marrast, as elaborated in said opinion of this court in that cause, and as reaffirmed, shortly afterward, by this court in Beene v. Waples, *supra*, was to *classify* "elections" into *two essentially and funda-*

*mentally different classes;* first, "governmental" elections, including "general elections," and, second, *non-governmental* elections, including "primary elections." That stated distinction between "elections" of different kinds was there expressly declared by our Chief Justice, for a unanimous court, to be of sufficiently grave importance to determine the validity or invalidity of the primary election statute then under review: and that statute was held invalid, although every member of this court, then, as now, firmly believed, concerning the work of the Legislature, that "any doubt as to the validity of its legislation is to be resolved in its favor," as declared, in the present case, by our Chief Justice.

The decision in Waples v. Marrast was entirely consistent with that *classification* of elections. Indeed, that classification compelled that decision—just as it now strongly supports the decision heretofore made by this court in the present case, to the effect that the general power of the Legislature over "primary elections" is not restricted by the suffrage clause of our Constitution. The controlling and determining distinction in Waples v. Marrast was—and in the present is—that, unlike general elections, "primary elections" cannot successfully stand the rational and generally recognized tests as to what are and what are not "governmental elections"—"elections" within the meaning of provisions of our State Constitution which were designed to restrict or limit legislative power and authority, such, for instance as said section 52 of article III, and section 3 of article VII, in Waples v. Marrast (which were intended to restrict, somewhat, the use of public funds), and said section 2 of article VI, in the present case, embracing said suffrage clause, which was intended to restrict, somewhat, the right of suffrage.

In Waples v. Marrast, first establishing, and then observing and enforcing, the stated *distinction* between different kinds of "elections," necessarily involving said classification of "elections" into said *two classes,* this court consistently held that said two clauses of our State Constitution which restrict the use of public funds are applicable to "elections" falling in one of those classes, but wholly inapplicable to "elections" falling in the other class.

In the present case, recognizing and carefully observing that very classification of "elections," and consistently with that classification, this court held that the restrictive suffrage clause of that same Constitution is applicable to elections falling within one of those selfsame classes,—"governmental elections," such as "general elections"—but inapplicable to elections falling in the other class— *non-governmental elections,* including "primary elections" and "primary conventions."

That classification of elections, made in Waples v. Marrast and faithfully applied in the present case, is identical—common to both cases, the same in each case—although in each of the two cases a different restrictive provision of our Constitution was applied to that

class which includes "primary elections." In both the classification of primary elections as *non-governmental elections* is a common factor. To that extent, therefore, Waples v. Marrast and the present case unquestionably occupy common ground.

Upon that identical classification of "elections" this court held, in Waples v. Marrast, that, inasmuch as "primary elections" are not for any "governmental" or "public" purpose, expenses thereof can not, validly, be paid out of public revenues. And upon that same classification of "elections" this court consistently held, in the present case, that, *for the very same reason*—reinforced by the historic signification of the word "election" in suffrage clauses of other State Constitutions—"primary elections" are not within the legal effect and operation of the restrictive provision of the *suffrage clause* of our own State Constitution.

Consequently, if, as declared by our Chief Justice, the decision in the present case does, indeed, amount to a subversion of our Constitution, making of it "a vain and useless document," the error lies in said *classification* of "elections;" in treating "primary elections" as not being for any "public" purpose—as not being for "governmental purposes" for which, alone, "the powers of the State as a sovereignty exist"—as performing "no governmental function" —as constituting "no governmental agency"—as being "in no sense governmental instrumentalities;" but, on the contrary, as being, indeed, for mere "party" purposes, as existing, primarily, for the attainment of the "objects of political organizations" which are "intimate to those who compose them," but which "do not concern the general public," in a *governmental* sense, beyond the due application of the police power of the State. In other words, the error, if any, in the decision of this court in this case consists in treating "primary elections" as belonging in the *very class* in which they were placed by this court in Waples v. Marrast—the author of said dissenting opinion in the present case then being spokesman for a unanimous court—and again in Beene v. Waples, that member concurring.

But if that former judicial classification of "elections" into two classes—first, *governmental elections,* and second, *non-governmental elections,* was sound and correct, in 1916, and properly applicable, by this court, in Waples v. Marrast, and in Beene v. Waples, in testing the constitutionality of said two primary election statutes of 1913, why was not that selfsame classification of "elections" sound and properly applicable in 1918, when the Legislature had said statute of that year under consideration, and again in 1920, when the courts are passing upon the question of its constitutionality? If, without subverting our State Constitution, "elections" are, indeed, subject to said classification in determining whether its restrictions upon legislative action *concerning the use of public funds* do or do not apply to "primary elections," why, without violence to that

same Constitution, may not, and why should not, that identical classification of elections be applied, again (in the present case), in determining whether constitutional restrictions upon legislative action concerning *the right of suffrage* do or do not apply to "primary elections" and to "primary conventions?" In each instance the sole purpose and function of the courts is fairly to ascertain, and impartially to apply, the real meaning and legal effect of plainly "restrictive," (though separate) provisions of the same Constitution, which was framed in the convention and adopted at the polls as a "governmental" measure, dealing, in a practical way, with "governmental agencies," rather than with mere "party" affairs. If said classification of elections is not applicable to the issue in the present case, why is it not so applicable? Where, if at all, does the analogy, in principle, break down? The foregoing questions have not been satisfactorily answered.

Said dissenting opinion in the present case does not now deny the correctness of said classification of "elections" as related to the authority of the Legislature over "public" funds, although it does deny that such classification is properly applicable as related to the authority of the Legislature in the matter of suffrage.

In what, if any, sense, applicable to this case, may an election which is not for any "public purpose" be a "public election?" If, as declared by this court, in Waples v. Marrast, primary elections "constitute no governmental agency," "perform no governmental function," and "do not concern the general public," how, in the present case, involving a grave question as to the *restriction of general legislative power and authority* relating to the privilege of suffrage, can such elections fairly be called "public elections" and be treated by the courts as "governmental elections," belonging to the same class as "general elections," and, consequently, within the restrictive operation of our said suffrage clause? Under present circumstances to call primary elections "public elections" would seem to be a mere play on the word "public;" and to hold such elections to be "governmental elections" and, consequently, within the restrictive operation of said suffrage clause, would amount, practically, to an utter repudiation of the doctrine, or principle, which controlled the unanimous decision of this court in Waples v. Marrast.

In answering said certified question, in determining the true intent and operation of our said suffrage clause, this court has applied, in this case, those self-same tests to primary elections and primary conventions—mere "political instrumentalities . . . in no sense governmental instrumentalities"—with the inevitable result that, logically, in this case, (as in Waples v. Marrast), 'primary elections" have been found and declared by this court to fall in a class essentially different from "governmental elections," to which, alone, said restrictive provision of the suffrage clause of our Constitution has been held, by this court, to be fairly applicable.

"Governmental elections" are elections—such as "general elections"—which directly and finally affect all the people of the included territory, and which determine, *finally,* who shall hold public office, or whether a particular governmental policy shall or shall not prevail. Assuming, in the light of history, that our said suffrage clause deals with only such "elections" as subserve some direct "governmental" purpose, it is very evident that the *class* of "elections" which does lie within the restrictive meaning and legal operation of our said suffrage clause does not include "primary elections" or "primary conventions," which have none of the aforesaid characteristics, but which, on the contrary do not, *legally,* affect or concern all the people within the involved territory, but, at most, relate to only party affairs, and are merely advisory, and do not *finally determine, in contemplation of law,* who shall hold any office, or whether any particular "governmental" policy shall or shall not be adopted.

That being true, and there being, admittedly, no other restriction upon the general authority of the Legislature in the premises— "primary elections" and "primary conventions" are subject, as a necessary consequence under our form of government, to all reasonable regulation and control by statute, at the discretion of the Legislature, including permission to women to vote therein, subject to proper and contemplated tests of party fealty. Clearly, and undeniably, *on principle,* the cardinal, the fundamental, the controlling distinction, upon which the vital question here at issue—the certified question—properly turns, is the hereinabove stated distinction between "governmental elections" and "primary elections." How, then, reasonably, may "primary elections" be called "public elections," and be so treated by the courts, even to the extent of striking down an Act of the Legislature, (such as said statute of 1918), in which they are classified and treated as not being "public elections" in a governmental sense?

The inexorable logic of the situation is, either that said decision in Waples v. Marrast and the decision in the present case were both wrong, or that they were both right. It is as clear as the noon-day sun that, necessarily, the same stated principle is applicable, harmoniously, to both cases. If the stated distinction between said two classes of "elections" is *unsound*—if all "elections" which are authorized or which may be authorized by law belong in the *same class,*—as all being governmental elections—then the ground of this court's decision in Waples v. Marrast sinks out of sight and is wholly untenable; but if that decision was *sound,* and stood upon as enduring foundation (based, as it was, upon such classification of "elections"), then that decision is properly applicable, with controlling force, in the present case, as pointed out in said majority opinion, compelling a negative reply to said certified question. Why,

*as a matter of law,* should not this court's decision in Waples v. Marrast be followed and applied in this case?

On its merits—precedents aside—is said classification of elections into "governmental elections" (including general elections) and "non-governmental elections" (including primary elections and primary conventions), sound and correct, justifying this court in standing by it, or is it erroneous and unsound, necessitating abandonment? Both on principle and when tested by the best authorities extant, that classification is correct, and should stand. "Governmental" elections, such as "general elections" certainly do perform, \ *finally,* a distinct "governmental" purpose, affecting all the people of the involved territory, in the election of individuals to fill offices, and in the actual adoption or rejection of governmental policies. Taxes are collected from practically all the people, for whose benefit the government is maintained. Why should not tax monies, or any other public funds, be used in defraying expenses of· elections of *that class?* In that respect the Constitution reasonably does not seek to limit the general power and authority of the Legislature which, consequently, is left free, in the exercise of its general law-making authority, to authorize payment of such expenses out of public funds. Upon these considerations the restrictive provisions of our Constitution which denounce the use of ",public" funds for any except "public purposes" were declared inapplicable to "general elections." Waples v. Marrast. Upon the other hand, primary elections are not, in Texas, part and parcel of the machinery of government, as they are now in several States by virtue of express provisions (generally amendments), of their State Constitutions. Their action does not, in contemplation of law, determine, *finally,* who shall fill any office, or whether any governmental policy shall or shall not prevail; their action is merely *advisory;* and from a legal standpoint, it affects only adherents of a particular political "party." Upon these considerations said restrictive constitutional provisions concerning the use of public funds were held applicable to primary elections. Waples v. Marrast. Manifestly, upon the merits, (and extraneous of all precedents in such matters), the indicated distinction between those two kinds of "elections" is inherent, existing naturally, inevitably, and with classifying force and effect. Nowhere, perhaps, has that important distinction been drawn so graphically and clearly and finely as by Chief Justice Phillips, in Waples v. Marrast. The course of reasoning, there followed, in its support, is fairly indicated by the quotations therefrom set out in the majority opinion in the present case. In support of the classification of "elections" which this court observed and followed in the present case that cogent opinion in Waples v., Marrast is here adopted, not in the nature of a precedent alone, but as supplying a conclusive argument, on the merits, in support

of the negative reply which this court made to said certified question in the present case.

Moreover, as shown in said majority opinion, and hereinabove, that same classification of "elections," involving the stated distinction between 'primary elections" and "governmental elections," has been recognized and upheld and applied by the courts in almost every State in which the question of the effect of such a suffrage clause upon the Legislature's authority in matters affecting restricted suffrage of women has been considered. Upon that point see, especially, these cases: Hanna v. Young, 84 Md., 179, 34 L. R. A., 55, 57 Am. St. Rep., 396, 35 Atl., 674; Ledgerwood v. Pitts, 122 Tenn., 571, 125 S. W., 1036; Willis v. Kalmbach, 109 Va., 475, 21 L. R. A. (N. S.), 1009, 64 S. E., 342; State v. Johnson, 87 Minn., 221, 91 N. W., 604, 840; Kelso v. Cook, 184 Ind., 173, Ann. Cases, 1918E, 68, 110 N. E., 987; State v. Nichols, 50 Wash., 508, 97 Pac., 728; Line v. Board, 154 Mich., 329, 18 L. R. A. (N. S.), 412, 16 Ann. Cases, 248, 117 N. W., 730. To like effect are many other cases cited in said majority opinion and hereinabove.

As applicable to the certified question before this court, a careful study of the stated distinction between "elections" of different kinds, involving, necessarily, the stated classification thereof, leads, inevitably, to these pertinent conclusions, which are based upon both reason and authority :

(a)   Our State Constitution was adopted at the polls on February 15, 1876, and speaks from that date. Campbell v. Fields, 35 Texas, 752; Peak v. Swindle, 68 Texas, 250, 4 S. W., 481; In re Deckert, 2 Hughes' Civil Cases (U. S.), 187. Since then its suffrage clause has undergone no change except in respect to naturalization and poll taxes. Consequently, in determining whether it was intended to prohibit the Legislature from enacting a statute conferring upon women the privilege of voting in party primaries, conditioned on party fealty, it is essential that there be ascertained the true meaning and legal effect of "election," as then used throughout that Constitution, and, more particularly, in the Article thereof dealing, specifically, with "Suffrage." (Art. VI).

(b)   Not all of the "restrictions" which our Constitution imposes on legislative action concerning "elections" are applicable, indiscriminately, to *all elections*. Whether a particular "restriction" of that general nature is or is not applicable to a particular "election" depends upon the *character of that election*.

(c)   One such restrictive provision of even the Suffrage Article of our Constitution (Sec. 4 of Art. 6, relating to voting "by ballot"), was held inapplicable to the statutory plan of voting on annexation of adjoining territory to a city. Graham v. Greenville, and State v. Waxahachie, *supra*.

(d)   The applicability of at least two such restrictive provisions of our State Constitution, (Sec. 52, Art. III, and Sec. 3, Art. VIII),

relating to the use of "public" funds), for cogent and unanswerable reasons have been held to depend, specifically, upon whether the election in question was or was not for a strictly "governmental" purpose. Waples v. Marrast, *supra.*

(e) That same distinction between "governmental" and "non-governmental" elections reasonably may have been, and probably was, in the minds of our own Constitution makers when they embodied in that instrument (in Sec. 2 of Art. VI), the similar restrictive provision concerning the privilege of suffrage.

That conclusion flows, logically, from a study of our Constitution as a whole, regardless of decisions from other States; and the same conclusion flows, likewise, from a study of pre-existing Constitutions of other States, and decisions construing them.

However, discarding, for the moment, all former decisions bearing upon the point, what sound original reason can be offered in support of the view that a "restriction" upon legislative power, found in a provision of a Constitution, (whose primary and fundamental purpose, most assuredly, is to deal with strictly *governmental affairs*), should be construed and extended, by the courts, to include purely "party" affairs—should be so extended to matters not directly, or finally, or in contemplation of law, affecting either the "government" or the entire body of the people? None has been suggested. There is none.

In our present Constitution, as originally adopted, the word "election," occurs in various Articles, and that is true of "electors" also; but in no such instance is there made any express mention of "primary elections;" and, probably, in no such instance is the context such as to render either of those words reasonably applicable to party primaries. The minds of our fathers, in framing and adopting that instrument seem to have been on the fundamental principles of government, and on providing machinery for perpetuating them, and on declaring certain restrictions upon legislative power in matters involving pre-existing and inherent rights and liberties, rather than on prescribing limitations upon the power of the Legislature to deal with political parties and their affairs. Except where otherwise expressly indicated (as in section 41, article III, relating to a *viva voce* vote in "elections by the Senate and House of Representatives"), the word "election" throughout our Constitution as originally adopted seems to have been used strictly in the sense of "elections by the people," and not merely a part of them, as adherents of only one political party.

Indeed, in one section of our Suffrage Article (Sec. 4 of Art. 6, requiring that "the vote shall be by ballot"), the provision is that "in all elections by the people," etc. In that instance, obviously, that expression was employed to mark the distinction between an ordinary "election" and "elections by the Senate and House of Representatives," treated of in Article III, *supra.* Its use in

declaring the class of elections wherein "the vote shall be by ballot" indicates, very clearly, the conception of the meaning of election which impelled its use throughout that entire Suffrage Article, without the addition of any words expressly extending its meaning to embrace, (as in various other States at that time), all elections then or thereafter to be "authorized by law."

At the very outset, therefore, the presumption is against the view that "election," as used in our said suffrage clause, fairly applies to *all elections,* including *non-governmental elections,* such as a primary election or a primary convention. And supporting that presumption are said decisions of this court in the four hereinabove cited cases, and also the decisions of nearly all courts of last resort in the United States which have passed upon the issue as to whether such a suffrage clause does or does not include party primaries. The fair conclusion is that, upon the merits, and even aside from all thought of duty resulting from reasonable doubt as to the invalidity of said statute of 1918, said certified question should be answered negatively, as this court heretofore answered it.

The foregoing is intended to present a constructive view as to whether said certified question should be answered affirmatively or negatively.

Said dissenting opinion asserts that the decision of this court in this case "affirms . . . the authority of the Legislature to say what persons or classes of persons shall exercise the rights and privileges of members of the political parties of this State and thus, at its will, constitute them members of those parties." On the contrary, said decision means that the suffrage clause in our Constitution was never intended to give to all constitutional "electors," regardless of their political beliefs or views, free *entree* into all party councils. The practical effect of said dissenting opinion, if it were carried into operation, would be to admit all who are qualified to vote in general elections into all statutory primary elections and into all statutory primary conventions; but the effect of the decision of the court is to recognize and uphold the power of the Legislature to preserve, through reasonable party tests, the integrity of party organizations.

Said statute of 1918, to which said certified question refers, does not attempt to admit to party organizations individuals who are not adherents of any political party, nor does it seek to authorize adherents of one political party to participate in any primary election or primary convention or caucus of any other party. The established statutory regulations concerning tests of party fealty are left undisturbed. Said decision, in terms, merely affirms the power of the Legislature to forbid exclusion of women adherents of a party from its primaries *solely on account of her sex*—"only this, and nothing more."

Said dissenting opinion adverts to an apprehended extension to minors and to felons of the privilege of voting in primary elections, and also to an apprehended denial to voters of privilege from arrest during their attendance at such elections, etc.   Neither of those matters is mentioned in· the certified question; hence neither is now before the court.   The statute here now under review, and the certified question, relate, alike, and *solely,* to the extension, to *women only,* of a restricted right of suffrage.   The issue here is only as to the existence of a presently asserted legislative power, and not as to a remote possibility of a future abuse of power.   The authority of the Legislature to enact said·statute of 1918 cannot be determined by consideration of such extraneous matters.

Said dissenting opinion inquires why, if "election," as used in our suffrage clause, applies to "an election to determine whether pigs may run at large in a justice precinct" does it not apply, also, to a state-wide primary election?   That conundrum presents no real difficulty.   Its answer· may be found in its proponent's opinion in Waples v. Marrast, *supra.*   Our Constitution expressly authorizes the Legislature to "pass laws for the regulation of live stock and the protection of stock raisers in the stockraising portion of the State, and exempt from the operation of such laws other portions, sections, or counties."   Art. XVI, Sec. 23.   The exemption feature is exceptional, the general rule being that laws shall operate uniformly throughout the State.   But the Constitution makes no mention of "primary elections" or of "primary conventions."   Moreover, elections to determine whether "pigs" (or other live stock) shall be permitted to run at large are open to all qualified electors in the affected territory; whereas, only adherents of a particular political party may vote in a party primary.   Furthermore, a live stock election is *finally determinative* in character; whereas, a party nomination is merely *advisory.*   The two classes of elections are of essentially different character, or classes—the latter being *non-governmental,* the former being strictly "governmental" in con· stitutional mention, in purpose, and in legal effect.

Said dissenting opinion contains the following:

"It begs the question to say that the 'elections' referred to in this section mean only the elections provided in other parts of the Constitution.   The Constitution itself nowhere says that.   What warrant has a court in saying it?   How does it know that that is true?   What liberty has it to read any such provision into the Constitution?"   This court has not done that, in Waples v. Marrast, or in Beene v. Waples, or in the present case.   In each such instance it has clearly recognized the applicability of said suffrage clause, (in full restrictive effect), to *all governmental elections,* including those not mentioned or provided for in the Constitution but authorized by statute only.   Courts of certain other States have, indeed, held the suffrage clause of their Constitutions applicable to only

elections provided for by or mentioned in such Constitution, and in some States the courts have gone to the extent of holding such suffrage clause applicable to only elections for constitutional officers, or other officers. But all such decisions as were cited in said majority opinion in this case, or herein, have been cited merely to show that "election" in such suffrage clauses, has been treated, generally, as open to construction, and to show the general drift of courts throughout the United States against a construction of that word which would include party primaries, the general effect of nearly all the decisions being that it is a mere *play on words* to treat a party primary as being, really, an "election" in contemplation of a State Constitution. An exceptional instance occasionally occurs wherein the constitutional meaning of the word "election" is extended, by the courts, as a *remedial* measure—involving exercise of the police power—to enforce purity in even non-governmental elections.

That a Democratic nomination for the office of county treasurer of Wheeler County was not an *election* to that office, although in that county "the great preponderance of the vote was Democratic, and the real contest for the office was in the Democratic primaries, and the nomination thereat was equivalent to an election" was declared, in substance, in January, 1918, by our Court of Civil Appeals at Amarillo. Carver v. Wheeler County, 200 S. W., 537. See, also, Haas v. Neosho, 139 Mo. App., 293, 123 S. W., 473.

The decision in this case does not mean, as said dissenting opinion suggests, that "there are no individual rights, no personal liberties, in this State that are not held at legislative sufferance." Nor is there in the majority opinion any support whatever for the assertion, in said dissenting opinion, that said decision "unsettles the basis upon which until now the inherent, natural rights of the citizens of Texas have rested." What particular inherent or natural right of any citizen has that decision restricted, unsettled, or disturbed? Absolutely none. Participation in party primaries is entirely voluntary; there is no compulsion about it. How, then, can a primary election law invade or affect any natural or inherent right of a citizen? 9 R. C. L., p. 1077, and authorities cited.

Much of said dissenting opinion is devoted to platitudes (in which, of course, everybody concurs), concerning the inestimable privileges of constitutional government, and the sacredness of natural and inalienable rights of citizens guaranteed by the Bill of Rights in Article I of the Constitution of Texas. But what particular right or privilege, mentioned in or referred to by said Bill of Rights, is in anywise destroyed or questioned by said decision in this case? What particular one or more of the twenty-nine separate sections of said Bill of Rights does said decision "subvert?" Not one of them is specified, numerically, in said dissenting opinion.

The particular right of citizens to which that opinion especially directs attention as being one of the "inherent rights, natural rights, rights to be freely and independently exercised . . . without any meddling, any hindrance, and any control of the government" is what said opinion denominates "the right of the citizen to associate himself with other citizens in a political party for the advancement of his political beliefs and the influential exercise of his political rights." Is the implied reference to that portion of Section 27 of the Bill of Rights which declares that "the citizens shall have the right, in a peaceful manner, to assemble together for their common good?" Presumably so.

But said certified question does not mention or relate to said Bill of Rights or to any section or clause in it. On the contrary, that question, which, alone, is before this court for answer, is limited, expressly, to "section 2 of article VI," containing said suffrage clause. The statutory and settled practice in this court has been to confine the answer strictly to the "very question" certified. R. S., Art. 1619; Darnell v. Lyon, 85 Texas, 473, 22 S. W., 960; State v. Post, 106 Texas, 468, 169 S. W., 407.

However, if said Bill of Rights is to be considered, how can it be said to impose any restriction upon the power of the Legislature to enact said statute of 1918? Said Bill of Rights does not mention suffrage, nor does it carry any reference to that subject. Indeed, what is often called the "right of suffrage" is not a "natural" or "inherent" or an "inalienable" *right*, but is, essentially, a *privilege*, conferred by a Constitution or by a statute, or by both. Solon v. State, 54 Texas Crim. Rep., 262, 114 S. W., 349; 15 Cyc., 280, and cases cited.

In the very nature of things the right of the citizen to which said dissenting opinion presumably refers is not destroyed or abridged, but, on the contrary, is rendered more effective, by reasonable requirements relating to party fealty as conditions for participation in party assemblies, such as primary elections and primary conventions. Katz v. Fitzgerald, 152 Cal., 433, 93 Pac., 112. Tests of party fealty are essentials to party preservation.

Moreover, all of the rights and privileges guaranteed by our Bill of Rights to "citizens" belong, inherently, to women as well as to men. Women are "citizens," within the meaning of our Bill of Rights, although citizenship does not, necessarily, carry the privilege of suffrage. Const. U. S. Amd. xiv, sec. 1; Minor v. Happersett, 21 Wall. (U. S.), 162, 22 L. R. A., 627; 15 Cyc., 298, and cases cited. Men have no monopoly in the constitutional right of assemblage, or in any other right or privilege mentioned in our Bill of Rights. Thus it appears that if it be assumed that the stated right of assemblage extends to and embraces participation in primary elections and primary conventions, an extension to women of the privilege of voting therein does not deprive *men* of

any right or privilege; it rather makes effective, in a practical way, corresponding constitutional rights of women.

"There having been no constitutional limitation upon the power of the party with respect to the qualifications of its members, it would seem that, if the legislature has power to legislate on the subject at all, its power also is without limitation as far as concerns the rights of the individual elector." (to participate in party primaries). Morrow v. Wipf, 22 S. D., 146, 115 N. W., 1121; State v. Nichols, 50 Wash., 508, 97 Pac., 728.

Whether purely party affairs, such as primary elections and primary conventions, should or should not be regulated, and the extent of such regulation, so long as it is reasonable, are, peculiarly, legislative matters, involving issues of public policy with which courts have no concern. Ledgerwood v. Pitts, 122 Tenn., 571, 125 S. W., 1036, and cases cited; State v. Metcalf, 18 S. D., 393, 100 N. W., 923, 67 L. R. A., 331; De Walt v. Bartley, 146 Pa., 529, 15 L. R. A., 771, 28 Am. St. Rep., 81, 24 Atl., 185; McGrael v. Phelps, 144 Wis., 1, 128 N. W., 1041, 35 L. R. A. (U. S.), 353; People v. Committee, 164 N. Y., 335, 58 N. E., 124, 51 L. R. A., 674; Healey v. Wipf, 22 S. D., 343, 117 N. W., 521; People v. Board, 221 Ill., 9, 77 N. E., 321, 5 Ann. Cas., 568; Riter v. Douglass, 32 Nev., 400, 109 Pac., 444, and cases cited. See, also. Waples v. Marrast, *supra;* Glasgow v. Terrell, 100 Texas, 584, 102 S. W., 988; State v. Michel, 121 La., 374, 46 So. 430, and cases cited; 9 R. C. L., 1076, and cases cited; 15 Cyc., 332 and cases cited; 91 Am. St. Rep., 477, note. Upon that theory many of the States have enacted direct primary laws.

"The right of the Legislature to require that nominations shall be by primary and to prescribe additional qualifications for the voters participating in same has been recognized by the weight of authority in the States of the Union. Runge v. Anderson, 100 Wis., 533, 76 N. W., 482, 42 L. R. A., 239; State ex rel. McCarthy v. Moore, 87 Minn., 308, 92 N. W., 4, 59 L. R. A., 447, 94 Am. St. Rep., 702;; State v. Drexel, 74 Neb., 776, 105 N. W., 174; Hopper v. Stack, 69 N. J. Law, 562, 56 Atl., 1; Coffey v. Dem. Gen. Com., 164 N. Y., 335, 58 N. E., 124; Healey et al. v. Wipf, (S. D.) 117 N. W., 521; Griffin v. Gesner, 78 Kan., 669, 97 Pac., 794; Walling v. Lansdon, 15 Idaho, 282, 97 Pac., 396; State v. Nichols, 50 Wash., 508, 97 Pac., 728. . . . An examination of many of these cases has disclosed the fact that they are bottomed on two propositions, namely: (1) That such primaries are not in reality elections, but merely nominating devices; and (2) that they are valuable auxiliaries for the promotion of good government and are regulated by legislative enactment for the public welfare." Ledgerwood v. Pitts, 122 Tenn., 571, 125 S. W., 1036. See, also: McInnis v. Thames, 80 Miss., 617, 32 So., 286; Kenneweg v. Com'rs, 102 Md., 119, 62 Atl., 249.

It follows, upon both principle and authority, that insofar as it may present the view that said statute of 1918 deprives either male voters or political parties of an "inalienable right," said dissenting opinion is erroneous.  See, especially; Morrow v. Wipf; Labauve v. Michel;  and Riter v. Douglass, all *supra;*  State v. Flaherty, 23 N. D., 324, 136 N. W., 76, 41 L. R. A. (N. S.), 132; Katz v. Fitzgerald, 152 Cal., 433, 93 Pac., 112.

Essential to the very existence and practical operation of any comprehensive and reasonable primary election law is a requirement that all the participants therein shall be of the same political faith; as that only democrats shall participate in democratic primary elections.  But that qualification; is not mentioned in said Section 2 of Article VI of our Constitution; nor is it within the power of the Legislature to prescribe it, if as is here contended, primary elections are "elections" in contemplation of that section of our Constitution.  Consequently, if by reason of their constitutional qualifications, all "electors" may vote in the primary election of any party, they may, for like reason, vote in the primary elections of all parties—which, necessarily, would circumvent the purpose and utterly destroy the usefulness of all primary elections.  In other words, if said dissenting opinion is sound, its logical effect is to destroy all primary election and primary convention laws.

The suffrage clause of a Constitution being "restrictive" in its operation, its legal effect is to deprive the Legislature of authority *to take from or to add to* the therein defined qualifications of "electors" in any election to which that clause applies.  To that effect are practically all of the authorities.  The soundness of that proposition has not been questioned in this case.  Consequently, if (as is insisted in said dissenting opinion), said suffrage clause is applicable to primary elections and to primary conventions, the Legislature is as powerless to prescribe an additional qualification for participation therein as it would be to prescribe the same additional qualifiation for participation in "general elections." In.other words, if primary elections and primary conventions are "elections" within the meaning of said suffrage clause, the Legislature is powerless to prescribe, additional qualifications, such as *party fealty,* as a condition to participation therein.  There is no middle ground.  That principle was asserted and applied in Spier v. Baker, 120 Cal., 370, 52 Pac., 659, 41 L. R. A., 196.  Wherein it was held that expenses of primary elections validly might be paid out of public funds.  Further reference to that case will be made, hereinafter.

Under the view that our suffrage clause applies to primary elections and primary conventions as well as to "general elections" every man who is a qualified voter in a general election logically would have a *constitutional* privilege, regardless of party affiliations or

party fealty, of voting in every primary election and in every primary convention in his general election precinct.

That would render futile all party organization involving the use of primary election or primary convention machinery. In practice it would destroy, utterly, primary elections and primary conven-- tions, since without party fealty they cannot effectuate the purpose of their existence. It was so pointed out in the majority opinion in this case, quoting from Kelso v. Cook, 184 Ind., 173, 110 N. E., 909, Ann. Cases, 1918E, 68. To the same effect are Hamilton v. Davis, State v. Flaherty, and Morrow v. Wipf, all *supra*, and Riter v. Douglass, 32 Nev., 400, 109 Pac., 444, and many other cases. In Morrow v. Wipf, 22 S. D., 146, 115 N. W., 1121, the court said:

"It is for the party to nominate; for the people to elect. The question is not who shall be chosen to any particular public office. "That is for the voters of all political parties to determine at the polls. It is simply who shall represent the organization as its nominees, and certainly the determination of that question should be controlled by the action of the party itself; otherwise party nomi-- nations are impossible."

To prevent party disintegration resulting from participation of adherents of no party, or of another party, in a party primary, has been the declared purpose of primary election statutes in various States. Socialist Party v. Uhl, 155 Cal., 778, 103 Pac., 181. A North Dakota statute making party fealty a condition for participa-- tion in a party primary was held valid as neither prescribing an added franchise requirement nor restricting the right of suffrage, within the meaning of the suffrage clause of the Constitution of that State, wherein males only were declared to be qualified electors. In holding that statute constitutional the Supreme Court said: "To hold the contrary is to invalidate every primary election statute *in toto.* Deny constitutional recognition of purpose of the election, and apply the constitutional definition of elector, and hold that by virtue of being an elector he shall be 'deemed a qualified elector at such election,' and our whole primary election system must fall, because the right to participate depends not on the elector's con- stitutional rights so defined alone, but on added qualifications of partisanship." State v. Flaherty, 23 N. D., 313, 136 N. W., 76, 41 L. R. A. (N. S.), 132.

. In that case the court said, also: "The primary election statutes have as a principal purpose the regulation of the franchise of electors within party limits. The elections so provided concern primarily the rights of parties, and only incidentally those of the individual elector. The primary is not held to afford an elector as such merely a chance to exercise his right of suffrage, but instead an opportunity to participate in the proceedings and acts of a politi- cal party. This he does by exercising his right to vote, but within that party. . . . If he has no party belief whatever, denial of

right to participate in a partisan election does not deny him any right legally or morally existing to him merely as an elector. . . .

We cannot reasonably conclude these suffrage provisions were intended to so exaggerate the franchise privilege of the individual as to obliterate them or thwart any legislative purpose to perpetuate political parties.'' See, also: State v. Nichols, 50 Wash., 508, 97 Pac., 728; Whipple v. Broad, 25 Colo., 407, 55 Pac., 172; Britton v. Board, 129 Cal., 337, 61 Pac., 1115, 51 L. R. A., 115; Schostag v. Cator, 151 Cal., 600, 91 Pac., 502; State v. Johnson, 87 Minn., 221, 91 N. W., 604, 840; Kelso v. Cook, 184 Ind., 173, 110 N. E., 909, Ann. Cases, 1918E, 68.

''The elective franchise guaranteed to the electors under the Constitution of the State is a mere political privilege, not a natural right nor an inherent unqualified personal or political right, and, in consequence, it naturally follows that the rights of political parties are no greater than the rights of the electors derived from the Constitution. 6 Am. & Eng. Ency., p. 935; Bryce, Am. Commonwealth, pp. 422, 423; Weimer v. Bunbury, 30 Mich., 214; 8 Cyc., 743; Cooley, Const. Lims. (7th Ed.), pp. 244, 245; Beebe v. State, 6 Ind., 501-510, 63 Am. Dec., 391; Mayo v. Wilson, 1 N. H., 53; Hale v. Everett, 53 N. H., 9, 16 Am. Rep., 82; Eckerson v. Des Moines, 137 Iowa, 452, 115 N. W., 177 (1908); Healey v. Wipf, (S. D) 117 N. W., 521 (1908); Coggeshall v. Des Moines, 138 Iowa, 730, 117 N. W., 309, 128 Am. St. Rep., 221 (1908); Gougar v. Timberlake, 148 Ind., 38, 46 N. E., 339, 37 L. R. A., 644, 62 Am. St. Rep., 487.'' Riter v. Douglass, 32 Nev., 400, 109 Pac., 444.

Concerning tests of party fealty, as related to constitutional ''electors,'' the Supreme Court of Louisana said:

''It is of the very essence of a primary that none should have the right to participate in it but those who are in sympathy with the ideas of the political party by which it is being held. Otherwise the party holding the primary would be at the mercy of its enemies, who could participate for the sole purpose of its destruction, by capturing its machinery or foisting upon it obnoxious candidates or doctrines. . . . If, therefore, there could not be a primary under our Constitution without the admission of outsiders, the consequence would be that under our Constitution such a thing as a primary would be impossible. The argument, therefore, that in a statute-regulated, or compulsory primary, the qualifications of voters cannot be other than as fixed by the Constitution for the general election, would lead to the conclusion that such a primary was a legal impossibility. . . . As expressed by Judge Parker, (Coffey v. Dem. Gen. Com., 164 N. Y., 335, 58 N. E., 124, 51 L. R. A., 674), the idea of such a law is 'to permit the voters to construct the organization from the bottom upwards, instead of from the top downwards,' and it would be strange indeed if the Constitution

had made such a scheme impossible." State ex rel. Labauve v. Michel, *supra.*

"Written Constitutions were adopted, not as a sword against the public interest, but as a shield to protect the public interest, safeguarding the rights of the humblest citizen as well as the highest." Miami County v. City of Dayton, 92 Ohio St., 215, 110 N. E., 730.

Did the makers of the Constitution of Texas contemplate or desire such destruction or impairment of party organizations? If not, they could not have intended that our said suffrage clause should be construed and treated as applicable, alike, in all respects, to "general elections" and to primary elections and primary conventions.

All great writers on the philosophy of government have recognized the importance and practical necessity of political parties in preserving the essential principles of free government. 2 Bryce's Am. Commonwealth, ch., 60; Ladd v. Holmes, 40 Ore., 167, 66 Pac., 714, 91 Am. St. Rep., 457. Consequently, such destruction or derogation of political parties as surely would result from a logical enforcement of the minority view that "election," as employed in our said suffrage clause, embraces primary elections and primary conventions, hardly could have been contemplated or intended by those who wrote and adopted said suffrage clause; and a construction which might result so disastrously to the government and to all the people should not be given, by the Legislature and the courts, to that clause, unless its utter inelasticity so requires. Legislatures and courts, in nearly all instances, all over the United States, have declined to give the word "elections" so broad an interpretation. 15 Cyc., 332-3.

Furthermore, if said dissenting opinion in this case is sound—if primary elections and primary conventions are, indeed, *in a constitutional sense,* "public elections," elections constituting *a portion of the machinery of government,* and, therefore, open to all constitutional "electors," the effect of our primary election laws is *to* fasten upon the people of Texas a system of *double governmental elections,* for, at least, the selection of public officers. If that is what our Constitution really contemplates—if, as declared in the dissenting opinion in the present case, "party primaries are . . . public 'elections' and are elections in the common everyday meaning of the word, and so known and recognized to be by everybody"—why did the author of that opinion declare, in Waples v. Marrast, *supra,* and why did this court therein unanimously hold that payment of expenses of statutory primary elections out of public funds is prohibited by our Constitution? Why did it not hold directly to the contrary, as did the Supreme Court of California, upon similar reasoning, in Spier v. Baker, *supra?* That very contention of the dissenting opinion in the present

case was one of the two grounds of that California decision, the other being that their suffrage clause (unlike ours), expressly embraced "all elections which are now or may hereafter be *authorized by law.*"

Such a double system of *governmental elections* has, indeed, been expressly adopted by the people in various States (generally in the form of amendments of their State Constitutions); but it seems unreasonable to presume and hold that such was the purpose and intent of the makers of our own Constitution when said suffrage clause was embodied in it.

Then, if, in formulating and in adopting said suffrage clause the makers of our Constitution contemplated primary elections and primary conventions at all, they must have assumed that to primary elections and primary conventions said restrictive provisions of said suffrage clause would not apply; or, if they did not therein at all contemplate primary elections and primary conventions, said suffrage clause is not applicable to them. In either event said suffrage clause leaves the Legislature free to prescribe the qualifications of participants in primary elections and in primary conventions, as well as reasonably to regulate them in other respects; wherefore said certified question should be answered negatively.

In said dissenting opinion is much to the effect that our Constitution was intended to be of enduring character, employing language appropriate to that result and intended to meet conditions as they may arise, and that its makers sought therein to restrict the right of suffrage in those elections "at which elective officers of the State were to be determined." With all that everybody agrees, of course. But, by a very easy transition, the dissenting opinion declares that "in this State, in actual result, the primary election is the decisive election." When measured in terms of law, in actual governmental consequences cognizible by our State Constitution, that quoted conclusion lays down a proposition which cannot be maintained.

That postulate (which is essential to the support of the conclusion asserted in said dissenting opinion to the effect that primary elections are "public elections"), seems, at first blush, quite plausible; but, really, it is entirely unsound. Otherwise, there would be no need for a "general election," (for which the Constitution expressly provides),—the "decisive" result in the election of elective State officers having been already actually "determined" (according to that view) in party primaries of only the one party to which, alone, as a matter of classification, our general primary election law now applies. The fact is that, at that juncture, there has been a "nomination"—but no "election," to such offices, in contemplation of the Constitution. Line v. Board, 154 Mich., 329. No sophistry can change that fact. See majority opinion and authorities therein cited.

However, if, as the argument of our Chief Justice runs, in effect, "the framers of the Constitution and the people of the State in its adoption" in their deep concern for the future, undertook to provide, in that document, "that only those persons having the qualifications named in the Constitution should vote, or be entitled to vote, in the election, regardless of its name or other character, at which elective officers of the State were to be determined," and foresaw, "that save in an election involving change in the State's organic law, that election would be the most vital in the affairs of the State," and foresaw, also, that "the primary elections" were to become "the decisive elections in this State in the choosing of public officers," and that the party primaries of some one political party might and would, become "in actual result . . . the decisive election" with which they—our fathers—were undertaking, in our said suffrage clause, to deal, why were not "primary conventions," or "primary elections," as such, expressly provided for, directly or indirectly, or mentioned, in that suffrage clause (Sec. 2, Art. VI.), or elsewhere in our Constitution? And why was it that, in defining qualifications of electors, our suffrage clause used simply the words "any election," and did not even declare that provision applicable to *any election authorized by law,* as did, *at that time,* suffrage provisions of Constitutions of several States, including California and Iowa? See Spier v. Baker, 120 Cal., 370, 52 Pac., 659, 4 L. R. A., 196; Edmonds v. Banbury, 28 Iowa, 267, 4 Am. Rep., 177; Coggeshall v. Des Moines, 138 Iowa, 730, 117 N. W., 309, 128 Am. St. Rep., 221; Harris v. Burr, 32 Ore., 348; Ladd v. Holmes, 40 Ore., 167, 66 Pac., 714, 91 Am. St. Rep., 457. See, also, Const. of Minnesota; State v. Johnson, *supra.* As to the effect of provisions of that nature, concerning "elections," as employed in State Constitutions, see; Leonard v. Com., 112 Pa., 607, 4 Atl., 220, cited in said dissenting opinion; Allison v. Blake, 57 N. J. L., 6, 25 L. R. A., 480; In re Gage, 141 N. Y., 112, 25 L. R. A., 781.

In construing "elections," as used in such a suffrage clause of the Iowa Constitution, the Supreme Court of that State said:

"Until comparatively recent times the word 'election,' when applied to political subjects, did not denote the choice of a principle, or the decision of a question of government, or the advice to governing bodies by the electors, and only when declared by the instrument itself to be sufficiently comprehensive to cover these matters has it been construed to have this extended meaning." Coggeshall v. Des Moines, *supra.*

Had such an amplifying or enlarging expression concerning "elections" been inserted originally, in our suffrage clause, as it was, *earlier,* in the corresponding clauses of Constitutions of other States, there would be some reasonable ground for holding, in the present case, that our suffrage clause extends to and includes "primary elections," (in that they are, in a qualified sense "elec-

tions," and are "authorized by law")—just as was held in the California case, Spier v. Baker, relied upon by our Chief Justice, and, perhaps that reasoning although attenuated, might apply to "primary conventions" also. Was the omission of such an amplifying or enlarging expression, (so treated by courts generally), from the suffrage clause of our present Constitution accidental and without meaning, or intentional and fraught with significance? Presumably, the latter. And that presumption is strengthened by the fact that, certainly, that very distinction actively was present in the minds of the framers of that instrument—at least as to votes of "soldiers"— in that the next preceding section of article VI declares that they "shall not be allowed to vote in this State," although, prior to that time, the inhibition against their voting extended no further than to "any election created by this Constitution." Const. of Tex., 1845, Art. III, Sec. 1; 1861, Art. III, Sec. 2; 1866, Art. III, Sec. 1; 1869, Art. III, Sec. 1.

Contemporaneously with the adoption of our suffrage clause there was placed in the Judiciary. Article (Art. V), an enlargement clause, extending the judicial power of the State to "such other courts as may be established by law," as well as to the courts therein enumerated.

It is to be presumed that provisions of then existing Constitutions of other States, so extending the meaning of the word "elections," as used in Constitutions, as to make the provision expressly include *all elections* then or thereafter "authorized by law," (whether strictly governmental elections or not)—when such enlarged meaning was intended—were known to the makers of our own Constitution. Under such circumstances, and according to the last hereinabove cited line of decisions, if weight is to be ascribed to them, the very omission from our suffrage clause of any and all such words of expansion or enlargement of the usual governmental and legal office of the word "election" fairly implies that an unrestricted meaning or legal operation of that word was not therein contemplated. This phase of our Constitution, as compared with those of various other States, is mentioned herein both as a basis of appraisement of the value, in this case, of cited decisions of those States, and by way of showing that from whatever view point the present issue is considered the same general conclusion as to the validity of said statute of 1918 results.

Said dissenting opinion cites, in its support, on the main issue, the following cases from other States, but does not point out the difference between the Constitutions under which they arose and our own Constitution:

(a) Leonard v. Commonwealth, 112 Pa., 607, 4 Atl., 220. Unlike the present case, that case involved neither the construction of the suffrage clause of a Constitution nor the validity of a statute. Their Constitution denounced "bribery, fraud, or wilful violation

of any election law'' by any candidate for office, prescribing as a
punishment absolute disqualification° to hold office, and prescribing
forfeiture of the right of suffrage, for four years, as punishment for
"any person convicted of wilful violation of the election law."
Under said provisions, and a statute of 1881, which the caption and
the court declared was designed to prevent bribery and fraud at
primary elections and at nominating conventions, one section of
which denounced bribery by a candidate for office in securing his
nomination and prescribed penalties of fine and imprisonment only,
Leonard was ousted from office; the first penalty prescribed by the
Constitution but not by the statute being enforced against him.
Thus the controlling question on his appeal was whether said
first Constitutional penalty was applicable to his case; or, in other
words, whether said primary election and nominating convention
statute was an "election law" within the meaning of said provisions
of their Constitution.    The upper court decided that question
affirmatively, upholding said judgment.    But its supporting argu-
ment was to this effect: first, the statute, being "complete within it-
self"—"a perfect law so far as its validity depends upon mere form,"
and there being in the Constitution nothing to forbid its enactment, it
should be treated as a "law;" second, inasmuch as it was one relat-
ing to "elections" according to the "common and popular use of
words," it should be treated as an "election law;" and, third, in-
asmuch as said provisions of their Constitution were *remedial in their
nature*, and the object aimed at by them and by the statute was
the purification of that which had "become a part of our great
political system"—of important relation to the general election—
said provisions "must receive a liberal construction," and must be
"interpreted so as to carry out the great principles of government,
not to defeat them;" wherefore said statute must be held to be
"an election law" within the meaning of said provisions of their
Constitution. As a supporting argument the court added this:

"Moreover the relation of nominating conventions to the general
election, and the importance of that relation, is *recognized by the
Constitution itself*. This is notably so in Article VII, which pre-
scribes the oath of office, and which requires all senators and rep-
resentatives, and all judicial, state and county officers to swear
that 'I have not paid or contributed, or promised to pay or contri-
bute, either directly or indirectly, any money or other valuable
thing to procure my *nomination* or election.' "

Neither in prescribing the oath of office, nor elsewhere, does our
Constitution place "nominations" in the same category with
"elections," or in anywise refer to nomination of candidates for
office. That decision, and the reasoning of the court thereon, are in
accord with the liberal rule generally applied in the construction
and enforcement of remedial provisions of statutes and of Con-
stitutions. Ashford v. Goodwin, 103 Texas, 491, 131 S. W., 535, Ann.

Cases, 1915A, 699;   Anderson v. Ashe, 62 Texas Civ. App., 262, 130 S. W., 1044;   Allison v. State, 45 Texas Crim. Rep., 596, 78 S. W., 1065;   Schostag v. Cator, 151 Cal., 600, 91 Pac., 502.

But, just as generally, a stricter rule is applied when, (as in the present case), the question before the court is as to the restrictive effect, upon legislative power, of provisions of a State Constitution. In that case, under those circumstances, as the court there declared, it was fair to assume that the words "any election law" as used in said remedial provisions of their Constitution, were meant to embrace "any law relating to elections," (whether strictly "governmental" elections or not); but from that it does not follow, logically, that "election" as used in the suffrage clause of our Constitution (which imposes, as everybody concedes, restriction upon legislative authority), was intended to include purely party primaries.   That material distinction between the widely different purposes and functions of said provisions of the Pennsylvania Constitution and those of our own suffrage clause seems to have been ignored in the dissenting opinion in the present case.

However, substantially that same distinction was not ignored, but was recognized and emphasized by that court in that Leonard Case, in expressly reaffirming its own earlier hereinabove cited decision in Commonwealth v. Wells, 110 Pa., 463, 1 Atl., 310, wherein, quite recently, it had held that betting on a "primary election" was not a violation of a statute denouncing "wagering or betting on the event of an election held under the Constitution or laws of the United States or the Constitution and laws of this Commonwealth." (Note, in the context, the reference to an election *in contemplation of their Constitution.*) Commenting, in the Leonard Case, upon said earlier decision, (which dealt with an Act of 1817, as amended in 1839), that court said: "All this is very plain. When the Acts referred to prohibit and punish the betting on elections, they manifestly mean elections when some one is elected to a *public office;* not to elections when delegates are to be chosen to nominating conventions. *We reaffirm this ruling in all its fullness.* But does it apply to the case in hand?" (That earlier case had been cited as controlling the latter case.) The earlier case is much more like this case.   It   should   be   remembered   that   both   of   those Pennsylvania   decisions   were   by   the   same   seven   Justices, comprising what our Chief Justice justly calls "a strong and learned   court   as   can   be   found."     Themselves   being   judges, "elections" in the suffrage clause of our Constitution would not be held to include party primaries.   Aside from certain choice rhetoric in the Leonard Case announcing certain indisputable general conclusions on construction of Constitutions, it is difficult to see how that case affords any substantial support for said dissenting opinion. As between that case and Waples v. Marrast, is not the latter much more applicable, with controlling force, in answering said certified

question? As quoted by our Chief Justice that Pennsylvania opinion declared: ''We may safely assume that the words in a statute or a Constitution are used in the sense in which the people who made the statute or Constitution understood them.'' Precisely so; and in the present case extensive but unsuccessful research has been made to discover why, (if at all), this court should hold that ''election'' in our suffrage clause was used, by its makers, in a sense so strikingly different from that in which it has been used in Constitutions of so many other States.

(b) People ex rel. Breckon v. Board of Election Comr's, 221 Ill., 9, 77 N. E., 321, 5 Ann. Cases, 562 (decided in 1906); Rouse v. Thompson, 228 Ill., 522, 81 N. E., 1109, (decided in 1907); and People v. Strassheim, 240 Ill., 279, 88 N. E., 821, 22 L. R. A., (N. S.), 1135 (decided in 1909).

The decision in the Breckon Case was to the effect that primary elections are elections in contemplation of that clause of the Bill of Rights of the Constitution of Illinois which provides that ''all elections shall be free and equal;'' and that, consequently, a primary election law which regulates the form of the ballot, what shall appear thereon, and how the candidates must be chosen, must not violate that provision. Said provision does not appear in our Constitution.

The court said: ''The legislature may and ought to provide all such reasonable regulations as will make the provision of the Constitution effectual, and guard against fraud, undue influence or oppression, and preserve the equal rights of all from interference or encroachment.'' Accordingly the court held void certain provisions of the Act of 1905, among them being one prescribing, as to candidates for certain offices, restrictions in addition to those prescribed by the Constitution, and one requiring candidates to pay certain filing fees, in fixed amounts bearing ''no relation to the services rendered in filing the papers or the expenses of the election.'' Other features of that decision are unimportant here. That case did not involve construction of a suffrage clause and did not expressly involve restricted woman's suffrage. In Kentucky and in Tennessee, and in Indiana, as hereinabove shown, that provision in a Constitution has been held inapplicable to primary elections.

In the Rouse Case it was held that the provision in the primary election statute of 1906 authorizing the managing committee of a political party to nominate candidates in ''special elections'' to fill vacancies in elective offices was violative of said provision that ''all elections shall be free and equal.'' Therein it was held, also, that said primary law interfered with the voter's constitutional right to cast as many votes for one candidate as there were representatives to be elected, and, in that far, was void. And therein it was held, also, that certain provisions of the statute concerning

registration were void, because conflicting with a provision of the Constitution on that subject, which, it was declared, "applies to a primary election with the same force that it does to a general election." There was a vigorous dissenting opinion by Judge Carter. That case involved neither restricted woman's suffrage nor the construction of a suffrage clause. It.is interesting to note that therein the right of the Legislature reasonably to regulate primary elections is upheld, and the absolute necessity for tests of party fealty is recognized, in view of the fact there mentioned; that, otherwise, "the whole scheme of nominating party candidates by a primary election would fail, because of being incapable of execution." The court said, also: "What regulations should be had to secure fair primary elections must rest largely with the Legislature, and the courts should not override the discretion placed in that branch of the government by the Constitution, unless it clearly appears that the constitutional rights of the individual voter have been infringed upon."

In the Strassheim Case, which declaredly followed the doctrine of said two cited earlier Illinois cases, the primary election law of 1908 was held void on the ground that it undertook to deprive some electors possessing the constitutional qualifications of the right to vote at primary elections, and to add to such qualifications. The case involved only questions relating to residence, naturalization, and registration. The concurring opinion by Judge Carter indicated his view that he was bound by that court's former decisions.

Putting the matter most strongly against the decision of this court in this case, it may be conceded that, according to the views of the Supreme Court of Illinois, as to all candidates to be nominated thereat for *offices provided for by their Constitution*, a primary election is an "election" in contemplation of their suffrage clause. But, even in that State, (as pointed out in the majority opinion in the present case), the restrictive provisions of their suffrage clause is held inapplicable to either nominations, in party primaries, of candidates for *purely statutory offices*—or to other *purely statutory elections*. Accordingly an Illinois statute conferring upon women the privilege of suffrage, *to that extent*, was upheld, by that court, as valid. Scown v. Czarnecki, 264 Ill., 305, 106 N. E., 276, L. R. A., 1915B, 247, Ann. Cases, 1915A, 772, decided in 1914. That seems to be the latest Illinois decision on the subject.

Upon the whole, the three Illinois cases cited in said dissenting opinion do lend it some support; but they are contrary to the great weight of authority.

(c)   Spier v. Baker, 120 Cal., 370, 52 Pac., 659, 41 L. R. A., 196, (decided in 1898).

That is the California decision which was declared by the Supreme Court of Tennessee to be "opposed to the great weight of authority."

Ledgerwood v. Pitts, 122 Tenn., 570, 125 · S. W., 1036. With reference to it' the same court said: "California is one of the few States which hold that a compulsory primary law forms a part of the general election laws of the State and is governed by all constitutional limitations in regard to the right of suffrage." An earlier decision of California had declared a primary election an election referred to in their Constitution. Marsh v. Hanly, 111 Cal., 368, 43 Pac., 975, (decided in 1896). The suffrage clause of the Constitution of California restricted to males the right to vote "at all elections which are now or may hereafter be authorized by law." Art. 2, Sec. 1. Concerning primary elections the court said:

"In other words, the Legislature, believing a sound public policy demanded such a course, has made these elections *a State institution*. By the whole tenor of the Act they are placed upon the plane of *State elections*, and in the consideration of the law bearing upon them they must be so recognized." The words following "elections," (which are not in our suffrage clause), were treated as manifesting a deliberate purpose, on the part of the people of California, expressly to extend the provisions of their suffrage clause defining electors far beyond mere balloting, in the general election, for officers provided in the Constitution, and even beyond balloting on strictly govern-mental matters, and to make such suffrage clause applicable, unques-tionably, to all "public" elections then or thereafter "authorized by law." The decision in Spier v. Baker proceeds, declaredly, upon the view that under the language of their suffrage clause, and the legislation of that State concerning primary elections, such elections are not only "governmental elections" in the full sense of that term, but are, as well, "elections" in contemplation of their Constitution (citing Marsh v. Hanly, *supra.*) But for that fact, the court declared, the Legislature would have been destitute of authority to provide, as it had done, for pay-ment of primary election expenses out of State and county revenues derived from taxation, their Constitution, containing (as does ours), prohibitions against application of such funds to private uses.

Upon the view that primary elections were within the scope of the quoted language of their Constitution, and, consequently, were "State elections," that court did declare, with reference to their suffrage clause: "These things being true, the Legislature has no power to deprive any citizen of this State, who fills all the requirements demanded by the section of the Constitution quoted, from voting at an election provided for by this Act." Accordingly the primary election Act of 1897, (which the court called "the first of its kind"), was held void because it undertook to restrict, in certain respects, the privilege of suffrage as defined in their suffrage clause, and for other reasons not material here. The difference between their suffrage clause and our suffrage clause

is obvious, in that ours does not expressly refer to 'all elections authorized or to be authorized by law. The legal effect, if any, of the added words in the suffrage clause of that State need not now be determined. The very fact that they were therein, and were made, by that court, a basis of its decision in Spier v. Baker, is sufficient to break, if not entirely to destroy, the force of that decision as an authority in the present case. But, if said difference between their Constitution and ours is to be ignored, and that California decision is to be considered both sound and fairly applicable to primary election statutes of Texas, (all as indicated in said dissenting opinion by our Chief Justice), the logical and necessary legal consequence will be affirmation *in principle,* of the constitutionality of our said above mentioned unrepealed Presidential Primary Election Statute of 1913, which undertook to authorize payment of primary election expenses out of public funds, (and which this court held void, in Waples v. Marrast, *supra*) thereby impliedly *overruling his own opinion* in that case. Preferably, the decision in Waples v. Marrast should stand. But, certainly, it and said dissenting opinion are mutually destructive.

Let the test defined in Spier v. Baker be applied here. If, as therein decided, primary elections are "State elections," and if, as now declared by our Chief Justice, primary elections are, (equivalently), "public elections," and are, peculiarly, "elections" to which our fathers intended the restrictive qualifications set forth in our suffrage clause to apply, (in that, according to his averments, "in this State, in actual result the primary election is the decisive election"), there appears to be, indeed, no sound reason why expenses of such elections may not, validly be paid out of public funds. Conversely, if (as this court held in Waples v. Marrast), payment of expenses of primary elections out of public funds is inhibited by two sections of our Constitution, (because they are mere political party affairs and not "governmental" nor truly "public" or "State" elections), is it unreasonable to conclude, as did our Legislature when it enacted said statute of 1918, to which the certified question refers, that they are not, (as are "general elections," and "special elections"), the "elections" which were the objects of the anxious solicitude of our fathers in framing and in adopting said suffrage clause? And is there not even room for "a reasonable doubt" on that point, which if it exists, will, itself, (as our Chief Justice admits), properly support the validity of that statute?

The California case of People v. Cavanaugh, 112 Cal., 674, 44 Pac., 1057, (decided in 1896), discloses the view of primary elections which the Supreme Court of that State entertained prior to the legislation which, later, (in Spier v. Baker), it declared constituted them, substantially, "State elections." In that earlier case, in holding that Section 19 of the Purity of Elections Act of 1893 did

not apply to primary elections for delegates to a political convention, that court said: "Defendant was charged with attempting, by the use of money, to influence an election of certain delegates at a Republican primary election. It is now claimed that the purity of elections Act does not apply to primary elections, and this court is in accord with such contention. A primary election is purely a creation of political parties and associations. . . . In the body of this act may be found the word 'election' a hundred times or more, and it may be said in every instance that it is plainly apparent that the word is *not used as applying to primary elections.*"

And in California, in 1912, after said decision in Spier v. Baker, and even after the adoption, meanwhile, in 1908, of an amendment of their Constitution (Art. II, Sec. 2 1/2) expressly declaring that "the Legislature shall enact laws providing for the direct nomination of candidates for public office, by electors, political parties, or organizations of electors without conventions at elections to be known and designated as primary elections," (Art. II, Sec. 2 1/2; Socialist Party v. Uhl, 155 Cal., 776, 103 Pac., 181), and under a statute providing that if the petition for a local option election be certified within six months and not less than forty days before "the next general State or general municipal election within the territory described, such question shall be submitted at said general election; otherwise a special election shall be held for such purpose within not less than thirty or more than sixty days after the petition has been certified," it was held that, although the time for holding primary elections throughout the State was fixed by law, such general primary election was not a "general election" within the meaning of said local option statute. Bigelow v. Board of Supervisors, 18 Cal. App., 715, 124 Pac., 554.

Ought said Texas, statute of 1918 to be stricken down as unconstitutional on the alleged applicability and strength of the Pennsylvania, Illinois and California decisions?

Said dissenting opinion in the present case declares that Ashford v. Goodwin, 103 Texas, 491, 131 S. W., 535, Ann. Cas., 1913 A, 699, by this court, "settles this question and settles it beyond any doubt," and that Anderson v. Ashe, 62 Texas, Civ. App., 262, 130 S. W., 1044, by our Court of Civil Appeals at Galveston, "is equally conclusive." Those decisions were not so regarded or treated by the same Court of Civil Appeals, when, later, it certified said question to this court, nor by the Court of Civil Appeals at Austin, when, prior to this court's decision in this case, that court, in Hamilton v. Davis, *supra,* decided the same question just as this court decided it, upholding said statute of 1918. They were not so treated or regarded by this court on the original hearing of this case. On the contrary, in Hamilton v. Davis, and by this court in this case, they were treated, briefly, as not conflicting with the view that said primary election statute of 1918 is valid. It was not thought

necessary to discuss those decisions more fully in the original opinion of this court in this case, which was prepared before said dissenting opinion therein was completed; but, in view of the construction which our Chief Justice has placed upon them, and the emphasis with which he insists that they conclusively support his conclusion that said statute is unconstitutional, further analysis of and comment upon those decisions, herein, is deemed appropriate.

The Ashford Case and the Anderson Case, which were to the same effect, alike involved, concretely, no question as to whether the statutory plan for additions to municipal territory does or does not provide for an election at which all votes are required, by the suffrage Article of our Constitution, to be cast ''by ballot''— as did Graham v. Greenville and State v. Waxahachie, *supra;* no question as to whether primary elections are public ''elections,'' expenses of which validly may be defrayed from public funds—as did Waples v. Marrast, *supra;* and no question as to the power of the Legislature to prohibit a political party from excluding women from its primaries solely because of their sex, as does the present case. Upon what principle, then, can it fairly be said that those two cases, upon which our Chief Justice relies, control the present case?

Ashford v. Goodwin turned upon an issue as to the jurisdiction of a court; this case must turn upon a question of suffrage. That case involved the construction of a word inserted in an amendment, made in 1891, of an Article on a particular subject; this case involves the construction of a word used in 1876, in the original form of a different Article, on a different subject. It is true that in each instance the word is one the meaning of which is involved in this case; but that circumstance is unproductive, unless along with it goes the assumption that, in all instances, and regardless of the context, a given word means the same thing in every instance in which it is used in the same Constitution. And that is the very assumption upon which our Chief Justice and counsel for the tax collector base their insistence that Ashford v. Goodwin should control the answer to said certified question. But the unsoundness of that assumption is evident in the light of universally accepted canons of constitutional construction and of various decisions of this court. The assumption that ''elections'' in our suffrage clause means just what this court has declared it means in said jurisdictional clause, (Sec. 8), of our Judiciary Article is not maintainable except upon the untenable hypothesis that in each of those Articles the purpose of that word is the same; but, very clearly, they are not the same. The purpose and function of ''election,'' in said suffrage clause is restricted, solely, to a definition of qualifications of constitutional electors; whereas, the purpose and function of ''elections'' in said amendment of our Judiciary Article, (Art. V), is restricted, solely to a definition of jurisdiction of district courts. In Article V

"elections" is used in a *remedial* sense, requiring a liberal construction; in our suffrage clause, (Article VI), its use is restrictive of general legislative power, which fact renders the rule of liberal construction inapplicable.

The Ashford Case arose, not under Article VI of our Constitution, relating to suffrage," (as did the present case), but under Article V thereof, relating to the "Judicial Department," and, more particularly, under a section thereof, (Section 8), which deals, solely, with the *jurisdiction and powers of District Courts* and judges thereof. Very plainly the main function and purpose of that section of said Judiciary Article was something entirely separate and distinct from dealing with *qualifications for suffrage,* or with "elections" in relation to *who may vote therein,* or in relation to whether the voting shall be "by ballot" or otherwise.

The provision in Section 8, by which District Courts were empowered and required to take jurisdiction of and try "contested elections" was "remedial" only, in conception, in expression, and in legal effect. It is part of the public history of this State that the words "contested elections" were inserted, for the first time, in said Judiciary Article, in 1891, by amendment by the people at the ballot box, not to change the meaning of "election" as already embodied in the Suffrage Article, defining qualifications of voters, but for the express purpose of giving, for the first time, to District Courts indisputable authority to try contested election cases. As declared by this court in the Ashford Case, "prior to the adoption in 1891 of the amendment to Article 5 of the Constitution of this State the Legislature could not confer upon the District Courts authority to try contested elections. To remedy that defect section 8 of the amendment of Article 5 was adopted." And thereupon, in the Ashford Case, this court upheld the validity of a statutory provision placing within the original jurisdiction of District Courts "contests" of primary elections.

Viewing that decision even broadly, there is in it nothing clearly decisive, one way or another, of the certified question in the present case: and, when the opinion is examined closely, it is perfectly clear that of the two principles which declaredly controlled the decision in the Ashford Case only one can be applied, in any way, to said certified question; and neither of those principles was declared to be, in any sense or to any extent, the basis for the conclusion of our Chief Justice that said statute of 1918 is unconstitutional.

The one of those principles which is applicable to the present case is that it is the duty of this court to hold a statute *constitutional* "unless its invalidity be apparent beyond a reasonable doubt." That certainly was the main, as well as the first, ground of the decision in Ashford v. Goodwin. That principle was held sound, by the majority opinion in the present case, and formed an independent, but not the main, ground for the decision in this case. That

principle is declared by said dissenting opinion to be correct, abstractly, but *inapplicable to the present case.* Why is it not applicable?

The second and only other principle upon which this court rested its decision in the Ashford Case was that said provision of Section 8, conferring upon the District Court authority to try "contested elections," and the corresponding provision of the Act of 1909 putting that quoted clause of the Judiciary Article into operation, were "remedial" in their nature, and, for that reason, ought to be construed "liberally," in order that such suits might be tried out in the District Court. That principle is wholly inapplicable to the present case, in that the provision of our Constitution here directly involved, is not, in any *legal* sense, "remedial." Where the reason for a rule of constitutional construction fails there exists no occasion for application of the rule.

In support of that second controlling principle, this court, in Ashford v. Goodwin, cited and relied upon a noted Indiana case, State v. Hirsch, hereinabove mentioned, wherein a statute against the sale of liquor on "any election day" was held applicable to a primary election. The "remedial" purpose was to secure *purity in elections.* In that respect the decision in Ashford v. Goodwin was strikingly like that in the Pennsylvania case, Leonard v. Commonwealth, relied upon by our Chief Justice, and discussed hereinabove. The well settled rule in such matters is that a "liberal" construction should be given to "remedial" provisions of a Constitution or statute, in order to effectuate it general purpose. But in reason, and under the authorities, that rule is not fairly applicable where, (as in the present case), the effect would be *to impose limitations upon general legislative authority.* That distinction, (which said dissenting opinion ignores), is of grave importance in governmental affairs.

The mainspring in the decision by the Indiana court in the Hirsch Case, is found in its quotation from a distinguished lawwriter, (Endlich on Interpretation, Sec. 337), defining the above stated "liberal" rule of construction of "remedial" statutes. In the Ashford Case, in citing and following the 'Hirsch Case, this court declaredly treated that rule of construction as being properly applicable to "remedial" provisions of Constitutions, also—such as was the clause "contested elections" in 'Article V. The remedial effect of those words, *in that context,* is manifest in view of the fact that prior to the amendment by which they were inserted there, "contested election cases," (even when growing out of a "general election" provided for by the Constitution itself), had been declared by this court to be so far merely "political," (not partisan), in nature as to be matters not proper for judicial cognizance, and not within the then existing jurisdiction of the District Courts. Gibson v. Templeton, 62 Texas, 555, and cases therein cited.

Constitutional provisions conferring jurisdiction on courts of general jurisdiction are always construed liberally to avoid leaving the judicial system without a tribunal competent to take jurisdiction in matters of legislative enactment. State v. De Gress, 53 Texas, 387. In that case this court said:

"The clauses of the Constitution defining the jurisdiction of the district court should be liberally construed, with due regard to the fact that on this court, as the 'great reservoir' of jurisdiction, has heretofore devolved the body of litigation in this state. Especially may a narrow and literal construction be rejected, when the result is to leave no tribunal competent to take jurisdiction of important cases arising under legislative enactments."

As aptly quoted in Hamilton v. Davis, *supra*:

"It does not follow, either logically or grammatically, that because a word is found in one sense in one connection in a constitution, therefore the same sense is to be adopted in every other connection in which it occurs." Story on Constitution, Sec. 454.

But, (said dissenting opinion in the present case inquires), "is the same simple word in a constitution . . . to be broadly interpreted as found in one provision and narrowly interpreted as found in another provision? . . . If so, has it any certainty of meaning anywhere in the instrument? . . . This is more true of the words of a constitution, particularly the words of the most familiar character, as the word 'election' is." To that inquiry a specific and complete answer lies in the recent case of Aransas Co. v. Pasture Company, 108 Texas, 218, 191 S. W., 553, the opinion of this court therein being by the author of the dissenting opinion in the present case. In that earlier case the word "roads," as found in an amendment of our Constitution, (Sec. 52, Art. 3), was given a broader and more liberal meaning than had been ascribed to the same word in other Articles thereof, because, as our present Chief Justice there declared, "the purpose of the amendment was a broad one, its scope was large, its spirit liberal." Is not as much true of said amendment of Article V, concerning "contested elections?" But such amendments are not intended, and are never held, to change the meaning of the same word in *another Article*, dealing with a different subject matter, or an entirely different phase of even the same subject matter. In this instance, without conflict, each may have its full contemplated effect.

In the Ashford Case the court did say: "The language used in the Constitution, 'contested elections,' is broad enough to justify the construction placed upon it by the Legislature, and, there being nothing in the Constitution which limits the meaning of the words used, the Legislature did not exceed its authority in the enactment of the statute." However, as that opinion discloses, said declaration therein to the effect that the phrase "contested elections" is broad enough, *if taken literally,* to include contests of primary

elections, was in the nature of a predicate to support the application which this court there made of the hereinabove stated principle of "reasonable doubt," under which principle this court there held the statute then before it valid.

But the expression "there being nothing in the Constitution which limits the meaning of the words used," is now italicized by our Chief Justice as having been especially significant in that case, and as now furnishing effective support for his own dissenting opinion in this case. In weighing that remark in that case, and in appraising its value as applied to the certified question in this case, it must be remembered that this case deals directly with a clause of Article VI, which entire Article relates to "Suffrage" only—whereas that case dealt directly with a clause of Article V, which Article relates solely to the jurisdiction of the District Court. For aught that appeared in Ashford v. Goodwin, there might be in the Constitution several things which, either expressly or impliedly "limit," or materially affect, the historical meaning of "election" as that word is used in the suffrage provisions of Section 2, Article VI, which do not limit or affect the entirely different historical meaning of "contested elections" as used in the purely jurisdictional provisions of Section 8, Article VI. However, that possibility is denied in the statement of our Chief Justice that "neither is there anything in the Constitution which limits the meaning of the term 'election' as used in Section 2 of Article 6,"—the suffrage clause. But how about those hereinabove mentioned provisions of our Constitution, (Sec. 3, Art. VIII, and Sec. 52, Art. III), inhibiting the use of public funds for any other than "public purposes," which, as hereinabove stated, the author of that denial declared, (in Waples v. Marrast, supra), prohibit the use of such funds in payment of expenses of primary "elections," although, as expressly and very carefully there declared by him, expenses of general "elections" may be paid out of public funds? See, also, Beene v. Waples, supra).

Do not Sections 3 and 52, as so construed, heretofore, by those two unanimous decisions of this court, (and, for that matter, on their intrinsic and unambiguous meaning—aside from decisions), operate as a limitation upon the meaning which the Legislature is authorized to ascribe to the word "election" as used in our suffrage clause, "Section 2, of Article 6," as, for instance, when applied not to general elections or other governmental elections, but solely to purely party affairs? If not,—if "election" as used in Section 2 of Article 6 really "means, steadily and unfailingly, . . . all public elections in the State which the Legislature has power to establish and which it may provide by law," (as now declared by our Chief Justice)—the decision in Waples v. Marrast ought to have been diametrically opposite to what it was, and the Presidential

Primary Election Act of 1913 there held void, is legally, in force today.

Once before, in Hammond v. Ashe, 103 Texas, 503, 131 S. W., 539, too much was claimed as the intended legal effect of said decision in Ashford v. Goodwin, which had been decided just two weeks earlier. In that instance the same court which had rendered said earlier decision declared that it was not authority for the proposition that Section 10 of our Judiciary Article, (Art. V), guaranteeing the right of "trial by jury" in "all *causes* in the District Court" was applicable to "contests of primary elections;" although, in that earlier case, it had been held that such contests were within the original jurisdiction of that court pursuant to Section 8 of that same Article V as amended in 1891. The effect of those two practically contemporaneous decisions was to hold one section of that Article applicable and another section of that same Article inapplicable to contests of "elections" In each instance the election happened to be a primary election. Much less is said decision in Ashford v. Goodwin of controlling force in determining what meaning should be attributed to a word as used in the original and many years earlier draft of an entirely different Article dealing with a distinctly different subject-matter, to wit, "suffrage," instead of *jurisdiction of courts.*

In view of what has been said, hereinabove, it must be too clear for doubt that there is no real conflict between the decision in this case and the decision in Ashford v. Goodwin. But, if such conflict does exist, (as insisted by our Chief Justice), the decision in the present case has at least the merit of following the latest prior decision of this court directly involving the determinative principle, towit, Waples v. Marrast, *supra.*

Is it not barely possible that (as the original majority opinion in the present case assumed), the different provisions of our Constitution which were involved, respectively; in Graham v. Greenville, Ashford v. Goodwin, and Waples v. Marrast, all *supra,* and the present case, are all harmonious with one another, as are the decisions in all those cases, and that the only discordant note, throughout, in decisions of appellate courts in Texas, is that which is sounded in said dissenting opinion in this case?

As to Anderson v. Ashe, it simply followed Ashford v. Goodwin. However, in preparing the opinion of the Court of Civil Appeals in that Anderson Case, Chief Justice Pleasants, (who certified to this court the question in the present case), with true judicial discernment and caution expressly and very carefully limited in 1910 that decision of this court to a construction of the word "election as used in the Section of our Constitution above quoted"—which was Section 8 of Article V, providing a remedy in court theretofore denied, and not Section 2 of Article VI, prescribing qualifications for voters. Was there in 1910 in the minds of the members of

his court, then including, also, Associate Justices Reese and McMeans, the stated question which the Chief Justice of that court has certified to this court for answer? Even then they seemed to be impressed with the idea that inasmuch as the word "elections" in those separate Articles of our Constitution, (V and VI), were inserted therein, respectively, at different times, and for radically different purposes, they fairly might carry somewhat different shades of meaning, aptly corresponding to the essentially different functions which, respectively, they were designed to perform. Aransas Co. v. Coleman-Fulton Pasture Co., *supra;* Kelso v. Cook, 184 Ind., 173, 110 N. E., 987, Ann. Cases, 1918E, 68; School Dist. v. State, 173 S. W., 525; Schostag v. Cator, 151 Cal., 91 Pac., 502.

The dissenting opinion laments the consequences of the decision in the present case.

That dissenting opinion, if made operative, would strike down said statute of 1918; would uphold, as valid, the Act of 1913 providing for payment of expenses of certain primary elections out of public funds derived from taxation; and would open the doors of all party primaries to all who are entitled to vote in general elections—thereby destroying party organization and party usefulness in preserving clean and efficient government. The decision itself is one which leaves in force an enactment of a co-ordinate department of the government, forbidding, in purely party affairs, exclusive discrimination against women solely on account of their sex; which leaves unimpaired the former decisions of this court denying that public funds may be used to defray expenses of party primaries; and which restricts to adherents of that particular party participation in party primaries—thereby preserving the integrity of party organization and its benefits to the civil life of the commonwealth.

The dissenting opinion, in the construction of said Article VI, (which deals, exclusively with suffrage), would apply to Section 2 thereof, here under review, (which prescribes *qualifications* of voters in all elections with which that entire Article was intended to deal), a construction conflicting materially, in principle, with the construction which this court repeatedly has applied to said Section 4 of that Article, (which prescribes the *manner* in which such electors shall vote).

Moreover, the dissenting opinion would apply to "election" in said suffrage clause of Article VI a construction wholly inconsistent with section 52, article III and section 3 of article VIII of our Constitution concerning expenditure of public funds. In those two last mentioned respects the dissenting opinion is squarely in contravention of the well settled rule of construction that, if possible, any written instrument should be so construed as that every part thereof may stand and perform its own proper function and conserve its own particular purpose. But the decision of this court

in this case involves and presents no conflict whatever between different Articles or different Sections of our Constitution.

The dissenting opinion would overturn said earlier unanimous opinions of this court in Graham v. Greenville, in State v. Waxahachie, in Waples v. Marrast, and in Beene v. Waples; the decision itself is in perfect harmony with each of them, and not in conflict with any decision of this court.

The dissenting opinion conflicts, irreconcilably, with the decisions of nearly all courts of last resort in the United States which have passed upon the issue here presented; the decision itself agrees with them, applying, in the present case, the here pertinent and controlling principle.

The printed argument in support of said motion for a rehearing presents the view that, broadly, from a governmental standpoint, and inasmuch as women cannot vote in general elections, they should not be permitted to vote in even party primaries. Whatever might be the weight of such arguments in the estimation of the Legislature they cannot be considered here, because they do not affect the one purely legal issue which said certified question presents.

Much of the force of the argument for the tax collector has been spent on the contention that inasmuch as the nomination in a democratic primary in Texas is practically equivalent to a final election, the extension to women of the privilege of suffrage in primary elections is tantamount, *in law,* to giving women the right of suffrage in the general elections and in the special elections provided by our Constitution. If that contention were sound it would reduce the argument of counsel for appellee, on the main issue before us, to the extremity of saying that whenever the Democratic nomination shall be equivalent practically to an election such primary election law will be unconstitutional and void, but whenever the Democratic party and some other party shall become about evenly balanced, rendering such a nomination no longer equivalent in practice to an election, such primary election law will be constitutional and valid. Under that view the constitutionality of the statute here now in question is made to depend upon whether a nomination in the primaries is or is not practically equivalent to an election. Thereby the constitutionality of said statute is made to depend, from time to time, upon purely fortuitous circumstances, which is absurd.

Treating the required statutory pledge to "support the nominees of this primary," (R. S., Art. 3096), as a *legally* binding obligation to *vote* for them in the "general election," counsel for the tax collector contend, substantially, that inasmuch as our suffrage clause concededly prohibits women from voting in the general election, and inasmuch as the result of the general election is, practically, controlled by the result of the primary elections, the statute of 1918, which permits women to vote in party primaries, should be held invalid. The impelling idea seems to be that the general election law

and the primary election laws are statutes *in pari materia*, and, for that reason, should be construed together, and that, when so construed, the requirement in the earlier general primary election law that the participant in the primary shall be there pledged to "support" the nominees, shows, conclusively, that the Legislature, in enacting the general primary election law, contemplated that no one other than a qualified voter in the general election shall be permitted to vote in a primary election, and that said provision should have controlling effect, rendering said statute of 1918 practically inoperative and invalid. And therewith is coupled the suggestion of conflict between the statutory requirement that every voter in a primary election shall take such pledge of party fealty, and the statutory provision for punishment for voting in a primary election by one who is not qualified to vote in a general election.

As a whole, and in every part, that argument falls short of the single issue presented here by said certified question.

In the first place, (and as pointed out in the original opinion of this court in this case), freely conceding the moral effect of participation in party primaries, including such pledge of party fealty, such participation has, very clearly, no *legal* effect whatsoever upon the *status* of an elector or voter in a "general election," or upon the ballot of such voter cast therein in open contravention of such primary election obligation.

In discussing the party pledge required by the North Dakota primary election law of 1907, the Supreme Court of that State said: "Such pledge, at the most, merely created a moral obligation to fulfill the same. . . . It would seem that courts do not and cannot deal with merely moral obligations as distinguished from legal obligations. Their functions are restricted to the latter." State v. Blaisdell, 18 N. D., 31, 118 N. W., 141.

Such a ballot in the general election must be counted, regardless of any and all party obligations or promises, whether kept or broken. Consequently, in no proper *legal* sense can it be said, fairly, that participation, in a party primary, of those who are not qualified voters in the general election may affect either the validity or the result of such general election, and, consequently, is inhibited by our Constitution. Obviously that conclusion is sound in all instances, whether such nomination in a primary election be or be not equivalent, practically, to a final election. As to its constitutionality the *status* of a party primary is, at all times, a fixed quantity, regardless of the ebb and flow of political opinion.

In the second place, the supporting argument does not reach the marrow of the present question, which relates solely to *the power of the Legislature* to authorize women to vote in primary elections, rather than to the construction of those statutes. If it be conceded that by the terms of the general primary election statute none but males are allowed to vote in party primaries, the fact remains that

said statute of 1918 undertakes to confer that privilege upon women also; and certainly that later provision, to the extent of irreconcilable conflict, (if any), is of controlling force, and should be held *valid,* unless clearly *inhibited* by the Constitution itself. That proposition is wholly unaffected by any inconsistency, apparent or real, between those statutes growing out of failure of the Legislature to eliminate from the earlier statute the provision that the participant in the primary election shall be pledged to "support" the nominees of that primary.

Any and all questions concerning the legal effect of such party pledge, as related to votes of women in party primaries, are purely questions of *statutory construction,* and do not go to the authority of the Legislature to enact such statutes, and, consequently, do not reach the present issue as to the *validity* of said statute of 1918. Nor is that single issue controlled or affected by statutory provisions prescribing punishment for voting illegally; hence all suggestions on that score are, presently, inapplicable.

Contending that reasonable party tests may be applied, in party primaries, consistently with their purpose, and consistently with the application of the constitutional definition of "electors" to them, the argument in support of said motion challenges the view expressed in the original opinion of this court to the effect that application of the strict letter of our suffrage clause to party primaries would destroy them by admitting to participation therein all who are qualified to vote in the general election, regardless of their party views. Upon careful reconsideration of that feature the former conclusion of this court is considered sound, and supported by the better reasoning, as well as by many authorities, as hereinabove shown, although there are cases to the contrary.

The argument in support of said motion, (like said dissenting opinion), presents the view that inasmuch as "primary elections" are treated, everywhere, as being public "elections" in such sense and to such extent as to justify the enactment of laws extending over them the police powers of the State, (Baer v. Gore, 79 W. Va., 50, L. R. A., 1917B, 728, 90 S. E., 530; Hopper v. Stack, 69 N. J. L., 569, 56 Atl., 1; State v. Felton, 77 Ohio St., 554, 12 Ann. Cases, 65, 84 N. E., 85; Riter v. Douglass, 32 Nev., 400, 109 Pac., 444), they must be "elections" in contemplation of our suffrage clause. But are not elections of domestic corporations (both of stockholders and of directors), regulated *by statute,* and is not the police power of the State plainly applicable to them also? As well might it be held that, from said considerations, our suffrage clause is applicable to those corporation elections, with the legal result that no female stockholder and no non-resident stockholder may vote in them. Fairly the illustration may be extended to include certain fraternal and benevolent organizations.

The argument on said motion quotes, in its support, from 9 Ruling Case Law, p. 1074; but the excerpt is not in harmony with most of the pertinent decisions throughout the country.

Without giving due effect to the established rule that words in a Constitution speak as from date of their *original insertion* in the organic law, unless it be provided otherwise therein, the argument on said motion mentions various primary election measures which had been introduced in our Legislature prior to the amendment of our suffrage clause in 1902, and also our general primary election statute of 1895. Thereupon it is argued that said amendment ought to be treated by the courts as having been adopted in contemplation of "primary elections," with the legal result that at least from and after adoption of that amendment the word "election" in our suffrage clause should be held to include primary elections as well as general elections. But if it was, indeed, the purpose of the people, in adopting said amendment of 1902, thereby to change the historic meaning of "election" in that Article, (so as to make it include thenceforth, as that argument assumes, "primary elections" and "primary conventions"), is it not passing strange that they made therein no mention whatever of political parties, or of party affairs, or of "primary elections," or of "primary conventions?" A direct treatment, in the amendment, of the subject upon which, (appellee assumes), such contemplated change in meaning was to operate would have been more natural, more candid, more certainly efficacious, and decidedly more probable. Such direct and open language is customarily employed, in Texas and elsewhere, in amending Constitutions. Particularly is that true as to amendments in various States carrying provisions intended to include or affect primary elections.

Our suffrage Article, as originally adopted in 1876, in defining one class of qualified electors, used the language "who, at *any time* before an election, shall have declared his intention to become a citizen," etc. In 1896 that quoted language was changed to read "who, *not less than six months* before any election at which he offers to vote shall have declared his intention to become a citizen," etc. Obviously that change concerned only that *one class* of voters; and, even as to them, the only legal effect of the change was to extend to a date more anterior to the election the required declaration of intention.

The amendment of said suffrage clause in 1902 consisted, solely, in an *addition*, relating to *poll taxes*. Although affecting all classes of "qualified electors," (whatever that term may mean), that addition could not rationally have been designed to affect, as to anyone, the privilege of suffrage in any other respect. In each instance the proposed change was so understood by the people, and no ulterior or different purpose—such as extending to purely party

affairs the meaning of "election"—was reasonably in the minds of the people in voting upon such amendment.

To hold otherwise would be entirely unwarranted, and shockingly would violate all applicable rules of construction. According to common sense and fairness the meaning of "election," as it stands now in that suffrage clause, must be tested as of date of its original insertion in that section 2, in 1876, as assumed in said original opinion in this case, and also in said dissenting opinion. "Steadily and unfailingly," since 1876, it has meant just what it meant then.

This does not mean that words employed in a Constitution or statute ought never to be held to include any matter not actually within contemplation or knowledge of its makers at date of its adoption. On the contrary, it does sometimes happen that a certain word, whether in a statute or a Constitution, may be found to have been therein used in a sense broad enough to include things not then within human experience or knowledge; and especially is that true of words of generic import—such, for illustration, as "insurance," which may include classes of insurance not yet devised. People ex rel. Kasson v. Rose, Secretary of State, 174 Ill., 310, 42 L. R. A., 124, 51 N. E., 246. See also: South Carolina v. U. S., 199 U. S., 437, 50 L. R. A., 261, 26 Sup. Ct., 110, 4 Ann. Cases, 737; Spickerman v. Goddard, 182 Ind., 523, 107 N. E., 2, L. R. A., 1915C, 513. Just so, and consistently, the word "election," in our suffrage clause, being itself of generic significance, is, concededly, applicable to various kinds of elections which, it may be assumed, were not actually in contemplation of the makers of our Constitution when it was framed and adopted, *provided,* always, that each such included election be a *real and final election for some strictly and purely "governmental" purpose.* Just there the line of demarcation was clearly drawn in Waples v. Marrast, and in Beene v. Waples, *supra.* In many other States, as shown by numerous cases cited in said majority opinion in this case and hereinabove, that line has been so drawn as to make substantially similar suffrage clauses, include, in certain States, only such elections as were expressly provided for by their Constitutions, and in other States, (still more exclusively), only elections for "public officers" expressly provided by their Constitutions. In none of those instances was the word "elections" applied in its broad and etymological signification, as this court is urged to apply it in this case, and as our Chief Justice insists it should be applied. So, as applied to this case, the foregoing proposition as to the date from which the legal effect of "election" in our suffrage clause is to be considered means, simply, that the legal signification of "election" in that clause remains wholly unaffected by said amendments of that section 2.

Nor is there anything new in that idea. In Cox v. Robison, 105 Texas, 426, 127 S. W., 806, (the opinion being by our present

Chief Justice), this court, after tracing the history of "releases" and "owners" through successive Constitutions of this State, in order properly to construe those words, declared: "The re-adoption in a subsequent constitution of a provision found in the constitution that it supersedes is presumed to have been with a purpose not to change the law, and the use of the same language is presumed to have been with the same intent. Cooley, Const. Lim., 75; Muench v. Oppenheimer, 86 Texas, 568; State v. Board of Assessors, 35 La. Ann., 651."

In that cited Muench Case, this court, through Mr. Justice Gaines, applied the same rule as between amended section 8 of said Judiciary Article V, as amended in 1891, and unamended section 22 of that article; and by Judge Cooley's cited great work the same rule was thus extended to unchanged words of the same amended *Section* of a Constitution: "When a Constitution is revised or amended . . . if the new instrument re-enacts in the same words provisions which it supersedes it is a reasonable presumption that the purpose was not to change the law in these particulars, but to continue it in uninterrupted operation. This is the rule in the case of statutes. . . . Its application to the case of an amended or revised Constitution would seem to be unquestionable."

The attempt, in the argument on said motion, to break the force of the former decision of this court in Waples v. Marrast, *supra,* as applied to the present case, is labored and ineffectual. That argument concedes that the "purpose" of the election was there held to be of controlling force in determining whether two certain sections of our Constitution are or are not applicable to primary elections. Said argument does not explain why, (if at all), the same tests do not likewise properly determine whether another section of the same written instrument, (Sec. 2, of Art. VI),—our suffrage clause—is or is not applicable to primary elections.

That payment from public funds of expenses of primary elections "has no relation to the question" now before this court is asserted in said argument; but directly and strongly to the contrary was the opinion of the Supreme Court in Spier v. Baker, *supra,* cited in the brief of the tax collector, (and relied upon by our Chief Justice), wherein that feature of their system of laws, which was held permissible under *their Constitution,* was treated by the California court as *highly material* in determining whether primary elections were or were not within the meaning and legal operation of the word "elections" in their suffrage clause. See, also, Labauve v. Michel, 121 La., 374, 46 So., 430.

A careful re-examination of each of the cases cited in behalf of the tax collector fails to develop any sound reason for denying the authority of the Legislature validly to enact said statute of 1918.

The printed argument in support of said motion closes with comments of the President of a Woman's Suffrage Association of an-

other State concerning a decision of its Supreme Court construing an amendment of its Constitution, and an extract from an editorial comment of a leading newspaper of this State criticising the decision in this case and approving the dissenting opinion therein. Whatever may be the tenor of such matter in support of or against a decision of the court in a cause still pending, and whatever may be considered its intrinsic weight, the practice of embodying such matter in file papers, such as motions and arguments, is disapproved.

The pending issue has these two distinct phases:

1. As to reasonable doubt concerning the *power* of the Legislature validly to enact said statute of 1918.

2. On the merits of the issue—as to the *legal* meaning of ''election'' in our suffrage clause.

From what has been shown in the original majority opinion in this case, and herein, it must be evident that the two independent lines of inquiry and reasoning ultimately converge and blend into one common and indisputable conclusion that the statute of 1918 here under review ought not to be declared unconstitutional. In view of the judicial Texas history of the pending issue, and in view of the conflicting decisions of so many courts of other States, with so many dissenting opinions, thereon, the insistence, in said dissenting opinion in the present case, that said statute is *clearly* unconstitutional beyond a reasonable doubt,—that ''election,'' in our suffrage clause is so utterly unambiguous as not to admit of construction, seems not well founded: and, in view of the hereinabove cited applicable and controlling prior decisions of this court, reinforced as they are by so many strong decisions from other States, the solemn declaration by our Chief Justice that the decision in this case ''subverts the Constitution of this State and makes of it a vain and useless document'' seems, as Mark Twain termed the reports of his own death, somewhat exaggerated.

Fortunately, in answering the certified question, this court has not played the role of pioneer. Happily its own independent prevailing conclusions run, not counter to, but with, the thread of the great current of judicial decisions, in Texas and elsewhere.

The certified question is direct and searching. Its candid and dispassionate judicial answer rests in the normal and correct application of certain simple elementary and fundamental legal principles, and certain carefully wrought out and long established rules for the construction of Constitutions. Those elementary principles and those rules of construction are not vague, shadowy, indefinite, or unformulated, and, consequently, subject to varying and conflicting expression; they are substantial, concrete, of definite mold, of fixed and terse expression, of clear and unequivocal meaning. Those principles and rules, in the form of their expression, are almost as well established and generally accepted as are the fixed and universal

principles and rules of the arts and sciences or the elementary and constructive rules of mathematics. They stand approved by practically all text writers and courts. Consequently, in the statement of them there is no occasion for confusion or disagreement—no matter what differences may arise in applying them to the present issue.

Moreover, those applicable and controlling principles and rules of construction had assumed their present form of expression, and had attained, in the estimation of nearly all authorities, everywhere, the rank and dignity of immutable and universal principles of law, long before our Constitution was framed or adopted, and must, therefore, be assumed and treated by the courts as having been present in the minds of the members of the constitutional convention in framing that expression of our organic law, and also in the minds of the people of Texas in adopting it, thereby giving it vitality and power.

Inevitably, therefore, in construing and applying ambiguous provisions of that sacred instrument, such as its suffrage clause demonstrably is—a duty which, under our form of government rests, in the last analysis, upon this court—it is its highest and most important duty intelligently and tirelessly and faithfully to seek out and find, and unflinchingly to apply, such established applicable and controlling principles and rules of construction, and to determine the pending issue accordingly. In the original opinion of this court in this case, and again herein, that has been attempted, with identical results.

When so considered the certified question reasonably admits of none but a negative reply To that effect was the original decision: so it will not be disturbed. The motion is overruled.

Mr. Chief Justice PHILLIPS dissenting.

Opinion delivered
April 21, 1920.